**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| GENERAL CIGAR COMPANY, INC., | |
| Plaintiff, | |
| v. | CASE NO: |
| EMPRESA CUBANA DEL TABACO, D.B.A. CUBATABACO. | JURY TRIAL DEMANDED |
| Defendant. | |

Plaintiff General Cigar Company, Inc. ("General Cigar" or "Plaintiff") for its Complaint against Defendant Empresa Cubana del Tabaco, d.b.a. Cubatabaco ("Cubatabaco" or "Defendant"), alleges as follows:

### NATURE OF ACTION

1.     General Cigar seeks two forms of relief in this *de novo* action.  First, this is an appeal from a December 20, 2022 post-trial decision (the "Decision") of the Trademark Trial and Appeal Board (the "TTAB") in an *inter partes* cancellation proceeding (the "Proceeding") brought by Cubatabaco.  A copy of the Decision is attached as Exhibit A.  The Decision was adverse to General Cigar: it cancelled two U.S. trademark registrations (one issued in 1981 and the other in 1995) owned by General Cigar for the mark COHIBA used in connection with cigars (the "Registrations").[1]

---

[1] Under TTAB regulations, the order of cancellation is stayed during the pendency of this appeal.  *See* Trademark Trial and Appeal Board Manual of Procedure § 806.

2.      Congress allows a losing party in a TTAB *inter partes* registration decision to appeal by way of a *de novo* action in federal district court rather than an appeal to the Federal Circuit.  Section 21(b)(1) of Lanham Act, 15 U.S.C. § 1071(b)(1); 37 C.F.R. 2.145(c).  In such an action, all legal conclusions made by the TTAB are reviewed *de novo*, and the law applied is that of the Circuit where the district court sits (here, the Fourth Circuit).  The plaintiff in the action also is entitled to plead new related claims so that all disputes regarding cancellation of a registration can be decided in a single action.  General Cigar has opted to both appeal from the Decision and to obtain complete relief from Cubatabaco's attack on its Registrations by initiating this *de novo* action.[2]

3.      First, the Decision should be reversed for legal error, specifically the TTAB's failure to apply settled principles of preclusion.  At trial, Cubatabaco asserted five separate legal grounds for cancellation of General Cigar's COHIBA Registrations.  However, the TTAB found for Cubatabaco on only one of those grounds, arising under Article 8 ("Article 8") of the General Inter-American Convention for Trade Mark and Commercial Protection, 46 Stat. 2907 (the "Inter-American Convention" or "IAC").  The TTAB found, as facts, that Cubatabaco used a "Cohiba" mark for cigars in Cuba before General Cigar first applied to register that mark in the U.S., and that General Cigar had knowledge of the "use, employment, registration, or deposit" of that use before applying to register the COHIBA mark in the United States.  From these factfindings, the TTAB concluded as matters of law that General Cigar's registrations for COHIBA violated Article 8 of the IAC and that under U.S. law, a U.S. trademark registration may be cancelled on the basis of such a violation.  It therefore ordered cancellation of General Cigar's registrations "in due course."

---

[2] Venue in the Eastern District of Virginia is mandatory for this appeal, because Cubatabaco, the adverse party in the TTAB proceeding, is a foreign (Cuban) corporation.  15 U.S.C. § 1071(b)(4).

4.      However, years before the TTAB trial, Cubatabaco had already litigated and lost an identical claim for cancellation of the Registrations under Article 8 of the IAC.  Shortly after filing its petition in the Proceeding in January 1997, Cubatabaco sued General Cigar in the Southern District of New York, claiming that Cubatabaco, not General Cigar, owned the U.S. rights to the COHIBA trademark and that General Cigar's sales of COHIBA cigars were an "infringing" use (the "Federal Action").  Its complaint sought an injunction against General Cigar's sales of COHIBA-branded cigars and cancellation of the COHIBA registrations, and repeated the claims Cubatabaco asserted months earlier in the Proceeding.  *See Empresa Cubana del Tabaco d.b.a. Cubatabaco v. Culbro Corp., et al*, 97-cv-8399, (Dkt. No. 1) (S.D.N.Y. Nov. 12, 1997).[3]  The district court's power to decide the issue of cancellation in infringement litigation was concurrent and co-equal with the TTAB's power to decide that issue in cancellation proceedings.  *Compare* 15 U.S.C. § 1119 *with* 15 U.S.C. § 1067.  Congress gave the courts that power so that all disputes regarding a trademark, including the right of registrability , can be decided in one litigation.

5.      It was so obvious that the Federal Action would finally determine the dispute over the Registrations that Cubatabaco asked the TTAB to suspend the Proceeding, representing that the determination of the Federal Action "will be dispositive of all the issues in the instant Cancellation Proceeding, including the issue of entitlement to registration."  *Empresa Cubana del Tabaco v. General Cigar Co., Inc.*, 11 TTABVUE 1 (Nov. 25, 1997).

6.      One of Cubatabaco's claims in the Federal Action sought cancellation of General Cigar's registrations of the COHIBA mark on the basis of an alleged violation of Article 8 of the IAC.  This was the same cancellation claim that Cubatabaco had already asserted in the

---

[3] Culbro Corp. was a predecessor company to General Cigar.

Proceeding.  Cubatabaco then moved the federal court for partial summary judgment on this Article 8 issue, arguing that under the reasoning of prior TTAB decisions, Article 8 in itself provided basis for cancellation of a U.S. trademark registration.  However, the district court rejected this argument, and instead agreed with General Cigar that U.S. law does not recognize Article 8 as a basis for cancellation of a U.S. registration.  Its final judgment dismissed Cubatabaco's Article 8 claim with prejudice.  *See Empresa Cubana Del Tabaco v. Culbro Corp.*, 213 F. Supp. 2d 247, 282 (S.D.N.Y. 2002).  Cubatabaco cross-appealed from this aspect of the judgment to the United States Court of Appeals for the Second Circuit.  The Second Circuit affirmed the dismissal of the Article 8 claim and rejected Cubatabaco's other arguments for cancellation of the Registrations.  See *Empresa Cubana Del Tabaco v. Culbro Corp.*, 399 F. 3d 462, 483 (2d. Cir. 2005).  The United States Supreme Court then denied Cubatabaco's petition for certiorari.  *Empresa Cubana del Tabaco v. General Cigar Co.*, *Inc.*, 547 U.S. 1205 (2006).

7.     Given this final federal judgment, the doctrine of issue preclusion plainly barred Cubatabaco from relitigating its losing Article 8 claim in the Proceeding.  All elements of the doctrine were satisfied: Cubatabaco fully briefed and argued its Article 8 cancellation claim in the Federal Action; the Article 8 claim was decided against Cubatabaco by the district court judgment and was necessary to the judgment; and Cubatabaco had the opportunity to appeal from the judgment, which became final upon denial of certiorari review.

8.     This court should reverse the TTAB's decision and vacate its order of cancellation.  As General Cigar argued to the TTAB, as a matter of law, the final Federal Action judgment dismissing Cubatabaco's Article 8 claim precludes Cubatabaco from later asserting an Article 8 cancellation claim against the same registrations in the TTAB.  The Court should conclude that the TTAB committed legal error by sustaining, rather than dismissing, the Article 8 claim.

9.      Second, General Cigar seeks a final resolution to its 26-year-old trademark dispute with Cubatabaco over General Cigar's rights to own U.S. COHIBA registrations.  It therefore asks the Court to declare that Cubatabaco has no other legal basis for cancellation of General Cigar's COHIBA registrations and declare that General Cigar's COHIBA registrations are valid.

