**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

GENERAL CIGAR COMPANY, INC.,

       Plaintiff,

v.

EMPRESA CUBANA DEL TABACO, D.B.A.
CUBATABACO.

       Defendant.

CASE NO: 23-cv-00227-LMB-WEF

**DEFENDANT EMPRESA CUBANA DEL TABACO d.b.a. CUBATABACO'S**
**<u>OPENING TRIAL BRIEF</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

  A.  Article 8, IAC's Requirements Are Met ...................................................................... 2

    1.  "Legal Protection" of COHIBA in Cuba ................................................................. 3

    2.  GC's "Knowledge" of COHIBA's "Use, Employment,
        Registration or Deposit" in Cuba ........................................................................... 4

        *GC's "Knowledge" Prior to Its March 13, 1978 Application* ...................................... 4

        *GC's "Knowledge" Prior to Its November 1982 "Adoption and Use"*
        *of COHIBA* .............................................................................................................. 5

  B.  The Cuban Assets Control Regulations Do Not Bar Cancellation Under
      Article 8, IAC ............................................................................................................ 5

STATEMENT OF THE FACTS ......................................................................................... 6

    *Cubatabaco's COHIBA cigar* ....................................................................................... 6

    *GC's COHIBA: 1977-1982* ........................................................................................... 9

    *GC's COHIBA: 1982-1992* ......................................................................................... 12

PROCEDURAL HISTORY ............................................................................................... 13

STANDARD OF REVIEW ................................................................................................ 14

ARGUMENT ...................................................................................................................... 15

I.   Article 8, IAC's Requirements for Cancellation Have Been Established .......................... 15

  A.  CT Enjoyed "Legal Protection" for COHIBA Prior to March 13, 1978, When GC
      Applied to Register COHIBA ...................................................................................... 15

    1.  Legal Protection by Virtue of Cuban Reg. No. 110,044 ........................................... 17

    2.  Legal Protection by Virtue of Article 240, DL805/36 ............................................. 20

    3.  Legal Protection by Virtue of CT's 1972 Application to Register COHIBA.............. 21

4. CT's Legal Protection Did Not Lapse Because of Non-Use........................................ 21

B. CT Has Established GC's "Knowledge" of COHIBA's "Use, Employment, Registration or Deposit" in Cuba ....................................................................................... 23

1. GC's "Knowledge" by March 13, 1978, When It Applied to Register COHIBA .................................................................................................................... 23

2. GC's "Knowledge" Prior to November 1982, the Date of GC's "Adoption and Use" of COHIBA ......................................................................................... 25

II. The CACR Does Not Bar Cancellation Under Article 8 ...................................................... 27

A. In a Ruling That Is Law of the Case, the Federal Circuit Decided the CACR Issue Against GC ........................................................................................................... 27

B. Even If the Issue Is Considered Anew, the CACR Do Not Bar Cancellation ................... 28

CONCLUSION ......................................................................................................................... 30

**Cases**

*Bacardi Corp. of America v. Domenech*
    311 U.S. 150 (1940) .................................................................................................... 2

*Booking.com v. Matal*,
    278 F. Supp. 3d 891 (E.D. Va. 2017) .................................................................. 15

*Deasy v. Hill*,
    833 F.2d 38 (4th Cir. 1987) .................................................................................... 23

*Empresa Cubana Del Tabaco d.b.a. Cubatabaco v. General Cigar Co.*,
    753 F.3d 1270 (Fed. Cir. 2014) ................................................. 1, 5, 13, 27, 29

*Exxon Corp. v. Humble Expl. Co.*,
    695 F.2d 96 (5th Cir. 1983) .................................................................................... 26

*Hydro-Dynamics, Inc. v. George Putnam & Co.*,
    811 F.2d 1470 (Fed. Cir. 1987) ............................................................................ 26

*Kappos v. Hyatt*,
    566 U.S. 431 (2012) .................................................................................................. 14

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ............................................................................................ 29

*La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*,
    495 F.2d 1265 (2d Cir. 1974) ................................................................................ 26

*Mastic Inc. v. Mastic Corp.*,
    230 U.S.P.Q. 699, 1986 WL 83610 (T.T.A.B. 1986) .................................... 26

*Phillips v. Hudnut*,
    263 F. 643 (D.C. Cir. 1920) .................................................................................. 26

*Proctor & Gamble Co. v. Johnson & Johnson, Inc.*,
    485 F. Supp. 1185 (S.D.N.Y. 1979) .................................................................... 26

*Ralston Purina Co. v. On-Cor Frozen Foods, Inc.*,
    746 F.2d 801 (Fed. Cir. 1984) .............................................................................. 26

*Regan v. Wald*,
    468 U.S. 222 (1984) .................................................................................................. 29

*Richardson-Vicks Inc. v. Franklin Mint Corp.,*
    216 U.S.P.Q. 989, 1982 WL 52089 (T.T.A.B. 1982) ............................................27

*Romero v. Barr,*
    937 F.3d 282 (4th Cir. 2019) ...........................................................................29

*RXD Media, LLC v. IP Application Dev.,*
    377 F. Supp. 3d 588 (E.D. Va. 2019) ..............................................................14

*Shammas v. Focarino,*
    784 F.3d 219 (4th Cir. 2015) ...........................................................................14

*Stallard v. USPTO,*
    658 F. Supp. 3d 298 (E.D. Va. 2023) ..............................................................15

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
    566 U.S. 560 (2012)........................................................................................25

*Times Mirror Mags., Inc. v. Sutcliffe,*
    205 U.S.P.Q. 656, 1979 WL 24923 (T.T.A.B. 1979) ........................................26

*Trans World Airlines, Inc. v. Franklin Mint Corp.,*
    466 U.S. 243 (1984)........................................................................................30

*Vitkus v. Blinken,*
    79 F.4th 352 (4th 2023) ...................................................................................25

**Statutes**

Lanham Act

    Section 2(d), 15 U.S.C. §1052(d) ....................................................................30

    Section 21(b), 15 U.S.C. §1071(b) ..............................................................13, 14

    Section 44(e), 15 U.S.C. §1126(e)....................................................................13

Amendments to the Trading with the Enemy Act,
    Public L. 95–223, 91 Stat. 1625 (1977) ...........................................................29

**Treaties**

General Inter-American Convention for Trade Mark and Commercial Protection,
    46 Stat. 2907 (1929).......................................................................... *passim*

**Regulations**

31 C.F.R. Part 515.................................................................................................................1

31 C.F.R. § 515.201.................................................................................................27, 29, 30

31 C.F.R. § 515.309.............................................................................................................29

31 C.F.R. § 515.310.............................................................................................................29

31 C.F.R. § 515.527.........................................................................................5, 27, 28, 29

31 C.F.R. § 515.528.............................................................................................................28

**Other Authorities**

3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR
COMPETITION § 19:118 (5th Ed. 2023) ...................................................................25

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW, § 335(1) (AM. LAW. INST.
1987) .......................................................................................................................30

U.S. Dep't of State, *Treaties in Force* (2020)................................................................2

<u>Note</u>: Cited Cuban law materials are not included in the Table of Authorities.

Defendant Empresa Cubana del Tabaco, d.b.a. Cubatabaco ("CT"), by and through counsel, respectfully submits this memorandum of law for judgment on the written record. Pursuant to Dkt. 107 (Order, Dec. 21, 2023), CT limits its submission to: (a) CT's claim for cancellation under Article 8, General Inter-American Convention for Trade Mark and Commercial Protection, 46 Stat. 2907 (1929) ("IAC"); and (b) General Cigar Company, Inc. ("GC")'s defense that the Cuban Assets Control Regulations, 31 C.F.R. Part 515 ("CACR"), bar cancellation under Article 8.

## INTRODUCTION

The Trademark Trial and Appeal Board ("TTAB") held that CT satisfied Article 8's requirements for cancelling GC's two registrations of COHIBA for cigars. Exhibit ("Ex.") 1 (TTAB Decision) at 27-31.[1] The Court should reach the same result for the reasons stated by the TTAB and further supported here.

The Court of Appeals for the Federal Circuit held that the CACR do not bar cancellation under Article 8. *Empresa Cubana del Tabaco d.b.a. Cubatabaco v. General Cigar Company, Inc.*, 753 F.3d 1270, 1275 (Fed. Cir. 2014). Its ruling is law of the case, and thus dispositive. If the CACR issue is considered nonetheless, the Court should reach the same result for the reasons stated by the Federal Circuit and further supported here.

This controversy arises out of CT's application to register COHIBA in the United States for cigars on the basis of its Cuban registration. Notwithstanding the U.S. trade embargo, the United States and Cuba allow trademark registration by the other country's nationals. GC's two U.S. registrations for COHIBA block CT from registering COHIBA. In seeking their cancellation, CT invokes, just as U.S. companies have done successfully in Cuba, Article 8, a self-executing

---

[1] GC's registrations, Exs. B and C to the GC's First Amended Complaint ("FAC"), Dkt. 27, are Reg. No, 1,147,309 (Feb. 17, 1981) ("First Registration") and Reg. No. 1,898,273 (June 6, 1995) ("Second Registration").

provision of the IAC, *Bacardi Corp. of Am. v. Domenech*, 311 U.S. 150, 161, 163 (1940); the treaty is in force between Cuba and the United States. U.S. Dep't of State, *Treaties in Force* 534 (2020).