10.     At trial in the Proceeding, Cubatabaco argued a number of separate grounds for cancellation of the COHIBA registrations besides IAC Article 8, including fraud, abandonment, likelihood of confusion with a mark used by Cubatabaco in the U.S. under § 2(d) of the Lanham Act, 28 U.S.C. § 1052(d), and misrepresentation under §14(3) of the Lanham Act, 28 U.S.C. § 1064(3).  General Cigar's brief argued that the law required dismissal of all of these cancellation claims, and that Cubatabaco had failed to sustain its burden of proof on the likelihood of confusion brand of its § 2(d) claim.  The TTAB, however, decided only Cubatabaco's Article 8 claim, and did not consider any of Cubatabaco's other claims or conduct any fact-finding other than that related to the Article 8 claim.

11.     A plaintiff taking a *de novo* court appeal from a TTAB decision may assert additional claims that are related to the mark in dispute.  15 U.S.C. § 1071(b)(1).

12.     Therefore, General Cigar seeks a declaration that Cubatabaco cannot prevail on any of the cancellation grounds asserted at the TTAB trial.  Cubatabaco's 26-year long attack on General Cigar's lawful COHIBA trademark registrations has already consumed much party and judicial time and expense.  Unfortunately, reversal of the Decision alone may not end the dispute: even then Cubatabaco could try to return to the TTAB and seek to reargue its unaddressed trial claims for cancellation.[4]  If it succeeded in having the TTAB hear those grounds and prevailed at a second trial, General Cigar would appeal by a new *de novo* action in this Court.

---

[4] General Cigar reserves the right to argue, if necessary, that the Lanham Act does not permit a remand from federal court to the TTAB.

13.     Fortunately, this winding road can be bypassed here.  The provision of the Lanham Act that authorizes General Cigar to bring this civil action in federal court also authorizes it to assert additional claims related to the disputed mark(s) so that all such disputes can be decided in one action.  *See Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 109 USPQ2d 1291, 1295 (4th Cir. 2014).  General Cigar asks the Court to issue a declaratory judgment finding that Cubatabaco cannot assert such claims because they are either (a) precluded or otherwise legally barred, or (b) Cubatabaco cannot sustain its burden of proof on those claims.  There can be no dispute that a real, ongoing controversy between Cubatabaco and General Cigar regarding each claim exists, and clouds General Cigar's trademark rights, in a way sufficient to authorize the granting of relief under the Declaratory Judgments Act.   Counts II-V of this Complaint specify the basis for granting declaratory relief against each claim.

## PARTIES

14.     Plaintiff General Cigar Company, Inc. is a Delaware corporation with a principal place of business at 2100 East Cary Street, Suite 200, Richmond, Virginia, 23223.

15.     General Cigar, founded in 1906, is one of the world's foremost manufacturers and marketers of premium, hand-made cigars.

16.     General Cigar is the owner of two United States trademark registrations: (1) an incontestable registration for the standard word mark COHIBA for cigars, issued by the United States Patent and Trademark Office ("USPTO") on February 17, 1981, as U.S. Reg. No. 1,147,309; and (2) a registration for the stylized mark **COHIBA**, issued by the USPTO on June 6, 1995, as U.S. Reg. No. 1,898,273.  These two registered marks are referred to collectively herein as the "COHIBA Marks" and the two registrations are referred to collectively herein as the "Registrations."  The Registrations are appended to this Complaint as Exhibits B-C.

6

17.     Since February 1978 (with a hiatus in shipments to distributors and retailers between 1987 and November 1992), General Cigar, including through its predecessor the Culbro Corporation, has exclusively used and enforced the Registrations in the United States and its territories in connection with the sale and offering of cigars made of non-Cuban tobacco in the U.S.  General Cigar sells its COHIBA cigars to approximately 3,500 wholesalers and retailers, who in turn sell the cigars to U.S. cigar consumers.  Since 1997, when General Cigar converted the COHIBA to a "super-premium" cigar brand, it has sold millions of COHIBA cigars in the U.S., earning revenues from COHIBA sales exceeding $100 million.  Since 1997, General Cigar has spent in excess of $10 million in advertising and promoting COHIBA cigars to American cigar smokers and millions of dollars more in enforcing the Registrations.  For example, General Cigar has sued infringers and worked with U.S. customs authorities to bar entry of counterfeit COHIBA cigars into the U.S.

18.     Defendant Empresa Cubana del Tabaco d.b.a. Cubatabaco is a Cuban company established by Cuban Law No. 1191 of 1966 and is organized under the laws of Cuba with its principal place of business in Havana, Cuba.

19.     Upon information and belief, Cubatabaco is the Cuban state tobacco monopoly. Upon information and belief, Cubatabaco and a sister company, Habanos S.A., have sold "Cohiba"-branded cigars of Cuban origin, exclusively outside of the U.S.  Under the Cuban Asset Control Regulations promulgated by the United States pursuant to Section 5(b) of the Trading with the Enemy Act of 1917 (the "Cuban Embargo")), and subsequently codified by the LIBERTAD Act (22 U.S.C. § 6021 *et seq*.), Cubatabaco is legally barred from selling or advertising any Cuban-origin cigar in the U.S., including its "Cohiba"-branded cigars.  Neither Cubatabaco nor Habanos S.A. has *ever* sold a "Cohiba"-branded cigar in the U.S.  Moreover, Cubatabaco cannot reasonably

expect to be able to legally sell "Cohiba"-branded cigars at any foreseeable point in the future due to the Cuban Embargo.

## JURISDICTION AND VENUE

20.     This is an action arising under the Lanham Act, 15 U.S.C. § 1051 *et seq*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

21.     This Court has subject matter jurisdiction: (a) under 15 U.S.C. §§ 1119 and 1121, in that this is an action involving a mark registered under the Lanham Act; (b) under 28 U.S.C. §§ 1331 and 1338(a), in that this matter involves an action arising under the laws of the United States, and arises under the federal Lanham Act; (c) 15 U.S.C. § 1071(b)(1), in that this action is a civil action seeking review of a TTAB decision; and (d) under 28 U.S.C. §§ 2201 and 2202, because General Cigar seeks a declaration of rights regarding an actual case and controversy between the parties.

22.     Because Cubatabaco resides in Cuba, a foreign country, and was the adverse party in the TTAB proceeding, this Court has personal jurisdiction over Cubatabaco under 15 U.S.C. § 1071(b)(4).

23.     Venue is appropriate in this District and Division under 28 U.S.C. §§ 1391(b)(3) and (c)(3), and mandatory in this District because Cubatabaco does not reside in the United States and is subject to the personal jurisdiction of this Court.  15 U.S.C. § 1071(b)(4).

## FACTS COMMON TO ALL CLAIMS

### A.      The Cuban Embargo

24.     By law and regulation, cigars of Cuban origin, including the "Cohiba" cigar which, upon information and belief, Cubatabaco sells in other countries, may not be sold or advertised in the U.S.

25.     In 1963, the United States Government issued regulations substantially prohibiting commerce between the U.S. and Cuba, which are commonly known as the "Cuban Embargo."  The Cuban Embargo prohibits person(s) subject to U.S. jurisdiction from transporting, importing, or otherwise dealing in or engaging in any transaction with respect to merchandise that is either: (i) of "Cuban origin"; (ii) located in or transported from or through Cuba; or (iii) made or derived in whole or in part of any article which is the growth, product, or manufacture of Cuba.  *See* 31 C.F.R. §§ 515.101, *et seq*.  Because cigars made with Cuban-grown tobacco fall within this ban, it has been illegal for the last sixty years for such cigars to be imported into or sold in the U.S.