GC chose to register COHIBA in the United States precisely because it was a Cuban cigar brand. It "fit into our strategy of marketing premium cigars"—"to take advantage of the marketing benefit resulting from U.S. consumers' association of Cuban brands with premium cigar status." CT's mark was legally protected in Cuba when GC applied to register COHIBA, a prerequisite for CT invoking Article 8. As the TTAB found, a *Forbes* article read by GC's management and the very first two documents in GC's internal trademark file for COHIBA stating COHIBA to be a "brand in Cuba," "presently used in Cuba," "Castro's cigar brand," and "sold in Cuba," all from before GC's application, establish GC's "knowledge" of COHIBA's "use, employment, registration or deposit" in Cuba, as required by Article 8 for cancellation.

### A. Article 8, IAC's Requirements Are Met

Article 8 of the IAC provides for the cancellation of a registration when: (a) it is an "interfering mark;" (b) the party seeking cancellation "enjoyed legal protection for his mark in another of the Contracting States prior to the date of the application for the registration" of the interfering mark; and (c) the registrant, "prior to [its] adoption and use thereof or prior to [its] filing of the application" for registration, "had knowledge of the use, employment, registration or deposit" in any Contracting State of the mark for the specific goods to which the registered mark is applied. Ex. 2 (Article 8). Each of these three requirements are met here.

As the TTAB found, GC's is an "interfering" mark because the PTO denied CT's application to register COHIBA on account of GC's two registrations.[2] There is no dispute that Article 8's other requirements—"legal protection" and "knowledge"—are met with respect to

---

[2] Ex. 1 (TTAB Decision) at 26; Dkt. 27 (FAC) ¶¶ 72, 78; Ex. 3 (CT21, PTO file excerpt).

GC's Second Registration, entitling CT to cancellation of that registration under Article 8.[3] CT shows that, as the TTAB found, both the "legal protection" and "knowledge" requirements are met with respect to the First Registration, entitling CT to cancellation of that registration as well.

1. **"Legal Protection" of COHIBA in Cuba.** CT, as required by Article 8, "enjoyed legal protection for" COHIBA in Cuba prior to March 13, 1978, the date of GC's application for the First Registration, for three, independently sufficient reasons:

(1) CT's 1972 Cuban Reg. No. 110,044, valid for 15 years, provided legal protection for the word COHIBA.[4] The decisions of Cuba's Supreme Court and its trademark authority, cited by CT's expert, are dispositive that, contrary to the unsupported opinion of GC's expert, the registration of a mixed mark, such as was Reg. No. 110,044, protected the word element of the mark, here, COHIBA, even apart from the mark's design element;

(2) Cuban law entitled CT to prevent unauthorized use of the word COHIBA because it would take advantage of the goodwill CT had built up in the mark over eight years, regardless of whether the word COHIBA was protected by Reg. No. 110,044; and

(3) CT's 1972 application to register COHIBA as a word mark prevented another's registration of the same or a similar mark.

GC's argument that the protection afforded by Reg. No. 110,044 lapsed prior to March 13, 1978 due to non-use of its design element for three years does not address point two (protection of

---

[3] CT's Cuban Reg. No. 111,059 for the word mark COHIBA, which issued on July 1, 1980 for a term of 15 years, Ex. 4 (CT1) at 7-8, provided legal protection prior to December 30, 1992, the Second Registration's application date. *See also* Ex. 1 (TTAB Decision) at 27. GC concedes it knew of COHIBA's "use, employment, registration or deposit" before then. Ex. 8 (TTAB Amended Petition) ¶ 36; Ex. 9 (TTAB Answer) ¶ 36.

[4] For Cuban Reg. No. 110,044, *see* Ex. 4 at 4-5; *see also* Ex. 5 (CT6, fully certified file from Cuban trademark authority); Ex. 6 (counsel's photo of original registration certificate). Art. 103, Decree-Law 805/1936 ("DL805/36"), Ex. 7, provided that a registration was valid for 15 years.

goodwill) or point three (protection afforded by CT's 1972 application). As to Reg. No. 110,044, GC's "lapse" contention fails on the facts: the evidence shows use of the design within three years of March 13, 1978. It is also fails on the law: (a) the protection afforded by Reg. No. 110,044 continued notwithstanding CT changing the design used on its COHIBA-branded cigars because the design element was a secondary feature of the registration; and (b) even if it were not, CT's application to register COHIBA as a word mark continued Reg. No. 110,044's protection.

**2. GC's "Knowledge" of COHIBA's "Use, Employment, Registration or Deposit" in Cuba.** Article 8's "knowledge" requirement, the remaining requirement for cancellation, is established by the same evidence that was before the TTAB. It is satisfied by GC's knowledge prior to *either* GC's "filing of the application" to register COHIBA on March 13, 1978, *or* "adoption and use" of the mark. While either suffices, CT has shown both.

*GC's "Knowledge" Prior to Its March 13, 1978 Application.* The TTAB correctly found that the evidence establishes GC's requisite "knowledge" when it applied for the First Registration. Ex. 1 (Decision) at 27-31.

Cuban and U.S. witnesses, credited by the TTAB, Ex. 1 (Decision) at 27-28, show that, from 1970 to March 13, 1978, CT sold, conservatively, over 3 million COHIBA cigars in Cuba, directly and indirectly: (a) to Cuban Government ministries and agencies and other Cuban institutions, all of which regularly used the COHIBA-branded cigars as protocol gifts; (b) at Havana's five major hotels; (c) at two retail outlets; and (d) at upscale restaurants.

As the TTAB found, Ex. 1 (Decision) at 28-31, GC's pre-March 13, 1978 "knowledge" of COHIBA's "use, employment, registration or deposit" in Cuba is established, *inter alia*, by its management having read a *Forbes* article that identified COHIBA as a Cuban cigar "brand" owned by a commercial enterprise, CT, and in use and employment; and by the first two documents in

GC's COHIBA trademark file that identify COHIBA as a "brand in Cuba;" "presently used in Cuba;" "Castro's cigar brand" and "sold in Cuba."

*GC's "Knowledge" Prior to Its November 1982 "Adoption and Use" of COHIBA.* There was no "adoption and use" by GC until it, in early 1982, selected COHIBA from its warehouse of trademarks in its "trademark maintenance program" for a product it decided only that year to develop and, in November 1982, made commercial shipments of COHIBA-branded cigars for the first time. By then, GC had still additional knowledge of COHIBA's "use, employment, registration or deposit" in Cuba.

### B. The Cuban Assets Control Regulations Do Not Bar Cancellation Under Article 8

The Federal Circuit held that CACR General License 31 C.F.R. Section 515.527 authorizes the TTAB's cancellation of GC's registrations under Article 8, *Empresa*, 753 F.3d at 1275. This Court's decision that the Federal Circuit's rulings are law of the case, Dkt. 46 (Order, July 7, 2023); Dkt. 47 (Tr., July 7, 2023) at 18, disposes of the CACR issue.

The result would be the same even if the issue is considered anew. The CACR's text establishes that cancellation under Article 8 is authorized. Even if the text were ambiguous, cancellation is authorized under the OFAC Director's interpretation of Section 515.527, which is entitled not only to substantial weight but deference.

A treaty provision is at issue. As required by Supreme Court jurisprudence, the Court, in recognition of the separation of powers, should not find that the United States has abrogated its Article 8 obligations because of an Executive regulation, the CACR, unless the Executive so advises the Court, particularly in light of the OFAC Director's letter.

In sum, and as further shown below, the Court, in accordance with the TTAB and Federal Circuit decisions, should find Article 8's requirements have been established and the CACR do not

bar cancellation under Article 8, entitling CT to judgment.

**STATEMENT OF THE FACTS**

It is undisputed that GC's is an "interfering" mark. CT states here the evidence upon which it relies to establish Article 8's other requirements, COHIBA's "legal protection" in Cuba and GC's "knowledge," with respect to GC's First Registration. It is undisputed that those requirements are satisfied as to GC's Second Registration.

***Cubatabaco's COHIBA cigar***. CT, a Cuban state-owned enterprise, Ex. 11 (CT 462), applied to register a mixed mark, the word COHIBA and design, in Cuba on Sept. 29, 1969. Ex. 4 (CT1) at 4-5; Ex. 12 (CT 8) at 2-8. It began sales in Cuba in 1970, which continued through (and beyond) March 13, 1978, when GC applied to register COHIBA in the United States. Ex. 13 (CT884). CT's application matured into Reg. No. 110,044 on May 31, 1972, valid for a term of 15 years. Ex. 4 (CT1) at 4-5; Ex. 12 (CT 8) at 5-8.