26.     In 1996, Congress codified the Cuban Embargo in the Cuban Liberty and Democratic Solidarity Act of 1996 (the "LIBERTAD Act").  *See* 22 U.S.C. § 6021, *et seq*., including specifically § 6032(h) ("Codification of economic embargo").

**B.      Parallel Brands in the U.S. Cigar Industry**

27.     After the Fidel Castro regime came to power in Cuba in 1960, the Cuban government expropriated existing cigar businesses, taking possession of their businesses and assets (including their intellectual property), and ousting their owners.

28.     Many expropriated cigar owners and their families fled to countries like the United States or the Dominican Republic to reestablish their cigar businesses.  They resumed manufacturing and selling cigars in the U.S. using non-Cuban tobacco, while using the same trademarks and trade dress they had exploited in Cuba.

29.     The U.S. courts rejected suits by the Cuban government seeking to prohibit the exiled Cuban owners from using their trademarks and trade dress.  *See, e.g.*, *F. Palicio y Compania v. Brush*, 256 F. Supp. 481, 487-88, 150 USPQ 607, 611-12 (S.D.N.Y. 1966), *aff'd*, 375 F.2d 1011

(2d Cir. 1967); *Menendez v. Faber, Coe & Gregg, Inc.*, 345 F. Supp. 527, 552, 174 USPQ 80, 85 (S.D.N.Y. 1972).

30.     Many of the exiled Cubans later sold their cigar businesses and associated trademarks to existing U.S. cigar manufacturers, including General Cigar's predecessor-in-interest Culbro Corporation.  General Cigar and its competitors have continued to sell non-Cuban cigars in the U.S. using the marks and often the trade dress of the original Cuban brands.

31.     In the meantime, Cubatabaco (the Cuban state tobacco monopoly), through its licensees and distributors, began selling outside the U.S. Cuban cigars, using the same marks and trade dress that they had expropriated from the original owners.

32.     This phenomenon of "parallel brands" is a peculiar feature of the cigar market and well-known to U.S. premium cigar consumers.  There are dozens of cigar brands that are sold exclusively in the U.S. (and its territories) by entities unaffiliated with Cuba using non-Cuban tobacco, while those same cigar brands are sold outside the U.S. exclusively by Cubatabaco and its licensees (i.e., Habanos S.A.) using Cuban tobacco.  Some of these cigar brands include some of the most well-known premium cigars sold in the U.S., including Montecristo, Partagas and Romeo y Julieta.  Although the Cohiba mark did not originate until after Fidel Castro came to power, Cohiba is also regarded in the U.S. as a parallel brand, since non-Cuban cigars under that mark are sold in the U.S. by General Cigar, and Cuban cigars under the mark are sold in other countries by Cubatabaco and its licensees.

C.     **The Premium Cigar Industry**

33.     The U.S. cigar market is broadly divided into the following two cigar segments: (1) mass-market cigars, which are machine-made; and (2) premium cigars, which are hand-rolled

typically with all-natural long filler tobacco, then wrapped in a tobacco leaf known as "wrapper" tobacco.

34.    The filler in premium cigars is typically "long leaf", meaning that the strips of tobacco are the same length as the cigar itself, whereas the filler in machine-made cigars is typically shredded, lesser quality tobacco.

35.    Premium cigars are prized among U.S. cigar consumers and are therefore sold at a significantly higher price point than mass-market cigars.  The lowest priced premium cigars are sold at retail for at least $5.00 per cigar, although many premium cigars are sold at retail above $10.00 per cigar.  Machine-made cigars, however, can retail for less than $1.00 per cigar.

36.    Premium cigars suffered from a drastic and sustained decline starting in the mid 1960's.  It is estimated that between the mid-1960's and the early 1990's, consumption of cigars in the U.S. declined by approximately 66%.  Cigar magazine *Cigar Aficionado* later stated that by 1992, "American cigar consumption was spiraling to all-time lows."

37.    However, towards the end of 1992 there was a sudden and dramatic improvement in the U.S. cigar market, which became known as the "cigar boom."  In fact, by 1996 imports of premium cigars in the U.S. nearly tripled that of 1992.

**D.    General Cigar's Adoption, Use, and Prosecution of the COHIBA Marks**

38.    General Cigar sells many brands of cigars and from time to time introduces new brands that it hopes will appeal to U.S. cigar consumers.

39.    In February 1978, General Cigar decided to adopt "COHIBA" as a brand for a new cigar.  At that time, a General Cigar official had heard second-hand that U.S. State Department official had been given a cigar called "Cohiba" by Cuban officials.  General Cigar had no knowledge of whether  Cohiba-labeled Cuban cigars were being sold.

40.     Consistent with common practices of trademark owners in 1978, General Cigar, in February and June 1978, shipped boxes of mass-market cigars labeled "COHIBA" to retailers, who then sold the cigars to the public.  After making the first of these shipments, General Cigar, on March 13, 1978, filed an application to register the "COHIBA" word mark with the USPTO. The mark was published for opposition on November 4, 1980, and the USPTO issued a registration for the mark on February 17, 1981 as U.S. Reg. No. 1,147,309.  This Registration is sometimes referred to in this Complaint as the "First Registration."

41.     Between 1978 and 1982 General Cigar shipped thousands of COHIBA-branded cigars to its retailers.  The number of cigars shipped increased substantially beginning in 1982, when General Cigar began to use the COHIBA mark on its pre-existing Canario D'Ono "upscale bundle" premium cigar, manufactured in the Dominican Republic.  General Cigar also provided in-store advertisements for its COHIBA cigars between 1982-1987.

42.     Specifically, between 1982 and 1987 General Cigar shipped COHIBA-branded cigars in the following amounts: (i) 1982 (November and December): 90,000; (ii) 1983: 323,000; (iii) 1984: 118,000; (iv) 1985: 70,000; (v) 1986: 5,000; and (vi) 1987: 3,000.  While General Cigar always intended to relaunch COHIBA as a brand for a high-end premium cigar, the ever-declining state of the cigar market did not allow it to launch of a new premium branded cigar during this period.

43.     On July 16, 1986, General Cigar filed in the USPTO a Declaration under Sections 8 and 15 of the Trademark Act seeking "incontestability" status for its COHIBA mark registered in the First Registration.  The Declaration stated, among other things, that: (i) the mark was still in use by General Cigar; and (ii) the mark was in continuous use in interstate commerce by General

Cigar for five consecutive years from February 17, 1981 to July 16, 1986, in connection with cigars.

44.     At the time this Declaration was filed, General Cigar had made continuous sales of a COHIBA-branded cigar from 1978 to retailers, who in turn sold those cigars to the public. General Cigar believed that it made a continuous commercial use of the COHIBA mark during the five-year period stated in the Declaration and had received legal advice from its trademark counsel that its use qualified as "continuous use" as declared in the Section 8 & 15 Declarations. General Cigar thus believed the statements regarding use in its Declaration to be truthful.

45.     However, the U.S. premium cigar market continued to decline and by 1987, General Cigar had concluded that it should temporarily discontinue sales of the COHIBA cigar until market conditions improved and the COHIBA could be relaunched. It resumed sales of a COHIBA cigar in November 1992, a few months after the U.S. "cigar boom" began.