Sales were approximately 350,000-375,000 for each year, 1970-74; 450,000 in 1975 and in increasing numbers thereafter—conservatively totaling 3.1 million cigars by March 13, 1978.[5] As the TTAB found, Ex. 1 (Decision) at 27-28, CT sold the cigars, directly or indirectly (a) to Cuban Government ministries and agencies and other Cuban institutions,[6] all of which regularly used them as protocol gifts to foreign persons meeting with their officials;[7] (b) at Havana's

---

[5] Ex. 14 (Mercedes Gonzalez Vasquez, Secretary of Administration, 1970-75, at *El Laguito*, the CT factory that produced and sold COHIBA, and Chief of the Economics Department at the factory, 1975-88) at 17-20, 32-33, 48, 77; Ex. 15 (CT 441, Gonzalez Vasquez). *See also* Ex. 1 (TTAB Decision) at 27 n.50.

[6] Ex. 15 (Gonzalez Vasquez); Ex. 14 (Gonzalez Vasquez) at 41-42, 47-48; Ex. 16 (Fernando Perez Valdes, of Salon Humidor, a wholesaler that bought from *El Laguito* and resold to ministries, agencies and other institutions) at 10-13, 16-20, 60-61, 73-74.

[7] Ex. 16 (Perez Valdes) at 11, 16-20 (Foreign Ministry, Ministry of Foreign Commerce, Ministry of Basic Industry, Ministry of Sugar, Workers Federation, Small Farmers Federation, press agency, others); Ex. 17 (Rosalie Plasencia, U.S. citizen who worked in Cuba as an interpreter) at 11-16, 22-23 (sports federation); Ex. 14 (Gonzalez Vasquez) at 42-44 (Council of State, Office of the

principal hotels; (c) at upscale restaurants; and (d) at two retail stores for foreign embassies and staff, foreigners working in Cuba, others with permission and Cubans with hard currency from trips abroad.[8]

All sales were in Cuba; commercial exports did not begin until 1982.[9] The Foreign Ministry sent COHIBA cigars bought from CT to the Cuban Mission to the U.N. in New York and the Cuban Interests Section (later the Cuban Embassy) in Washington, D.C. for distribution at receptions and to give as gifts. Fidel Castro, Cuba's President, regularly brought them on trips abroad to give as gifts.[10] U.S. persons purchased COHIBA cigars on trips to Cuba.[11]

By March 13, 1978, CT had built up substantial goodwill in COHIBA. More than 3 million COHIBA-branded cigars had been sold; the evidence shows widespread, positive recognition of the cigar, which was associated in the public's mind with Fidel Castro;[12] COHIBA cigars had been

---

President); Ex. 18 (Kirby Jones, former press secretary to Sen. McGovern, who traveled to Cuba in June-July 1974 to interview Cuban President Fidel Castro for a documentary aired on CBS and formed company to organize U.S. business trips to Cuba) at 5-6, 11-12, 15-35, 47-52, 54; Ex. 19 (Normal Sherman, former press secretary to Vice President Humphrey; organized U.S. business trips to Cuba with Jones) at 10, 17-28; Ex. 20 (Saul Landau, Emmy winning U.S. journalist and documentary film maker) at 5-12, 38-41, 59-61, 90-93.

[8] *At hotels* (Habana Libre, Hotel Riviera, Hotel Nacional, Hotel Capri, Hotel Deauville); Ex. 14 (Gonzalez Vasquez) at 38-40; Ex. 21 (Jose Manuel Valdes Martinez) at 12-14, 18, 54, 116 (buyer for Cubalse, company that bought from *El Laguito* and resold to two Cubalse-owned retail outlets, which also sold to hotels); Ex. 22 (Daniel Garcia) at 12-15, 77; Ex. 23 (James C. Fuller, *Minneapolis Tribune* reporter) at 7-9, 16-17; Ex. 24 (Michael Withey, U.S. attorney) at 3-5-6, 11-12, 47-50; Ex. 20 (Landau) at 36-37. *At restaurants*: Ex. 23 (Fuller) at 17; Ex. 22 (Garcia) at 77. *At retail outlets:* Ex. 15 (Gonzalez Vasquez) ¶¶ 5-6; Ex. 21 (Valdes Martinez) at 12-17, 25-26, 30, 113-15; Ex. 19 (Sherman) at 47-48; Ex. 23 (Fuller) at 17-18; Ex. 20 (Landau) at 47; Ex. 17 (Plasencia) at 35-37.

[9] Ex. 25 at 17-20, 37-38 (Jaime Mas Manzanares, CT export and then general director, 1967-84).

[10] Ex. 20 (Landau) at 42-46, 98-102, 109-110 (distribution at Cuban Mission to U.N. and Cuban Interests Section receptions and given as gifts); Ex. 14 (Gonzalez Vaquez) at 66-69 (Cuban President's trips abroad).

[11] Ex. 19 (Sherman) at 47-48; Ex. 24 (Withey) at 11-12, 48-49; Ex. 23 (Fuller) at 17.

[12] Ex. 17 (Plasencia) at 21-24, 32-35; Ex. 25 (Mas Manzanares) at 60; Ex. 14 (Gonzalez Vasquez) at 22; Ex. 24 (Withey) at 7-9, 13-15, 43-47. A "myth was created surrounding" it, Ex. 25 (Mas

given as commemorative gifts to the hundreds of Cuban delegates and foreign observers at the historic First Party Congress in December 1975,[13] and were included in CT's promotional calendar for 1976. Ex. 27 (Cabezas Suarez) at 57-58.

Contrary to GC's contention, Reg. No. 110,044's design element was used within three years of GC's March 13, 1978 application. Gonzalez Vazquez, Secretary to the Administration, 1970-75, and Chief of the Economics Department, 1975-83, at *El Laguito,* the CT factory which produced and sold COHIBA cigars, *supra*, n.5, testified that COHIBA-branded cigars were sold with the design until the "end of 1975," when a new design was adopted at the time of and in connection with the First Party Congress, Ex. 14 at 58-60, 63-64, which was in December 1975. Ex. 28 (Philip Brenner, Professor, American Univ.) at 4-6, 95.

Valdes Martinez, of Cubalse, which bought COHIBA cigars from *El Laguito* and resold them to two retail stores in Havana, which it owned, *supra*, n.8, likewise testified that the design was used until "towards the end of the year; September or October" of 1975. Ex. 21 at 72-74.

Cabezas Suarez, CT's director of publicity from 1970-77, recalled that the design was replaced in 1971, Ex. 27 at 28-29, but the physical evidence establishes that his recollection was inaccurate. In *July 1974*, Kirby Jones, in Cuba to interview Fidel Castro for what became a Dan Rather CBS broadcast, received a box of COHIBA cigars from Castro. Ex. 18 (Jones) at 11-15, 21; it displayed the Reg. No. 110,044 design. Ex. 29 (CT442). This is consistent with Gonzalez Vasquez and Valdes Martinez's testimony, but not Cabezas Saurez's recollection. Cabezas Saurez's recollection is also inconsistent with the testimony of Perez Valdes, who worked at a COHIBA

---

Manzanares) at 60. Cubans wanted to smoke COHIBA even though few could afford it. Ex. 21 (Valdes Martinez) at 48, 51. "[E]verybody [was] talking about it." *Id.* at 118.

[13] Ex. 26 (CT419); Ex. 16 (Perez Valdes) at 39-40, 73; Ex. 27 (Humberto Cabezas Suarez, CT's director of public relations and publicity) at 12, 27-28; Ex. 14 (Gonzalez Vasquez) at 59-60, 63.

cigar wholesaler (first design used until "approximately" 1974). Ex. 16 at 23-24.

*GC's COHIBA: 1977-1982.* In the period leading up to its March 13, 1978 application to register COHIBA, GC, "one of the world's foremost manufacturers and marketers of premium, hand-made cigars," Dkt. 27 (FAC) ¶ 19, had a strong, active interest in Cuban cigar brands. In 1976, it purchased the U.S. rights to three pre-Revolution brands from the Cifuentes family, a manufacturer of Cuban cigars until Cuba's expropriation of its cigar industry in 1960. Ex. 30 (Cullman, Jr.) ¶¶ 14-15; Ex. 31 (Cullman, Jr.) at 1017-20. GC purchased the rights "because they were Cuban brands," Ex. 30 (Cullman, Jr.) ¶ 15, which have "a mystique in the United States." Ex. 31 (Cullman, Jr.) at 1021.

After acquiring the Cifuentes brands, GC followed a "strategy of purchasing other Cuban cigar marks." *Id.* at 1028. In 1977, it was "on the lookout for potential Cuban names for cigar brands." *Id.* at 1031; Ex. 30 (Cullman Jr.) ¶ 23. GC "chose to apply to register [COHIBA] after hearing of the Cuban COHIBA;" it "did not come up with the name on [its] own," Ex. 31 (Cullman Jr.) at 1013. COHIBA "fit into our strategy of marketing premium cigars"—"to take advantage of the marketing benefit resulting from U.S. consumers' association of Cuban brands with premium cigar status." *Id.* at 1031.