46.     The evidence presented by General Cigar to the TTAB showed that General Cigar never intended to abandon its mark during the 1987-1992 period, including: (i) internal strategy discussions throughout the period about converting the COHIBA from a "bundled" to a super-premium cigar, to be sold in wooden boxes as one of General Cigar's primary cigars; (ii) discussions with outside counsel starting in April 1989 (and lasting until 1992), whether General Cigar could relaunch a COHIBA-branded cigar using the Cuban Cohiba trade dress; (iii) its decision not to include COHIBA in a list of over 30 cigar trademark registrations that would not be renewed; and (iv) its continued enforcement of the registered COHIBA mark against third-party infringers.

47.     In November 1992, at the very beginning of the "cigar boom," General Cigar promptly resumed substantial sales of a COHIBA-branded cigar, shipping the following quantities

to cigar merchants: (i) 1992: 5,600; (ii) 1993: 50,000; (iii) 1994: 49,000; (iv) 1995: 101,000; (v) 1996: 96,000; and (vi) 1997 (for the first three months): 27,000.

48.     This COHIBA cigar was a "transitional" premium cigar sold through two national cigar retailers, Alfred Dunhill and Mike's Cigar's.  It was General Cigar's intention to use the COHIBA mark for a "super-premium" cigar; however, such a cigar, which would use aged tobaccos, required time to develop, and business conditions had only just begun to improve. Moreover, the cigar boom had caused a worldwide shortage of available aged premium non-Cuban tobacco, so General Cigar could not have satisfied market demand for a new super premium COHIBA.

49.     On December 30, 1992, General Cigar filed a second application with the USPTO to register a stylized version of the COHIBA mark under 15 U.S.C. §1051(b), citing a first use in commerce date in another form dating back to February 1978.  The application was published for opposition on April 12, 1994, allowed on July 5, 1994, and after General Cigar filed specimens of use on June 5, 1995, the USPTO registered General Cigar's stylized COHIBA mark on June 6, 1995, as U.S. Reg. No. 1,898,273.  This Registration is sometimes referred to below as the "Second Registration."

50.     By 1996, aged premium non-Cuban tobacco supplies had become more available. Accordingly, General Cigar prepared a marketing plan for 1997 that set forth General Cigar's plan to release a new super-premium COHIBA-branded cigar at the 1997 Retail Tobacco Dealers Association (RTDA) convention.  General Cigar did not plan to market its new COHIBA cigar as having a Cuban connection, but instead focused on evoking a sophisticated "1950's-style" lifestyle mood.

51.     General Cigar also developed and marketed a new, distinctive trade dress for the super-premium COHIBA launch featuring a red dot in the middle of the "O" of COHIBA, which was used on the cigar band and box.  The cigar bands and boxes created by General Cigar included states of origin for the country of manufacture (*e.g.*, Dominican Republic, Honduras, Nicaragua). Ultimately, General Cigar has launched a host of COHIBA sub-brands (a common practice in the premium cigar industry), to allow it to reach different segments of the U.S. premium cigar consumer market; the sub-brands include (i) COHIBA Red Dot; (ii) COHIBA Black; (iii) COHIBA Macassar; (iv) COHIBA Nicaragua; (v) COHIBA Luxury Selection; (vi) COHIBA Blue; (vii) COHIBA Royale; (viii) COHIBA Spectre; (ix) COHIBA Connecticut; and (x) COHIBA Silencio.

52.     Since 1997, when General Cigar first released COHIBA as a super-premium cigar General Cigar has sold over one hundred million dollars' worth of COHIBA cigars in the U.S. and has spent over ten million dollars marketing the COHIBA cigar to U.S. customers.

53.     General Cigar has also spent millions of dollars in legal fees enforcing its exclusive ownership of the COHIBA Marks against infringers and counterfeiters.  For example, General Cigar has filed numerous lawsuits against counterfeiters and has worked with the United States Customs and Border Protection Agency to seize counterfeit COHIBA cigars, boxes, ashtrays, lighters, and cigar cutters.

**E.     Cubatabaco's Alleged Use, Adoption, and Registration of a Cohiba Mark.**

54.     Upon information and belief, on or about September 28, 1969, Cubatabaco filed an application in Cuba with the Oficina Cubana de la Propiedad Industrial for the below logo for a stylized design of an Indian head dress and "Cohiba" as a verbal element in connection with cigars.



55.     Upon information and belief, on May 30, 1972, a registration issued for this logo for Cohiba cigars with the Cuban Registration No. 1,110,044.

56.     Upon information and belief, Cubatabaco never made a commercial use of this logo in connection with its Cohiba cigars, and when this Registration was up for renewal in 1987, Cubatabaco failed to renew it, abandoning this registration.  General Cigar was never aware that Cubatabaco made a commercial use of this mark.

57.     Upon information and belief, on March 6, 1972, Cubatabaco filed an application in Cuba with the Oficina Cubana de la Propiedad Industrial for the word mark "Cohiba" in connection with tobacco, cigars, cigarillos, and other cigar related categories.  Upon information and belief, the Cuban trademark authorities issued a registration for that mark on June 30, 1980 under Cuban Registration No. 1,111,059.  Under Section 44(d) of the Lanham Act, 15 U.S.C. § 1126(d), Cubatabaco could have obtained priority in the United States had it filed an application to register the "Cohiba" mark within six months of filing its Cuban registration in 1972, but it chose not to avail itself of the rights provided to foreign mark owners by U.S. law.

58.     Upon information and belief, Cubatabaco filed an application to renew this registration on July 1, 1996.  However, under Cuban law, that renewal was not timely. Consequently, upon information and belief, Cubatabaco abandoned the Cuban "Cohiba" mark as of January 1, 1996.  Cubatabaco, therefore, did not own any registered "Cohiba" mark in Cuba at the time it sought to register that mark in the U.S. or at the time it petitioned the TTAB to cancel General Cigar's Registrations.

59.     Upon information and belief, as early as July 1983, Cubatabaco discussed with its outside counsel the possibility of registering the "Cohiba" word mark in the U.S.  However, upon information and belief, by August 1984, Cubatabaco learned that General Cigar had registered the COHIBA mark in the U.S.

60.     Cubatabaco's conduct for the next twelve years indicated that it knew it had no right to register a Cohiba mark in the U.S. and demonstrates laches.  Upon information and belief, between 1985 and 1996, Cubatabaco filed eighteen trademark registrations in the U.S. for other cigar marks, but did not file any application to register the Cohiba mark.  During this period, Cubatabaco also engaged and consulted with U.S. trademark attorneys about protecting its intellectual property rights in the U.S.

61.     Upon information, in 1987, Cubatabaco learned that General Cigar had filed a Declaration of Use and Incontestability under Sections 8 and 15 of the Lanham Act for the First Registration in 1986, and discussed challenging General Cigar's rights to the COHIBA trademark in the U.S.  However, it chose not to take any action against General Cigar's registered rights.

62.     In the early 1990s, General Cigar representatives had several interactions with Cubatabaco's representatives, in which Cubatabaco indicated that it did not object to General Cigar owning and registering the COHIBA Marks in the U.S.

63.     For example, in November 1992, counsel for General Cigar met with an in-house attorney for Cubatabaco, and the latter acknowledged that General Cigar owned the COHIBA name in the U.S., but stated that Cubatabaco would object if General Cigar used the trade dress associated with Cubatabaco's Cohiba cigar (General Cigar has never used such a trade dress).  The Director of Cubatabaco also told the General Cigar counsel that trademarks are not important to

Cubatabaco.  The Director indicated that when the Cuban Embargo ended, Cubatabaco expected that companies in the U.S. with Cuban-origin cigar marks would have to sell the marks back to Cubatabaco and get distribution rights or else Cubatabaco would just sell cigars under a new name. In 1993, the same Director said in an interview that "We are not going to fight with somebody else because he owns the brand name of Cohiba or Montecristo in America.  We have been living without that for a long time."