In finding the requisite GC "knowledge," the TTAB cited the November 15, 1977 *Forbes* article, *Help From Havana? The U.S. Cigar Industry is in Bad Odor. Can Cuban Tobacco Help it Relight?*, Ex. 32 (CT123). Ex. 1 (TTAB Decision) at 29-31. The *Forbes* article specifically referenced COHIBA and Cubatabaco:

> Still, there is a marketing hurdle [to Cuban cigars entering the U.S. market if the U.S. embargo against Cuba were relaxed]. U.S. trademarks for the historic Havana houses—H. Upmann, Montecristo and Partagas, among others—are now all held by American firms, chiefly Gulf+Western. That means state-owned CubaTobacco [*sic*] must sell here under unknown colors, and brands it is now developing contrast sharply with the aristocratic old lines. Fidel's favorite brand, Cohiba, is named for

the old Indian custom of smoking through one's nose; another Cuban label touts a worker born on the anniversary of the *Communist Manifesto*. Hardly the way to lure an American businessman to pay $2 for a cigar.

Edgar M. Cullman, Sr., GC's chair and principal owner, received *Forbes* and admitted that he "must have" seen the article. Ex. 33 at 7-8, 88-92. Cullman, Jr., GC's Executive VP, admitted that the article would have come to management's attention, Ex. 34 at 188-90; he "must have read it;" it was "likely." Ex. 31 (Cullman Jr.) at 1032.

Also cited by the TTAB, Ex. 1 (Decision) at 27-28, the first two documents in GC's trademark file for COHIBA, dated Dec. 12 and 14, 1977—a month after the *Forbes* article— identify COHIBA as a "brand in Cuba;" "presently used in Cuba;" "Castro's cigar brand" and "sold in Cuba." Ex. 35 (CT332); Ex. 36 (CT333).[14]

The first of the two, CT333, was from GC's VP for premium cigar sales, Bob Lilienfeld, to Charles H. Sparkes, who was responsible for trademark registrations and maintenance and maintained GC's trademark files, Ex. 37 (Sparkes) at 11-16, 362-63, 371. It conveyed Cullman, Jr.'s list for "possible registration" of COHIBA, two Cuban geographic names and a pre-Revolution Cuban brand. Lilienfeld "ask[ed] me [Sparkes] to check the mark Cohiba" for registration, *id.* at 15, 18, 377-80. The second, CT332, is Sparkes' follow-up memo. *Id.* at 19-20.

At the time of these memos, Sparkes testified, there were only "three or four" people at GC who "were interested in the mark." *Id.* at 370, 372. The source for "Castro's brand cigars," "presently used in Cuba," and "Castro's cigar brand," written by Sparkes, was Lilienfeld "or somebody else at General Cigar," *id.* at 20-21—necessarily, one of those "three or four" people. Sparkes testified that he did not know whether Lilienfeld or someone else wrote "sold in Cuba"

---

[14] The file contained "everything that had to do with the . . . trademark." Ex. 37 (Sparkes) at 360-367.

and "brand in Cuba" on the Lilienfeld memo, *id.* at 27-28, but the only people "who would have had access" to the document was GC "management." Ex. 34 (Cullman, Jr.) at 138-39, 164-66.

Cullman, Jr. testified that he knew prior to March 13, 1978 that Fidel Castro gave COHIBA cigars to people meeting with him. *Id.* at 133-34. He admitted that he did *not* know whether others in the "management" group who were involved had made any investigation of COHIBA, including whether it was sold in Cuba, *id.* at 144-45, 180, and that no one had told him that COHIBA was not sold. *Id.* at 135-136, 144-45.

GC applied for the COHIBA mark on March 13, 1978. A few days later, on March 19, 1978, GC obtained the COHIBA cigar band COHIBA , Ex. 38 (CT383), which it considered registering, *id*. at A25812; and subsequently learned, before it began commercial sales of COHIBA in November 1982, that CT had registered COHIBA in England and France in the early 1970's, Ex. 39 (CT452), and had begun exports, to Spain.[15]

After applying to register the mark, and continuing until 1982, GC simply included COHIBA in a "trademark maintenance" program for 33 marks. Exs. 8-9 (TTAB Amended Petition and Answer) ¶ 35; Ex. 37 (Sparkes) at 233-36.

Under this program, GC, for each of 33 marks, shipped two boxes, with a paste-on label bearing the mark's name and containing 50 defective cigars from other product lines to two retailers. Exs. 8-9 (TTAB Amended Petition and Answer) ¶¶ 35-37; Ex. 37 (Sparkes) at 51-58, 242-45.[16] The retailers put the shipping carton with the two boxes for each mark on the sales floor;

---

[15] GC's executives read *World Tobacco*, Ex. 40 (Alfons Mayer, GC's VP for tobacco) at 5, 17, 204-06, which, in July 1982, reported on CT's beginning exports of COHIBA. Ex. 41 (CT224). A September 7, 1982 GC memo stated that CT "is using Cohiba in Spain." Ex. 42 (CT374).

[16] Ex. 37 (Sparkes) at 57 (shipments "irregularly spaced out"); Ex. 43, (Rothman, one of the two retailers) at 12-13,33-36 ("there was no continuity;" appeared "out of the blue").

unless the two COHIBA-labeled boxes came to the top of the carton, they would not have been visible. GC made no effort to put the COHIBA-labeled box on the top. Exs. 8-9 (TTAB Amended Petition and Answer) ¶¶ 35-37; Ex. 43 (Rothman) at 135. GC told the retailers, which did not request or want the cigars and received credits for the nominal invoiced amount they paid, that the shipments were for "trademark purposes." Ex. 43 (Rothman) at 123-27, 133, 136-37. There was no signage identifying the marks, marketing or promotion. *Id.* at 135. The price was nominal ($1 per box of 50, *id.* at 135; a "discount" price, Ex. 37 (Sparkes) at 55-56, 243). The number of cigars shipped in COHIBA-labeled boxes was 650 in 1978; 600 in 1979, 1,000 in 1980; 700, in 1981; and 200, in 1982. Exs. 8-9 (TTAB Amended Petition and Answer) ¶ 38.

In 1982, GC's Marketing Department, tasked with developing a product for a gap in GC's product line, developed the concept of a clear canister of premium cigars positioned between boxed and bundled cigars. *"[A]t that point*, it was determined it was a good idea to meet the market need with this type of product and we would brand it Cohiba." Ex. 44 (Kowalsky, VP for Marketing) at 12, 46-48 (emphasis added). Shipments began in November 1982. *Id.* at 16, 30.

*GC's COHIBA: 1982-1992.* Sales dwindled until they ended completely in 1986, as CT contends, Dkt. 33 (Answer) ¶ 47, or early 1987, as GC contends, Dkt. 27 (FAC) ¶ 47. In September 1992, *Cigar Aficionado*'s premier issue, which reached an estimated 25% of U.S. premium cigar smokers, Ex. 45 (CT86) ¶ 1(a); Ex. 46 (CT182), gave singular prominence to the Cuban COHIBA, lavishing extensive praise on it, and ranking it first in a blind tasting test.[17] After its publication, and after more than five years of non-use, GC, on advice of outside trademark counsel, Ex. 48 (Milstein, VP Assistant General Counsel) at 8, 17-18, 284, 321-23, applied for the Second Registration on December 30, 1992 and began sales of a new product under the COHIBA mark.

---

[17] Ex. 47 (CT152) at, *inter alia*, A13773, A13797-98, A13810-A13817, A13820.

Dkt. 27 (FAC) ¶ 50. GC knew of CT's use and employment of COHIBA when it applied for the Second Registration. Exs. 8-9 (TTAB Amended Petition and Answer) ¶ 36.

**PROCEDURAL HISTORY**

On January 15, 1997, CT applied for registration of COHIBA for cigars based on its Cuban registration, pursuant to Section 44(e), Lanham Act, 15 U.S.C. §1126(e), Dkt. 27 (FAC) ¶ 78; Dkt. 33 (Answer) ¶ 78, and it petitioned to cancel GC's two Registrations. Ex. 10 (A0001); Dkt. 27 (FAC) ¶ 72, Dkt. 33 (Answer) ¶ 72. The PTO denied CT's application because of GC's registrations. *See supra* n.2. The application remains pending until the final outcome of the cancellation proceedings. Dkt. 27 (FAC) ¶ 72; Dkt. 33 (Answer) ¶ 72; Ex. 3 (CT21).

The extensive subsequent procedural history until commencement of this action is detailed in the TTAB Decision, Ex. 1, at 9-22, and CT's Motion for Judgment on the Pleadings, Dkt. 35 at 3-7. Relevant here, after the Federal Circuit determined that neither preclusion nor the CACR were a bar, the TTAB, upon reversal and remand by the Federal Circuit, cancelled GC's two Registrations under Article 8 on December 20, 2022.

GC filed this action on February 20, 2023 pursuant to Section 21(b), Lanham Act, 15 U.S.C. § 1071(b), with Count I, one of multiple counts, directed to the TTAB's decision. On CT's Motion for Judgment on the Pleadings, Dkt. 35, the Court held that the Federal Circuit's decision was law of the case, and, consequently, its ruling that the SDNY action did not give rise to preclusion, *Empresa*, 753 F.3d at 1276-78, controlled. Dkt. 47 (Tr., July 7, 2023) at 18. It rejected CT's argument that GC could not dispute CT's Article 8 claim on the merits because it had not done so in the TTAB. *Id*.