64.     In 1993, Cubatabaco received samples of General Cigar's COHIBA cigars, but it did not file an opposition to General Cigar's Second Registration when it was published for opposition in April 1994 or then seek to cancel the First Registration.

65.     Not until a decade after becoming aware of General Cigar's use and registration of the COHIBA mark in the United States, did Cubatabaco change its mind and legal tactics.  On January 15, 1997, Cubatabaco filed an application in the U.S. to register a stylized Cohiba word mark in connection with tobacco, cigars, and other cigar-related goods.  Registration was initially refused by the USPTO on the basis of General Cigar's prior Registrations, and the application has been suspended pending the resolution of the resolution of the cancellation proceeding concerning the COHIBA Marks.  Obviously anticipating that registration would be refused by the USPTO on the basis of General Cigar's senior Registrations, Cubatabaco, on the same day it filed its application, January 15, 1997, also filed a petition in the TTAB to cancel General Cigar's Registrations.

66.     Cubatabaco has never used its Cohiba mark in commerce in the United States.

## COUNT I (concerning the First and Second Registrations)

### REVIEW AND REVERSAL OF THE TTAB DECISION AND VACATUR OF THE TTAB'S CANCELLATION ORDER
### (15 U.S.C § 1071(b)(1) AND 37 C.F.R. § 2.145)

67.     Count I seeks review of the TTAB Decision (attached hereto as Exhibit A), reversal of that decision for legal error, and vacatur of the TTAB's order of cancellation.  General Cigar repeats and realleges the allegations of Paragraphs 3-8 and 38-66 as though fully set forth herein.

68.     Because the TTAB erroneously failed to give the judgment in the Federal Action preclusive effect, it is necessary to summarize elements of the procedural history of the Federal Action.  General Cigar reserves the right to supplement these facts during the action.

69.     On January 15, 1997, Cubatabaco filed an application in the USPTO to register the mark COHIBA in its own name under Section 44(e) of the Lanham Act, 15 U.S.C. § 1126(e), based only on its 1980 registration in Cuba (Reg. No. 1,111,059).  However, Cubatabaco also was aware that General Cigar already owned two Registrations for COHIBA and that the Trademark Examiner would therefore refuse registration under § 2(d) of the Lanham Act.  Ultimately, registration was refused by the USPTO based on General Cigar's Registrations.

70.     On the same date, January 15, 1997, Cubatabaco launched an effort to destroy General Cigar's registered U.S. rights, by filing a cancellation petition in the TTAB (the "Petition") and thereby commencing the Proceeding.  Among the grounds for cancellation cited in the Petition was that General Cigar allegedly applied to register the COHIBA mark in the U.S. with knowledge of Cubatabaco's use of a Cohiba mark in Cuba, which Cubatabaco claimed was a violation of Article 8 of the IAC (1 TTABVUE 9-12, First and Second Grounds).

71.     On November 12, 1997, Cubatabaco commenced the Federal Action in the U.S. District Court for the Southern District of New York.  Its federal complaint (the "Federal Complaint") alleged that Cubatabaco had priority of use of the mark in the U.S. under the so-called "famous marks" doctrine and thus owned the mark, making General Cigar's use of the mark to sell cigars infringing.  Cubatabaco also sought cancellation of General Cigar's two COHIBA

registrations.  The Third Claim for Relief of the Federal Complaint alleged that General Cigar's

use and registration of the COHIBA Marks violated violation of Articles 7 and 8 of the IAC.[5]  *See*

*Empresa Cubana del Tabaco d.b.a. Cubatabaco v. Culbro Corp., et al*, 97-cv-8399, (Dkt. No. 1)

¶¶ 49-52 (S.D.N.Y. Nov. 12, 1997).  The Federal Complaint did not allege that Cubatabaco's treaty

rights under Article 8 of the IAC were enforceable in the U.S. only through a statutory provision

of the Lanham Act.

72.  On November 25, 1997, Cubatabaco moved to suspend the Proceeding in favor of

the Federal Action and represented to the TTAB that "[t]he determination of this pending [federal]

action will be dispositive of all of the issues raised in the instant Cancellation Proceeding, including

the issue of entitlement to registration."  Cubatabaco's motion was granted, and the Cancellation

Proceeding was suspended.  Cubatabaco thus made a deliberate litigation decision to pursue all of

its cancellation grounds in federal court rather than in the TTAB.

73.  In 2001, Cubatabaco moved for partial summary judgment in the Federal Action,

asking the district court to cancel the Registrations on, among other grounds, Articles 7 and 8 of

the IAC.  Cubatabaco argued that General Cigar had used and registered the COHIBA mark for

cigars with knowledge that Cubatabaco made prior use of that mark on cigars in Cuba, and that

under Section 8, Cubatabaco had priority to register the COHIBA mark in the U.S.  General Cigar

opposed this motion, arguing that any right under the IAC may only be enforced through the

Lanham Act, and that the Lanham Act did not encompass Article 8 of the IAC.

74.  The district court rejected Cubatabaco's argument and accepted General Cigar's

argument.  It found that under Second Circuit precedent (*Havana Club Holding S.A. v. Galleon*

*S.A.*, 203 F.3d 116 (2d Cir. 2000)), rights under the IAC may be enforced in the U.S. only if Section

---

[5] Cubatabaco also asserted claims under Articles 20 and 21 of the IAC, but these were dismissed by the District Court and were not reasserted by Cubatabaco at trial in the Proceeding.

44(h) of the Lanham Act (15 U.S.C. § 1126(h)) makes them enforceable, and that this could occur only an IAC provision was "related to the repression of unfair competition." It concluded that the rights created under Article 8 of the IAC are not related to the repression of unfair competition, and therefore cannot be used to cancel a U.S. trademark registration. The court also noted that a contrary ruling would allow foreign mark owners to avoid compliance with Section 44(d) of the Act, the statute in which "Congress specifically carved out how owners of trademarks registered in other countries may obtain a U.S. registration." 213 F. Supp. 2d at 282. The district court thus dismissed Cubatabaco's IAC claims.

75.     On March 26, 2004, following a bench trial on the remaining claims, the District Court ruled that Cubatabaco had obtained priority over General Cigar's Registrations in the U.S. under the "famous marks" doctrine and that Cubatabaco had established a likelihood of confusion under § 2(d) of the Lanham Act. It thus sustained Cubatabaco's claim for infringement under § 43(a) of the Lanham Act.

76.     On April 30, 2004, the District Court issued a final judgment enjoining General Cigar from further use of the COHIBA Marks and ordering the Registrations to be cancelled.

77.     General Cigar appealed from the portions of the final judgment that favored Cubatabaco, including the District Court's cancellation order, to the Second Circuit. Cubatabaco cross-appealed from, *inter alia*, the district court's dismissal of its IAC claims.

78.     On February 24, 2005, the Second Circuit issued an opinion reversing the district court judgment to the extent it granted relief in Cubatabaco's favor, but affirming that court's dismissal of, *inter alia*, Cubatabaco's IAC claims. It held that "we hold today that General Cigar, not Cubatabaco, owns the COHIBA trademark in the United States." *Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d 462, 479 n.9 (2d Cir. 2005). With regard to Cubatabaco's claims under

Articles 7 and 8 of the IAC, the Second Circuit held that "We agree with the District Court that Cubatabaco cannot assert claims under Articles 7 and 8 pursuant to Section 44(h) of the Lanham Act because Articles 7 and 8 do not relate to the repression of unfair competition," and that "[t]he District Court properly dismissed" the IAC claims. *Id.* at 483. The Second Circuit agreed with General Cigar that Congress "implement[ed] treaty rights regarding priority of foreign registrants," through Lanham Act §44(d). *Id.*

79.    Cubatabaco petitioned the U.S. Supreme Court for a writ of certiorari.  Its petition asked the Court to review, *inter alia*, the Second Circuit's affirmance of the dismissal of its claims under Articles 7-8 of the IAC.