On September 22, 2023 the Court granted the parties' Joint Motion Requesting Disposition on a Written Record, Dkt. 64. Discovery closed on October 10. Dkt. 58. On December 1, 2023,

the Court denied GC's *in limine* and *Daubert* motions. Dkt. 100. The Court then ordered the parties'

trial briefs and evidence limited to Article 8's merits and whether the CACR barred cancellation

under Article 8, while reserving the right to direct the parties to brief other issues. Dkt. 107.

## STANDARD OF REVIEW

An action under Section 21(b), Lanham Act, 15 U.S.C. §1071(b), such as this, Dkt. 27

¶¶ 25, 75, 117-118 (Count I), is *de novo* in the event evidence not before the TTAB is introduced.

*Kappos v. Hyatt*, 566 U.S. 431 (2012). While considering this to be a *de novo* action, the Court has

also stated that it would be "ridiculous not to" consider the TTAB's findings. Dkt. 47 at 22.

The Court's taking the TTAB findings into account is fully supported by authority. As an

alternative to pursuing an appeal to the Federal Circuit, a party dissatisfied with a TTAB decision

may file an action in the district court under Section 21(b). In addition to having the TTAB record

admitted, the parties are permitted to engage in discovery and submit new evidence. *RXD Media,*

*LLC v. IP Application Dev*., 377 F. Supp. 3d 588, 591-92 (E.D. Va. 2019) (quoting *Shammas v.*

*Focarino*, 784 F.3d 219, 225 (4th Cir. 2015)), *aff'd* 986 F.3d 361 (4th Cir. 2021). "[I]f new

evidence is presented on a disputed question of fact, the district court must make *de novo* factual

findings that take account of both the new evidence and the administrative record before the PTO."

*Id.* at 592 (quoting *Kappos*, 566 U.S. at 446). However, "if no new evidence is admitted that relates

to a disputed fact question, the reviewing court must apply the APA substantial evidence standard

to the PTO's findings of fact on that issue." *Id.* (citation omitted). Even when acting *de novo*, "the

district court may, in its discretion, consider the proceedings before and findings of the Patent

Office in deciding what weight to afford an applicant's newly-admitted evidence." *Kappos*, 566

U.S. at 445 (internal quotations and citation omitted).[18]

---

[18] Taking the TTAB's findings into account is consistent with the importance placed by the Court

While CT stresses that the result would be the same whatever the standard of review, it maintains that, in the circumstances, the TTAB's findings should be set aside only if unsupported by substantial evidence: all the fact evidence on the claim *sub judice*, Article 8, was before the TTAB, and the Article 8 claim is distinct from the other grounds for cancellation. CT recognizes, however, that the Court's opinion in *Booking.com v. Matal*, 278 F. Supp. 3d 891, 899 n.2 (E.D. Va. 2017), albeit *dicta*, may foreclose CT's position.

*De novo* fact determinations are to be made upon the preponderance of the evidence, the same standard applied by the TTAB, Ex. 1 (Decision) at 30-31, with the Court taking the TTAB's findings into account. The Federal Circuit's CACR ruling controls as law of the case; if the Court were nonetheless to consider the CACR issue, it should give deference to OFAC's interpretation of its own regulations.

## ARGUMENT

### I. Article 8, IAC's Requirements for Cancellation Have Been Established

Because the PTO denied CT's application to register COHIBA on account of GC's two Registrations, Dkt. 27 (FAC) ¶¶ 72, 78; Ex. 3 (CT21), GC's two Registrations are of an "interfering mark." Ex. 1 (TTAB Decision) at 26. CT addresses Article 8's remaining requirements, first, COHIBA's "legal protection" in Cuba, and then GC's "knowledge," with respect to the First Registration. There is no dispute that they are met with respect to GC's Second Registration.

### A. CT Enjoyed "Legal Protection" for COHIBA Prior to March 13, 1978, When GC Applied to Register COHIBA

As required by Article 8, CT "enjoyed legal protection" for COHIBA in Cuba prior to GC's application date by virtue of: (1) CT's 1972 Reg. No. 110,044, under which the word element of

---

on the Lanham Act's "channel[ing] claims" first to the TTAB. *Stallard v. USPTO*, 658 F. Supp. 3d 298, 307 (E.D. Va. 2023)

the registration was protected; (2) the goodwill CT had built up in COHIBA by the application date; and (3) CT's application for COHIBA without design in 1972. Each would suffice; CT establishes all three.

As to Reg. No. 110,044, the issue in dispute is whether the registration protected COHIBA even though registered with a design element, since GC's application was for the word without any design. CT's expert, Professor Marta Milagro Moreno Cruz, supports her opinion—that COHIBA was protected by the registration even though registered with a design—with two decisions of Cuba's highest court and six decisions of its trademark authority. Ex. 49 (Moreno Rpt.) ¶¶ 5-8; Ex. 50 (Moreno Rebuttal Rpt.) ¶¶ 8-13. GC's expert, Yanay Sanchez, offers a contrary position that cannot be reconciled with the controlling decisions cited by Moreno, lacks any supporting authority and is novel. Ex. 51 (Sanchez Rpt.) ¶¶ 12-30; Ex. 52 (Sanchez Rebuttal Rpt.) ¶¶ 8-25; Ex. 53 (Sanchez) at 72-73; 78-80; 84-85. Sanchez concededly knows of no authority stating that a third-party could register or use a word mark when the word was already registered as part of a mark with a design, called a "mixed mark," Ex. 53 (Sanchez) at 53-57; *see also id.* at 23-27, 34-35, 38-42.[19]

As to the second source of legal protection, Moreno's opinion that Article 240, DL 805/36, protects the goodwill built up by CT in COHIBA against its unauthorized use, regardless of whether Reg. No. 110,044 protected the word element of the registration, is alone consistent with Article 240's text, and is supported by the leading treatise, which was "authorized" by the Secretary

---

[19] Moreno, former dean of University of Havana Law School, created its course on trademark and other industrial property law, which she has taught for over 30 years, and has served as an expert advisor to the Cuban government on policy development and legal norms concerning trademarks. Ex. 49 (Moreno) at Annex A. Sanchez graduated from the Law School in 2001 and, among other positions, worked at the Cuban trademark authority for about 11 years, mainly in the Legal Advisory department. Ex. 54 (PTX889).

of Cuba's Commerce Department (which included Cuba's trademark authority);[20] Sanchez cites no authority. *Compare* Ex. 49 (Moreno) ¶ 13 *with* Ex. 52 (Sanchez) ¶¶ 33-41.

On the third source of protection, both experts agree that CT's 1972 application to register COHIBA without design protected it against anyone registering the same or a similar mark. Ex. 49 ¶ 12; Ex. 52 ¶¶ 28-29. This gave CT the right to bring an action in court to prevent another's registration. *See* Ex. 49 ¶ 12 (unchallenged by Sanchez, Ex. 52 ¶¶ 28-29). They differ on whether this constitutes Article 8 "legal protection." Ex. 49 ¶ 12; Ex. 52 ¶¶ 30-32.

### 1. Legal Protection by Virtue of Cuban Reg. No. 110,044

Reg. No. 110,044 was for "the TRADEMARK Denominated 'COHIBA,' (as per design)" for cigars and other tobacco products, issued on May 31, 1972 for a term of 15 years, *supra*, n.4. The Cuban Supreme Court and trademark authorities cited by Moreno establish that registration, such as Reg. No. 110,044, of a trademark with both word and design elements, a "mixed mark," protected the word element: they uniformly hold that the registration blocks a third party from registering a *word* mark that is the same as or similar to a mixed mark's word element. Ex. 49 (Moreno) ¶¶ 5-6; Ex. 50 (Moreno) ¶¶ 9-10. GC's expert offers no authority to distinguish or rebut these Supreme Court and trademark authority decisions. Ex. 53 (Sanchez) at 54-55.

In 1954, on opposition by the registrant of the mixed-mark , the Cuban Supreme Court denied registration of the word mark SANATOS, holding that, even though "there is no graphic resemblance" between the marks, the two denominations "share such a huge phonetic resemblance that they undoubtedly lead to the confusion that the . . . [Cuban] Industrial Property Law intends to prevent." Ex. 55 at 3. Similarly, in 1932, the Cuban Supreme Court denied

---

[20] MANUEL LLORET Y ROMAN ET AL., INDUSTRIAL PROPERTY LAW 100 (1940) ("Lloret Treatise"), Ex. 57.

registration of the word mark COMPAÑÍA LECHERA DE CUBA, finding that grant of the application "violated" another's rights in its trademark registration for  "and undoubtedly leads to error and confusion." Ex. 56 at 3-4.[21]

The Cuban trademark authority likewise denied registration of the following word marks because they "interfer[ed] with" the word element in the registered mixed marks:

| | | |
|---|---|---|
|  Denied applications for PIRANTINO and PIRASTRO (Ex. 50 at ¶ 10, 45-53) (1942) |  Denied application for OLAVINA (Ex. 50 at ¶ 10, 61-71) (1940) |  Denied application for NOCHE DE GALA (Ex. 50 at ¶ 10, 73-82) (1946) |
|  Denied application for VENERABLE (Ex. 50 at ¶ 10, 95-104) (1945) |  Denied application for SIBONEY (Ex. 50 at ¶ 10, 84-93) (1946) |  Denied application for CRISTAL (Ex. 50 at ¶ 10, 106-112) (1942) |

Sanchez's position is that a word element of a mixed mark would not enjoy legal protection "where the graphic element was substantially more prominent in position, size, and color than the word element." Ex. 51 (Sanchez) ¶ 21; *id.* ¶ 25 However, these factors are not discussed, let alone relied upon, in the above Supreme Court and trademark authority decisions. Nor, Sanchez concedes, are they noted in any other decision, the relevant trademark statute or its implementing regulations. Ex. 53 (Sanchez) at 84-85.