80.    On June 19, 2006, the Supreme Court denied Cubatabaco's writ of certiorari petition, resulting in a final judgment. *Empresa Cubana del Tabaco v. General Cigar Co., Inc.*, 547 U.S. 1205 (2006).

81.    Following the Second Circuit's mandate, the District Court entered judgment dismissing all of Cubatabaco's claims.  However, it did not direct dismissal of the suspended TTAB Proceeding, and denied General Cigar's motion to amend the judgment to provide for such dismissal.  *See Empresa Cubana del Tabaco v. Culbro Corp.*, 478 F. Supp. 2d 513 (S.D.N.Y. 2007).  The Second Circuit held that the denial was not an abuse of discretion.  *See Empresa Cubana del Tabaco v. Culbro Corp.*, 541 F.3d 476 (2d Cir. 2008).

82.    In 2011, Cubatabaco moved to reopen the Cancellation Proceeding at the TTAB and was granted leave to file an Amended Petition.

83.    On June 23, 2011, Cubatabaco filed its Amended Petition in the Proceeding.  Its Fifth and Seventh Grounds for Cancellation asserted materially the same claims for cancellation

of the Registrations under IAC Articles 7 and 8 that had been fully and finally decided against Cubatabaco by the district court and rejected by the Second Circuit.

84.     In September 2011, General Cigar moved for summary judgment dismissing the Amended Petition on the grounds that the judgment in the Federal Action deprived Cubatabaco of standing to seek cancellation of the Registrations.  General Cigar also raised issue and claim preclusion arising from the federal judgment as an alternative grounds for dismissal in the event that Cubatabaco was able to establish standing.

85.     On March 14, 2013, the TTAB granted General Cigar's motion for summary judgment on the basis that Cubatabaco "has no standing to maintain this proceeding and, therefore respondent [General Cigar] is entitled to judgment."  The TTAB stated that "[i]n view of our finding on the threshold issue of standing, we need not reach the merits of respondent's second ground for summary judgment, *i.e.*, that petitioner's claims are precluded by the application of the doctrines of res judicata and collateral estoppel."  Accordingly, the TTAB granted General Cigar's summary judgment motion solely based on Cubatabaco's lack of standing.

86.     Cubatabaco appealed the decision that it lacked standing to the Federal Circuit.  On June 4, 2014, the Federal Circuit issued a decision vacating the TTAB's summary judgment order, finding that Cubatabaco had standing under the Lanham Act to petition for cancellation of the Registrations, notwithstanding the federal judgment.  The Federal Circuit's opinion gratuitously addressed the alternative issues of issue and claim preclusion that the TTAB had expressly not considered.  In an alternate statement not necessary to reversal, it concluded that even if a federal Article III court does not have the power to cancel a registration under Article 8, a three-person panel of administrative law judges does have that power.  It found that Section 17 of the Lanham Act (15 U.S.C. § 1067(a)) gives the TTAB the power to directly cancel registrations under Article

8 of the IAC, and (citing to only TTAB decisions) that the TTAB did not need to consider the "interplay [between Section 8, IAC and] Section 44(h)" which was addressed in the Second Circuit's opinion.   The Federal Circuit concluded that the Article 8 "issue" decided in the Federal Action was not the same "issue" Cubatabaco presented to the TTAB.

87.     This statement was erroneous.  First, the TTAB does not have greater powers to cancel a registration than a federal court has.  It is settled law that the TTAB's power to cancel a registration under Section 17 of the Lanham Act, 15 U.S.C. § 1067(a), and the federal courts' power to cancel a registration in infringement litigation under Section 37 of the Lanham Act, 15 U.S.C. § 1119, are concurrent and equivalent.  Moreover, nothing in Section 17 of the Lanham Act provision cited by the Federal Circuit, suggests that the TTAB has superior powers of cancellation over federal courts.  That provision simply empowers the TTAB to determine and decide the respective rights to registration in an application to cancel the registration of a mark the same way Section 37 empowers federal courts to "order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action" in any infringement action "involving a registered mark."

88.     The Federal Circuit cited two TTAB decisions holding that the TTAB could cancel registrations under Article 8 of the IAC.  But these decisions simply establish that the TTAB interprets the Lanham Act differently from the Second Circuit.  They do not provide a basis for denying preclusion.  A court judgment that meets the tests for issue preclusion remains preclusive in a second court or administrative body even if the precedents of the latter jurisdiction would point to a different result.

89.     Following reinstatement of Cubatabaco's claims in the Proceeding, the parties proceeded to discovery and trial based on the discovery record and additional evidence submitted

in the Federal Action.  On December 20, 2022, the TTAB issued the Decision.  The TTAB found in favor of Cubatabaco on its IAC Article 8 claim and rejected General Cigar's affirmative defense that Cubatabaco's IAC Article 8 claim was barred by issue or claim preclusion.  The TTAB explained "[c]onsequently, we need not reach the merits of Petitioner's remaining claims" and did not address those claims.

90.     Because the TTAB ruled in favor of Cubatabaco on the IAC Article 8 cancellation ground, the TTAB cancelled the Registration "in due course" (i.e., after appeal if no reversal).

91.     The TTAB's refusal to apply issue or claim preclusion was legal error.  For a prior judgment to be preclusive of a claim in a later action or proceeding, four elements must be met: (1) an issue of fact or law must have been presented in both the prior and current actions; (2) that issue must have been actually litigated in the prior action and determined adversely to the precluded party in a valid and final judgment; (3) determination of that issue must have been necessary and essential to the prior judgment; and (4) the parties are the same, or the precluded party's position in the prior action was fully represented by another party.

92.     Each of those factors is satisfied on the record of this case.  First, whether a U.S. trademark registration may be cancelled on the basis of Article 8 of the IAC was a legal issue presented for decision by Cubatabaco in its federal summary judgment motion in the district court, and materially the same issue was later presented in Cubatabaco's Amended Petition and Trial Briefs in the TTAB.  Importantly, in federal court, Cubatabaco did not limit its IAC Article 8 claim to cancellation only if a provision of the Lanham Act permits that relief; rather, it asked the district court to follow the TTAB's decisions (later cited in the Federal Circuit decision and ultimately in the TTAB's Decision) and hold that Article 8 directly authorizes cancellation without the intermediary of the Lanham Act.

93. Second, this legal issue was determined adversely to Cubatabaco in a valid and final judgment. The district court conducted a painstaking analysis of Cubatabaco's IAC Article 8 cancellation claim and concluded that Second Circuit precedent required dismissal. Its judgment expressly provided that the IAC Article 8 cancellation claim was dismissed with prejudice. Cubatabaco, cross-appealed from this portion of the judgment and, when it lost, unsuccessfully sought Supreme Court review. Cubatabaco cannot dispute that the judgment was both final and valid.

94. The third factor of issue preclusion – whether the decision of the issue was necessary and essential to the prior judgment – is clearly satisfied on the procedural record. The legal issue decided by the district court–that Article 8 does not give a foreign mark owner the right to cancel a U.S. trademark registration—was the only basis for that court's with-prejudice dismissal of Cubatabaco's IAC claims. *See Empresa Cubana Del Tabaco v. Culbro Corp.*, 213 F. Supp. 2d 247, 282 (S.D.N.Y. 2002).