---

[21] The LA LECHERA decision was issued under an earlier law but the relevant provision was substantively identical. *See* Ex. 50 (Moreno) ¶ 9 n.1.

Even if these factors were relevant, COHIBA would have enjoyed legal protection, as Moreno notes. Ex. 50 ¶ 11 (Moreno). Legal protection was afforded to the word element where the word and design elements were in a variety of different positions, sizes and colors. Moreover, COHIBA's position and size are nearly identical to the word elements in other mixed marks the Cuban Supreme Court and trademark authority found enjoyed legal protection.



| *See supra*, p.17 | *See supra*, p.18 | Ex. 12 - 1972 *Boletín Oficial* | Ex. 6 – Counsel's Photo of Original Certificate | Ex. 4 – CT's 1997 Copy of Certificate[22] |

Indeed, COHIBA is stronger than several of the protected word elements: it is the only word (*compare, e.g.*, NOCHE GLORIOSA); it is neither generic nor descriptive or even a Spanish word (*compare*, *e.g.* LA LECHERA); and, unlike SANDOZ and PIRASTRO, claims a color ("*oro*"/gold). *See id.* ¶ 12(c)-(e), (g).

Sanchez also theorizes that, because the elimination of the graphic element of a mixed mark would constitute a "substantial[] change[]" to the mark's "main distinctive elements," this meant that a registrant had to apply for the varied mark to enjoy continued legal protection for a mixed mark's word element standing alone. Ex. 51 (Sanchez) ¶ 21. However, the above authorities squarely foreclose her claim because they were issued while the provision Sanchez relies upon, Art. 136, DL805/36, was in effect. *See* Ex. 50 (Moreno) ¶ 13. And, also dispositive, Article 136

---

[22] The record includes several images of the design with COHIBA in Reg. No. 110,044; three are shown above, including a photo taken by undersigned counsel's office of the original certificate. *See also* CT6, the fully certified copy of the trademark authority's file. Each shows the word and graphic elements with the same position, size and color. The Court denied GC's *in limine* motion to exclude these images, Dkt. 100, which CT showed to be authentic. Dkt. 89 at 10-11, 27-30.

expressly states it does *not* "affect[] the protection of the original trademark" when the registrant applies for the varied mark, Ex. 7 (DL805/36), which CT did: it applied for COHIBA without design in 1972. Ex. 4 (CT1) at 7-8.

## 2. Legal Protection by Virtue of Article 240, DL805/36

Even if Reg. No. 110,044 did not protect the COHIBA word element standing alone, CT enjoyed legal protection for COHIBA under Article 240, DL805/36: it provided that, when a party had built up goodwill in a product identified by a mark, it could protect that goodwill by an action against a third-party for its unauthorized use, regardless of whether the mark was protected by a registration. *See* Ex. 7; Ex. 49 (Moreno) ¶ 13.[23] Article 240 was framed "'in general terms'" to implement the IAC's unfair competition provisions, which also do not condition protection of a mark's goodwill on the mark's registration. Ex. 49 (Moreno) ¶ 13 (quoting Lloret Treatise). Unlike other provisions of the same statute, Article 240 does not reference registration. *Id*. Sanchez's opinion that, even if it had built up goodwill, CT had no legal protection for COHIBA except for whatever was provided by registration is contrary to the leading treatise, is not supported by any authority and lacks foundation in Article 240's text.

COHIBA had established goodwill protected under Article 240 by March 13, 1978. This is more than amply shown by, *inter alia*, CT's sales in Cuba, conservatively, more than 3.1 million cigars; the evidence provided of widespread, positive recognition of the cigar, associated in the public's mind with Fidel Castro; and by COHIBA cigars having been given as commemorative gifts to the hundreds of Cuban delegates and foreign observers at the First Party Congress in Cuba

---

[23] Article 240 prohibited engaging in: (a) "deceptive and misleading acts that . . . tend to take improper advantage of the reputation or industrial, agricultural, commercial or professional goodwill achieved by another as a result of the normal and honest development of [its] activities;" or (b) activities that "attempt[] to undermine that goodwill." Ex. 7 (DL805/36).

in December 1975. Statement of the Facts ("Statement"), pp. 6-8.

### 3. Legal Protection by Virtue of CT's 1972 Application to Register COHIBA

On March 7, 1972, CT applied to register the word mark COHIBA. Ex. 4 (CT1) at 7-8. There is no dispute that the application entitled CT to register the mark before any third party and bring a legal action in the courts to prevent another's registration. *See* Ex. 7 (DL805/36) at Arts. 12, 13 & 107; Ex. 49 (Moreno) ¶ 12; Ex. 52 (Sanchez) ¶¶ 28-29. Article 8 does not require that a party additionally be able to prevent use of a mark to satisfy its "legal protection" requirement.

### 4. CT's Legal Protection Did Not Lapse Because of Non-Use

At the December 1, 2023 hearing, GC advanced the position that, even if CT enjoyed legal protection of the word COHIBA by virtue of Reg. No. 110,044, that protection lapsed due to three years of non-use of the registration's design element. Dkt. 101 (Tr., Dec. 1, 2023) at 5-7.

GC's contention fails on the facts: the evidence shows that the design element was used *after* March 13, 1975. Two witnesses, directly involved in production and sale, so testified: Gonzalez Vasquez, Secretary to the Administration, 1970-75, and Chief of the Economics Department, 1975-83, at *El Laguito*, the factory which produced and sold COHIBA cigars (the Reg. No. 110,044 design was used until the "end of 1975," when a new design was adopted at the time of, and in connection with, the First Party Congress in December 1975); and Valdes Martinez, the buyer of cigars for Cubalse, a Cuban company that bought COHIBA cigars from *El Laguito* and sold them to two retail stores, which it owned (first design used until "towards the end of the year; September or October" of 1975). Cabezas Suarez's recollection that the design was replaced in 1971 cannot be reconciled with the physical evidence of the design being used in July 1974 (the July 1974 Kirby Jones box)—a date consistent with Gonzalez Vasquez and Valdes Martinez's testimony, but not Cabezas's recollection. Statement, pp. 8-9. GC's "lapse" contention thus fails

under the preponderance of the evidence standard.

GC's contention fails on the law as well. Even if the design had not been used for a three-year period, CT's continued use of the word element through March 13, 1978 would have been sufficient to maintain Reg. No. 110,044's protection. Under DL805/36, use of a trademark with different "secondary or non-substantive elements" was "not [] cause for [] lapsing." Art. 136, DL805/36 (Ex. 7). Even for "substantial[]" "change[s]" to the mark's "main distinctive elements," the registration's protection remained in effect unless: (a) a third-party made a complaint about use of the varied mark, *and* (b) the registrant failed, after the complaint was made, to apply for registration of the varied mark. *Id.*

Here, the design element was "secondary" or "non-substantive" and, therefore, use of the mark without it was "not [] cause for [] lapsing," Art. 136, DL805/36 (Ex. 7); *see* Ex. 50 (Moreno) ¶ 13 n.12. As products are known by their names, the word component dominates, especially here, where COHIBA was the mixed mark's only word and highly distinctive, with no Spanish meaning; and the design element was simply a modest variation of a ubiquitous Cuban architectural feature (the *mediopunto*). Ex. 50 (Moreno) ¶ 12 (c)-(e), (g).

Even if use of the mark without the design element were a "substantial[]" "change[]" to the trademark's "main distinctive elements," Art. 136, DL805/36 (Ex. 7), the registration's protections remained. First, CT had applied to register COHIBA without the design on March 7, 1972. Ex. 4 (CT1) at 7-8. Under Article 136, that application would have protected the mixed mark even if a third-party had brought a complaint of non-use of that mark.[24] Second, a registration's protection

---

[24] Article 136 states that "[s]hould the main distinctive elements of the trademark be changed substantially, the [Secretariat of Commerce], upon a prior complaint by a third party, shall require the trademark owner to apply for a new registration, *without affecting the protection of the original trademark*." Ex. 7 (DL805/36) (emphasis added.)

would lapse for non-use only if a third-party made a complaint charging non-use, but none did. Art. 133, DL805/36 (Ex. 7); *see also* Ex. 50 (Moreno) ¶ 17.

Third, for a registration to lapse, the Cuban trademark authority needs to have issued a lapse declaration, but it did not. *Id.* Cuban courts could not decide a registration had lapsed without the issue first having been decided by the trademark authority.[25] And, fourth, even if this Court could substitute itself for the Cuban trademark authority or court, GC's lapse argument would fail because there is no provision allowing retroactive application of a lapse declaration.