95. Finally, the fourth factor is met, because Cubatabaco and General Cigar are parties to both proceedings.

96. Preclusion is further supported by the Supreme Court's decision in *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138 (2015) ("*B&B Hardware*"), issued after the Federal Circuit's ruling. It holds that "if federal law provides a single standard, parties cannot escape preclusion simply by litigating anew in tribunals that apply that one standard differently," and that to allow a party to forum shop between forums that apply legal issues differently would "encourage the very evils that issue preclusion helps to prevent." *B&B Hardware*, 574 U.S. at 1307. Here, there is a single standard, since both the district court and TTAB considered whether the Registrations could be cancelled under the same law, namely Article 8 of the IAC, and

Cubatabaco's re-argument of the Article 8 claim after losing in Federal Court, seeking to take advantage of the TTAB's different interpretation of Article 8, is blatant forum-shopping.

97.    The TTAB Decision should be reversed, and the IAC claim found to be precluded, because to rule otherwise would effectively reward Cubatabaco for its ever-shifting forum shopping and encourage the "evils" denounced in *B&B Hardware*.  It was Cubatabaco which chose to have a federal court decide its cancellation claims, when it could instead have pursued those claims before the TTAB where the IAC Article 8 claim (at least) may have been sustained.  It was Cubatabaco that told the TTAB that the Federal Action would be dispositive of all of its cancellation claims.  It was Cubatabaco that chose to accelerate decision on the IAC claims in the Federal Action by moving for partial summary judgment.  It lost on the IAC claim in district court, lost again on appeal, and was denied review by the Supreme Court.  Having opted for a federal forum on its IAC Article 8 claim and having resoundingly lost, Cubatabaco was not entitled to relitigate the same issue through the TTAB.  The TTAB's refusal to apply issue preclusion here was clearly a legal error warranting reversal and vacatur.

98.    Even if the IAC Article 8 claim were not precluded, it would fail on the merits.

99.    First, Article 8 only provides protection if a foreign mark owner had protection for its mark in a foreign country at the time of its adversary's U.S. application.  Cubatabaco did not enjoy legal protection in Cuba for the Cohiba word mark as of March 13, 1978, when General Cigar applied for its First Registration.  The Cuban trademark authorities did not register that mark until June 30, 1980, more than two years later.  Moreover, upon information and belief, that Cuban registration had lapsed by the time General Cigar applied for its Second Registration.

100.    Second, Article 8 requires proof that the U.S. registrant, before filing its application, "had knowledge of the use, employment, registration or deposit" in the foreign country of that

mark.  Cubatabaco did not "use" or "employ" the Cohiba mark in Cuba, within the meaning of Article 8, prior to March 13, 1978, and General Cigar did not have knowledge of any qualifying use or employment prior to that date.

101.    Therefore, the December 20, 2022 TTAB Decision should be reversed and vacated and the Court should enter an Order:

    a) Finding that Cubatabaco's claim for cancellation of the Registrations under Article 8 of the IAC was barred by the doctrine of issue and/or claim preclusion or fails on the merits; and

    b) Reversing the TTAB Decision cancelling the Registrations.

<u>**COUNT II (concerning the First Registration):**</u>

**DECLARATORY JUDGMENT OF NON-ABANDONMENT OF GENERAL CIGAR'S THE FIRST REGISTRATION BETWEEN 1987-1992 (28 U.S.C. § 2201)**

102.    General Cigar repeats and realleges the allegations of Paragraphs 9-13 and 36-53 as if fully set forth herein. Count II seeks declaratory relief against Cubatabaco's claim (asserted as the First Ground For Cancellation in the Amended Petition in the TTAB and argued at trial) that General Cigar abandoned its COHIBA mark, between 1987 and 1992, and as a result the First Registration, issued in 1981, which became incontestable in 1986, should be cancelled for abandonment.

103.    The abandonment doctrine exists to prevent the warehousing of marks.  Under the Lanham Act provision in effect between 1987 and 1992, a statutory presumption of abandonment arises where a registered mark has not been used for two years.  However, the presumption may be rebutted by the mark user by providing evidence of an intent to resume use during the period

of nonuse. If the user does rebut, the party seeking cancellation assumes a heavy burden of proving abandonment.

104.     As alleged above, General Cigar did not abandon its COHIBA word mark between 1987 and 1992. Rather, during the nadir of the premium cigar market, it temporarily suspended sales of COHIBA cigars to retailers with the intention of resuming use of that mark on cigars once conditions in the market improved. Contemporaneous documents and testimony establish that General Cigar did not intend to abandon the mark, and in facts took steps during 1987-1992 to be ready to resume use upon improved conditions.

105.     As a matter of law, General Cigar's reasonable business explanations for non-use of the COHIBA mark due to depressed market conditions, coupled with its evidence showing an intention to resume use in the foreseeable future, rebuts the statutory presumption of abandonment from non-use. Because Cubatabaco has no material evidence in support of abandonment other than the non-use, it cannot sustain its heavy burden of showing that General Cigar abandoned the COHIBA Mark between 1987 and late 1982.

106.     The Court should therefore determine and declare that General Cigar did not abandon its COHIBA mark during the 1987-1992 period, and that the First Registration is therefore not subject to cancellation on the grounds of abandonment.

## COUNT III (concerning the First Registration):

**DECLARATORY JUDGMENT THAT GENERAL CIGAR'S SECTION 8 AND 15 DECLARATIONS FOR THE FIRST REGISTRATION DID NOT CONSTIUTE FRAUD ON THE USPTO**
**(15 U.S.C. §1064; 28 U.S.C. § 2201)**

107.     General Cigar repeats and realleges the allegations of Paragraphs 9-13 and 36-53 as if fully set forth herein. Count III seeks relief against Cubatabaco's claim (asserted as the Third Ground For Cancellation in the Amended Petition and argued by it at trial) that General Cigar filed

a false Section 8 and 15 Declaration in connection with renewal of the First Registration with the intent to defraud the USPTO, and that as a result, the First Registration should be cancelled.

108.    To prevail on this fraud claim, Cubatabaco must carry the heavy burden of proving every element of fraud, including falsity, the materiality of the false statement, and scienter (an intent to deceive the USPTO), by <u>clear and convincing evidence</u>.  It cannot sustain this rigorous and heavy burden.

109.    The gist of Cubatabaco's argument is that the volume of COHIBA-branded cigars sold by General Cigar between 1981-1986 was insufficient to constitute "continuous use" of the mark during that five-year period, and that the Declaration, which averred "continuous use in interstate commerce [of the COHIBA mark] from February 17, 1981 to the present" was knowingly false.  The facts, however, show that under trademark law prevailing at the time, and under a number of appeals court decisions, General Cigar's sales were sufficient to satisfy the continuous use requirement of the Lanham Act.

110.    Second, Cubatabaco cannot show any evidence that General Cigar willfully intended to defraud the USPTO by making the continuous use statement.  General Cigar's trademark manager at the time, who executed the Declaration and who was responsible for maintaining nearly 400 trademarks, testified that he believed the sales met the continuous use requirement – and that belief, as alleged above, is supported by legal authority.

111.    Accordingly, Cubatabaco cannot sustain its burden of proving that General Cigar did not make a continuous use of the COHIBA mark between 1981 and 1986 and that General Cigar filed the Declaration knowing that the Declaration contained false information in it.