Finally, GC's lapse argument need not be reached: it has no bearing on the protection provided COHIBA by its having established goodwill in it over eight years and by CT's application to register COHIBA as a word mark in 1972. Additionally, GC waited too long, until the Dec. 1, 2023 hearing, to assert that Reg. No. 110,044 had lapsed for it to be heard.[26]

## B. CT Has Established GC's "Knowledge" of COHIBA's "Use, Employment, Registration or Deposit" in Cuba

Article 8's "knowledge" requirement is satisfied either by GC's knowledge of COHIBA's "use, employment, registration or deposit" at the time of its application to register COHIBA *or* at the time of its "adoption and use" of COHIBA. Ex. 1 (TTAB Decision) at 2-3, 30.

### 1. GC's "Knowledge" by March 13, 1978, When It Applied to Register COHIBA

The TTAB correctly found GC had the requisite knowledge on March 13, 1978, when it applied to register COHIBA. Ex. 1 (Decision) at 28-31.

---

[25] *See* Ex. 58 (Art. 671, Law No. 7 (1977)) (must exhaust administrative remedies before going to Cuban courts); Ex. 7 (DL805/36) at Arts. 133, 138-39 & Ex. 59 (Decree No. 209/1956) at Arts. 127-31 (procedures for lapse declaration based on non-use).

[26] By then, CT could not present an expert report on the issue. That Sanchez referenced the lapse provision in opining on *another* issue does not avoid waiver. *See Deasy v. Hill*, 833 F.2d 38, 41 (4th Cir. 1987) ("Hinting at a claim in an expert witness statement leaves the opposing party guessing at one's real intentions."). As Sanchez merely touched upon the lapse provision tangentially, Moreno only addressed the issue briefly and out of caution. Ex. 50 (Moreno) ¶ 17.

As the TTAB found, Ex. 1 (Decision) at 30, the November 15, 1977 *Forbes* article establishes GC's pre-March 13, 1978 "knowledge" of COHIBA's "use" or "employment." Read by GC's management, it identified COHIBA as a "brand"; reported that this "brand" was owned by a commercial enterprise, CT, and that this enterprise manufactured and marketed cigars; placed COHIBA among other brands marketed by CT; reported that CT was developing COHIBA for export; and reported that COHIBA-branded cigars was an existing product ("Fidel's favorite brand"). Statement, pp. 9-10.[27]

As the TTAB also found, Ex. 1 (Decision) at 28-29, the first two documents in GC's own COHIBA trademark file, from 1977, stating "brand in Cuba," "presently used in Cuba," "Castro's cigar brand" and "sold in Cuba" on their face establish GC's "knowledge." Moreover, the evidence shows that these statements were made by one of "three or four" persons who were part of GC's "management;" they were consistent with what GC learned from *Forbes*; they were entirely accurate; they were consistent with what was known to be the case by numerous U.S. visitors to Cuba; and they were information GC would have wanted to know given its marketing strategy of labeling products with names that it could associate with Cuban brands. Statement, pp. 4-11.

Hoping to avoid this clear evidence of "knowledge," GC's Executive VP, Edgar M. Cullman, Jr., protests that all he knew pre-March 13, 1978 was that COHIBA was the name of the cigar brand gifted by Fidel Castro. Ex. 34 (Cullman, Jr.) at 133. Yet, the *Forbes* article, admittedly read by him and his father, head of GC, told GC more than that, enough, as the TTAB held, to satisfy Article 8's requirements. Equally significant, his testimony leaves undisturbed GC's own internal documents, whose statements, including "sold in Cuba" and "brand in Cuba," concededly

---

[27] The *Forbes* article also necessarily establishes GC's "knowledge" of COHIBA's registration. It would been implausible in the extreme for CT to not register one of its "brand[s]."

came from GC's "management," one of the "three or four" persons who were involved. And, Cullman, Jr. admitted that he did *not* know whether anyone in the involved "management" group had more knowledge about COHIBA than he asserts he had, including whether it was being sold— which must have been the case, given those internal documents. Statement, pp. 10-11.

Additionally, GC's conceded knowledge that COHIBA-branded cigars were used as State gifts itself satisfies Article 8. The article requires knowledge of "use" or "employment." Their ordinary meaning, as shown by dictionaries contemporaneous with the IAC's adoption, covers use as State gifts. *See* Ex. 60.[28] Moreover, trademarks used to distinguish goods that are distributed free are protected if, as here, Statement, pp. 6-8, there "is some element of open or public use," thereby generating goodwill. 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 19:118 (5th ed. 2023).

## 2. GC's "Knowledge" Prior to November 1982, the Date of GC's "Adoption and Use" of COHIBA

The alternative prong of Article 8's "knowledge" requirement, knowledge prior to "adoption and use," is established, satisfying the requirement even if GC's pre-application knowledge does not.

Days after its application, GC obtained the distinctive COHIBA cigar band, which signified a product branded for sale, and which, indeed, GC considered registering. Statement, p.11. Before November 1982, when commercial shipments of COHIBA-branded cigars began, GC learned that CT had registered COHIBA early in the 1970's in England and France, and had begun exports.

---

[28] When undefined in a statute, a term is given its ordinary meaning, for which contemporaneous dictionaries are consulted, *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566-68 (2012); *see also Vitkus v. Blinken*, 79 F.4th 352, 362 (4th Cir. 2023) (a treaty is interpreted "in good faith in accordance with the ordinary meaning to be given to its terms in their context and in light of its object and purpose") (internal quotations and citation omitted).

Statement, p. 11. It would have been inconceivable for CT to have registered COHIBA abroad without registering it in Cuba, or exported the brand without domestic sales.

When the IAC was drafted, "adoption and use" was the standard term denoting activity sufficient at common law to acquire trademark rights. *Hydro-Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1473-74 (Fed. Cir. 1987). There was no such activity here until GC had obtained the above knowledge. It was only in 1982 that GC decided to apply COHIBA to a product, which it thought of developing that year, took the mark out of its large warehouse of available marks, and then, in November 1982, began commercial shipments. Statement, pp. 11-12.

GC's prior inclusion of COHIBA since February 1978 in its "trademark maintenance program" for 33 marks did not establish any trademark rights. Dispositively, as shown, Statement, pp. 11-12, it was not, as was required, "open, public and notorious [] such that the purchasing public is made aware of the availability of the goods under said mark and of the use of the mark as an indication of the origin of those goods," *Mastic Inc. v. Mastic Corp.*, 230 U.S.P.Q. 699, 701, 1986 WL 83610, at *3 (T.T.A.B. 1986); it was not use that is "part of a commercial or related transaction directed to customers or potential customers for such goods with the purpose of establishing goodwill, recognition, and association." *Times Mirror Mags., Inc. v. Sutcliffe*, 205 U.S.P.Q. 656, 662, 1979 WL 24923, at *8 (T.T.A.B. 1979).[29] Additionally fatal, it did not "deal with the gap . . . between mark selection and final product commercialization," *Ralston Purina Co. v. On-Cor Frozen Foods, Inc.,* 746 F.2d 801, 805 (Fed. Cir. 1984); GC did *not* select COHIBA

---

[29] *See also*, holding to be insufficient, *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1272 (2d Cir. 1974) (Friendly, J.) (sporadic sales with little profit); *Exxon Corp. v. Humble Expl. Co.*, 695 F.2d 96, 100 n.3 (5th Cir. 1983) ("When it is necessary to explain," shipment is for trademark purposes); *Proctor & Gamble Co. v. Johnson & Johnson, Inc.*, 485 F. Supp. 1185, 1204 (S.D.N.Y. 1979) (marks not assigned to products; unrelated products stamped with marks and billed at nominal amounts) *aff'd*, 636 F.2d 1203 (2d Cir. 1981); *Phillips v. Hudnut*, 263 F. 643, 644 (D.C. Cir. 1920) (shipments not requested and discounted).

for an existing or future product until 1982 (Statement, pp. 11-12); *id.* at 804, *distinguishing Richardson-Vicks Inc. v. Franklin Mint Corp.,* 216 U.S.P.Q. 989, 1982 WL 52089, at *3, *7 (T.T.A.B. 1982) (no rights "while the specific product [was] yet to be determined").

## II.    The CACR Do Not Bar Cancellation Under Article 8

### A.  In a Ruling That Is Law of the Case, the Federal Circuit Decided the CACR Issue Against GC

The Federal Circuit expressly held that CACR General License 31 C.F.R. Section 515.527, Ex. 61, authorizes CT to obtain cancellation by the TTAB under Article 8. Its decision makes this crystal clear, as does GC's unsuccessful *certiorari* petition to the Supreme Court. The Federal Circuit's decision is law of the case and thus disposes of the CACR issue.

The Federal Circuit held, 753 F.3d at 1275:

> Before the Board, Cubatabaco enjoys affirmative authorization to seek cancellation emanating from the general license provided by the CACR. In a letter to Cubatabaco's counsel in 1996, OFAC explained that § 515.527(a)(1) authorizes Cuban entities to engage in transactions "related to the registration and renewal" of trademarks in the USPTO and "may be relied on . . . to petition to cancel a prior registration of a trademark where these actions relate to the protection of a trademark in which Cuba or a Cuban national general license [*sic*] has an interest."