112.    Alternatively, the First Registration may not be cancelled because as a matter of law, even fraudulent statements in a Section 15 declaration do not permit cancellation of the underlying registration.

113.    The Court should therefore determine and declare that the Section 8 and 15 Declaration filed by General Cigar in connection with the First Regulation was valid and not fraudulent, or alternatively that any misstatement therein does not legally permit cancellation of the First Registration.

### COUNT IV (concerning the Second Registration):

**DECLARATORY JUDGMENT THAT GENERAL CIGAR DID NOT DELIBERATELY MISREPRESENT THE SOURCE OF ITS CIGARS AS ORIGINATING IN CUBA AND THAT THE SECOND REGISTRATION MAY NOT BE CANCELLED UNDER SECTION 14(e) OF THE LANHAM ACT**
**(15 U.S.C. §1064(3); 28 U.S.C. § 2201)**

114.    General Cigar repeats and realleges the allegations of Paragraphs 9-13 and 24-53 as if fully set forth herein.  Count IV seeks relief against Cubatabaco's claim (asserted as the Eighth Ground For Cancellation in the Amended Petition and argued by it at trial) that General Cigar applied for and obtained U.S. Reg. No. 1,898,273 to capitalize on or exploit the renown of the Cuban Cohiba in the U.S., and therefore misrepresented the source of the General Cigar COHIBA cigars; which mandates the cancellation of the Second Registration General Cigar U.S. Reg. No. 1,898,273 under Lanham Act § 14(3), 15 U.S.C. § 1064(3).

115.    Because trademarks are territorial, a Lanham Act § 14(3) claim does not lie against a party who simply uses on goods the same mark as a foreign mark owner.  The claim lies only in the most egregious circumstances, where the defendant in marketing, trade dress, etc., deliberately makes material statements or does acts in connection with the mark that substantially misrepresent the origin of the goods.

116.    Cubatabaco cannot carry its burden under § 14(3).  None of General Cigar's consumer-facing advertising makes any claim that the General Cigar COHIBA cigars are of Cuban origin or has any historical connection with Cuba, much less that they originate with Cubatabaco. The word, "Cuba," "Cuban," or "Havana" do not appear in any General Cigar advertising, with the exception of occasionally identifying certain tobacco seed as "cuban seed," as do many other cigar manufacturers when describing a tobacco seed variety that originated in Cuba and has since been planted in many other countries.

117.     General Cigar also identifies its cigars and their containers by country of origin and explains the origins of the tobacco leaf and filler in marketing as coming from the Dominican Republic, Honduras, Nicaragua, Brazil, as appropriate.

118.    Accordingly, the Court should determine and declare that General Cigar did not misrepresent the source of its COHIBA cigars in applying to register, registering, marketing or selling those cigars, and that the Second Registration may therefore not be cancelled under § 14(3) of the Lanham Act, 15 U.S.C. § 1064.

### COUNT V (concerning the Second Registration):

**DECLARATORY JUDGMENT THAT THE SECOND REGISTRATION SHOULD NOT BE CANCELLED UNDER SECTION 2(d) OF THE LANHAM ACT. (15 U.S.C. §1052(d); 28 U.S.C. § 2201)**

119.    General Cigar repeats and realleges the allegations of Paragraphs 9-13 and 24-66 as if fully set forth herein.  Count V seeks relief against Cubatabaco's claim (asserted as the Sixth Ground For Cancellation in the Amended Petition and argued by it at trial) that the Second Registration should be canceled under § 2(d) of the Lanham Act.

120.     Section 2(d) permits cancellation of a contestable mark by one who has previously used a mark in U.S. commerce, where the use of the mark by the registrant in connection with the goods is likely to cause confusion or mistake, or to deceive.

121.     Cubatabaco cannot establish a § 2(d) claim against the Second Registration for three reasons.  First, rights under § 2(d) are premised on a plaintiff's priority of use of a mark in U.S. commerce, but Cubatabaco has <u>never</u> used the "Cohiba" mark in U.S. commerce and cannot claim priority of use over the filing date of General Cigar's second COHIBA registration.  Second, Cubatabaco did not make substantial "analogous use" of the mark in the United States, and in any event did not follow any claimed analogous use with actual use of the mark, as the law requires of a § 2(d) claimant.  Third, even if Cubatabaco could establish priority of use, it cannot prevail on the other branch of § 2(d), that is, it cannot prove that General Cigar's use of the COHIBA mark was likely to confuse an appreciable number of U.S. premium cigar consumers into believing that those cigars originated with Cubatabaco or in Cuba.  Its trial proof in the TTAB was totally inadequate to establish the confusion element, and it cannot submit any additional evidence in this action that will satisfy its burden.

122.     The Court should therefore determine and declare that Cubatabaco cannot obtain cancellation of the Second Registration under § 2(d) of the Lanham Act.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, General Cigar respectfully requests that this Court enter judgment:

A.     Reversing the December 20, 2022 Decision of the TTAB;

B.     Vacating the TTAB's order cancelling General Cigar's COHIBA Registrations, Reg. Nos. 1,147,309 and 1,898,273, and determining that those Registrations remain valid and subsisting;

C.      Determining and declaring that Cubatabaco cannot prevail on its claim for cancellation that General Cigar abandoned its First Registration, U.S. Reg. No. 1,147,309;

D.      Determining and declaring that Cubatabaco cannot establish the elements of fraud on the USPTO by the required clear and convincing evidence, and that it therefore cannot carry the burden of proof on its claim for cancellation of the First Registration based on statements in General Cigar's July 16, 1986 Section 8 and 15 Declaration for the First Registration, U.S. Reg. No. 1,147,309; or alternatively, that any knowingly false statement in the Section 8 and 15 Declaration would not permit cancellation of the First Registration;

E.      Determining and declaring that Cubatabaco cannot establish a right to cancellation of the Second Registration, U.S. Reg. No. 1,898,273, under § 14(3) of the Lanham Act, 15 U.S.C. § 1064(3);

F.      Determining and declaring that Cubatabaco cannot establish a right to cancellation of the Second Registration, U.S. Reg. No. 1,898,273, under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d);

G.      Ordering the Director of the USPTO to take actions consistent with the Court's decision;

H.      Determining that this case is exceptional, and ordering Cubatabaco to pay General Cigar's costs of this action, together with reasonable attorneys' fees; and

I.      Granting any other relief the Court deems just and necessary.

Dated: February 20, 2023

By: */s/ J. Kevin Fee_____*
            J. Kevin Fee (VA Bar No. 88376)
            DLA PIPER LLP (US)
            500 Eighth Street
            Washington, DC 20004
            Tel. 202.799.4441

kevin.fee@us.dlapiper.com

Andrew L. Deutsch (*pro hac forthcoming*)
Law Offices of Andrew L. Deutsch
6540 Olympic Place
Los Angeles, CA 90035
Tel: 917.861.3315
adeutsch221@gmail.com

Stanley J. Panikowski III (*pro hac forthcoming*)
DLA Piper LLP (US)
401 B Street
San Diego, CA 92101
Tel. 619.699.2700
stanley.panikowski@us.dlapiper.com

Joshua Schwartzman (*pro hac forthcoming*)
DLA Piper LLP (US)
1251 Avenue of the Americas, Fl. 27
New York, NY 10020
Tel. 212.336.4671
joshua.schwartzman@us.dlapiper.com

Oscar M. Orozco-Botello (*pro hac forthcoming*)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067
Tel. 310.595.3077
oscar.orozco-botello@us.dlapiper.com

***Attorneys for Plaintiff General Cigar Company, Inc.***