In its *certiorari* petition, GC asked for review of the following question:

> Whether the [CACR], which generally prohibit the transfer of any property to a Cuban entity by a person subject to U.S. jurisdiction, 31 C.F.R. § 515.201(b), bar a Cuban corporation from obtaining administrative cancellation of a trademark registration that has been held by a U.S. company for more than thirty years.[30]

General Cigar advised the Supreme Court that, Ex. 62 (*certiorari* petition) at 2:

> [T]he Federal Circuit has held, in the decision below, that the Regulations do not prohibit Cubatabaco from obtaining cancellation of th[e] mark in a [TTAB] proceeding . . .[31]

---

[30] Ex. 62 (*General Cigar Co, Inc. v. Empresa Cubana del Tabaco, D/B/A Cubatabaco*, No. 14-512, Petition for a Writ of Certiorari (October 2014)) at (i) (extracts).

[31] *See also, e.g.,* Ex. 62 (*certiorari* petition) at 13, 15 (emphasis in original): "the Federal Circuit concluded that the Regulations do *not* prohibit Cubatabaco from obtaining cancellation of the same

The TTAB correctly considered the Federal Circuit's decision to settle the issue.[32]

This Court has held that the Federal Circuit's decision is law of the case. Dkt. 46 (Order, July 7, 2023); Dkt. 47 (Tr., July 7, 2023) at 18. Consequently, as law of the case, the Federal Circuit's decision requires rejection of GC's Count Ten defense to CT's Article 8 claim.

In ruling from the bench that the Federal Circuit decision is law of the case, the Court expressly referenced the Federal Circuit's decision on preclusion, Dkt. 47 at 18, not, as well, its CACR ruling, which CT had also asserted to be law of the case. Dkt. 35 (Motion for Judgment on the Pleadings) at 7. In CT's estimation, this carries no significance. Moreover, there is no basis for the Federal Circuit's preclusion but not its CACR ruling to be law of the case.

**B. Even If the Issue Is Considered Anew, the CACR Do Not Bar Cancellation**

Just as the Federal Circuit held, 31 C.F.R. Section 515.527(a)(1) authorizes cancellation under Article 8. It authorizes "[t]ransactions related to the registration and renewal in the [USPTO] . . . of . . . trademarks . . . in which the Government of Cuba or a Cuban national has an interest." Ex. 61. In 1996, OFAC's Director, R. Richard Newcomb, issued a letter, Ex. 64 (CT22), on "whether Cuba may bring a petition to cancel the prior registration of a trademark related to its efforts to register a trademark," stating:

> The authorization contained in § 515.527 and the parallel provisions of § 515.528 are intended to provide reciprocal protection for the intellectual property of Cuba and the United States. Both of the processes you describe in your correspondence concern available legal means to protect trademarks in the United States. For this reason, the authorization contained in § 515.527 may be relied on to file an opposition to the registration of a new trademark or to petition to cancel a prior

---

[32] registrations from the TTAB;" "the Federal Circuit has interpreted the general license in § 515.527(a)(1) to *permit* Cubatabaco to obtain a cancellation of the same COHIBA registration [as currently owned by General Cigar] by the TTAB."

[32] Ex. 1 (TTAB Decision) at 22-23. CT stated in its opening TTAB brief that the Federal Circuit had rejected GC's CACR defense. *See* Ex. 63 at 10 (A91026). GC did not respond. A91272-467 (GC's Opposition Trial Brief in the TTAB).

registration of a trademark where these actions relate to the protection of a trademark in which Cuba or a Cuban national general license [*sic*] has an interest.

Consideration of Section 515.527's text suffices to establish the TTAB's authority. It authorizes "transactions related to the registration." The CACR define "transaction" to include "transfer," 31 C.F.R. § 515.309(a), which it defines to include "the issuance" of an "administrative process or order." 31 C.F.R. § 515.310 (Ex. 61). The TTAB's issuance of an order cancelling registrations that block a Cuban party's registration of a trademark is thus a transaction "related" to the Cuban party registering the trademark.

To the extent, if any, Section 515.527's text is considered ambiguous, the OFAC Director's letter settles the matter. Just as the Federal Circuit held, cancellation under Article 8 falls squarely within its four corners because the two GC registrations that CT seeks to cancel block its application to register COHIBA. *Empresa,* 753 F.3d at 1275.

The OFAC Director's letter is not only entitled to great weight but meets all the conditions entitling an agency's interpretation of its own regulations to judicial deference. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2410-23 (2019); *Romero v. Barr*, 937 F.3d 282, 291 (4th Cir. 2019) (discussing *Kisor*). The regulation it interprets is a quintessential "legislative" rule, as it is entirely of OFAC's own formulation, issued in the exercise of unfettered discretion under the broadest conceivable grant of authority from Congress.[33] The Director's letter is "reasonable;" its "character and context" support giving it controlling weight; it expresses OFAC's "authoritative and official position;" it implicates OFAC's "own substantive expertise;" it is not a *post-hoc* rationalization of

---

[33] The CACR allow OFAC to authorize otherwise prohibited transactions in its unfettered discretion. *See* 31 C.F.R. § 515.201(b) (Ex. 61). Congress's grant of authority to prohibit, and license, transactions related to property in which Cuba or a Cuban national has an interest, is conditioned only on the President determining it is in the "national interest" to do so. *See* Amendments to the Trading with the Enemy Act, Public L. No. 95–223, § 101, 91 Stat. 1625, 1625 (1977); *Regan v. Wald*, 468 U.S. 222, 225-229 (1984).

the agency's prior position or a litigation position; and it did not change a prior interpretation. Further, the Director's letter may be seen as itself authorization: OFAC allows transactions "by means of . . . rulings . . . licenses or otherwise." 31 C.F.R. § 515.201(a) (Ex. 61).

Moreover, at issue is a self-executing provision in a treaty in force between the United States and Cuba. Only "the political branches . . . hold the authority to repudiate" treaties, and, when they "have given no indication that they wish to do so," a treaty provision must be applied. *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 260-61 (1984). GC's is an extreme version of the position *Franklin Mint* rejected: it asks the Court to find that the United States has abrogated its Article 8 obligations because of an Executive regulation, the CACR, without the Executive so stating or so advising the Court, contrary to the Executive's express position and its express policy of preserving Cuba's reciprocal protection of U.S. intellectual property.[34]

The Court has observed, apparently with Section 2(d), Lanham Act, 15 U.S.C. § 1052(d), in mind, that the CACR's application to a ground for cancellation may turn on whether it requires CT to have a "property right" or "legal rights" to a U.S. trademark that it cannot acquire under the CACR. Dkt. 101 at 9-10 (Tr., Dec. 1, 2023). This issue does not arise with respect to Article 8: it only requires CT to own a *Cuban* trademark which enjoyed legal protection *in Cuba* and GC to have had knowledge of CT's use, employment, registration or deposit of the *Cuban* mark *in Cuba*, none of which are regulated by the CACR. *See* 31 C.F.R. § 515.201(b) (Ex. 61).

## CONCLUSION

For the foregoing reasons, judgment should be entered in favor of Cubatabaco.

---

[34] The United States' failure to honor Article 8 would entitle Cuba to do the same. RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW, § 335(1) (AM. LAW. INST. 1987). U.S. companies have successfully invoked Article 8 in Cuba. Ex. 65 (*Olin Corp.* (WINCHESTER)).

Dated: January 16, 2024

Respectfully submitted,

/s/ Benjamin L. Hatch
_____
Benjamin L. Hatch (VA Bar No. 70116)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Ste 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3727
Facsimile: (757) 640-3947
E-mail: bhatch@mcguirewoods.com

Lucy Jewett Wheatley (VA Bar No.77459)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-4320
Facsimile: (804) 698-2017
E-mail: lwheatley@mcguirewoods.com

John Marston (VA Bar No. 95106)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
Tel: 202-232-1200
Fax. 202-785-6687
jmarston@foleyhoag.com

Michael Krinsky (Admitted *Pro Hac Vice*)
Lindsey Frank (Admitted *Pro Hac Vice*)
RABINOWITZ, BOUDIN, STANDARD,
KRINSKY & LIEBERMAN, P.C.
320 West 85th Street
New York, NY 10024
Tel: 212-254-1111
Fax: 212-674-4614
mkrinsky@rbskl.com
lfrank@rbskl.com

Natasha N. Reed (Admitted *Pro Hac Vice*)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
Tel: 212-812-0400
Fax: 212-812-0399
nreed@foleyhoag.com

Nicole Kinsley (Admitted *Pro Hac Vice*)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
Tel : 617-832-1000
Fax : 617-832-7000
nkinsley@foleyhoag.com

*Attorneys for Empresa Cubana del Tabaco,d.b.a. Cubatabaco*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of January, 2024, a true and accurate copy of the foregoing was electronically filed with the Clerk of the Court for the Eastern District of Virginia, using the CM/ECF system, which will send a notification of such filing to all counsel of record.

Dated: January 16, 2024

/s/ Benjamin L. Hatch
Benjamin L. Hatch

*Attorney for Empresa Cubana del Tabaco, d.b.a. Cubatabaco*