**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

GENERAL CIGAR COMPANY, INC.,

        Plaintiff,

v.

EMPRESA CUBANA DEL TABACO, D.B.A.
CUBATABACO.

        Defendant.

Case No: 1:23-CV-227 (LMB/WEF)

<u>**PLAINTIFF GENERAL CIGAR COMPANY, INC.'S TRIAL BRIEF**</u>

# Table of Contents

I.     INTRODUCTION ........................................................................................ 1

II.    STATEMENT OF FACTS ........................................................................ 4

A.    The Claimed Development of a "Cohiba" Cigar Prior to March 13, 1978. .............. 4

B.    GC's Lack of Knowledge Concerning Trademark Use of the COHIBA Mark in Cuba Prior to March 13, 1978. .................................................................. 7

III.   THE CUBAN EMBARGO REGULATIONS AND LIBERTAD ACT BAR THE COURT FROM CANCELLING GC'S REGISTRATIONS UNDER ARTICLE 8 OF THE IAC OR ANY OTHER LEGAL THEORY ............................................. 8

A.    Nature of this Action under 15 U.S.C. § 1071(b)(1) ................................. 8

B.    The CACR and LIBERTAD Act, as Explained in the Second Circuit's Decision in *Empresa V*, Bar This Federal Court from Cancelling GC's Registrations. ............ 9

IV.   EVEN IF NOT BARRED BY THE CACR, CT MAY NOT PREVAIL ON THE MERITS OF AN ARTICLE 8 CLAIM UNDER THE IAC .................................. 16

A.    Legal Standard on an Article 8 Claim .................................................. 16

B.    CT Has the Burden of Showing that the COHIBA Word Mark "Enjoyed Legal Protection" in Cuba Prior to March 13, 1978. .......................................... 16

     *1.Article 8's Requirement of "Legal Protection"* ...................................... 16

     *2.The Provisions of Cuban Decree-Law 805 of 1936 Governing Trademarks* .............. 18

     *3. Article 136 of DL 805/36 Required Separate Registration of the COHIBA Word Mark for Protection to Attach to that Mark.* ......................................... 22

     *4.The Design Mark Registration Lapsed Prior to March 13, 1978 and CT Therefore Cannot Satisfy the "Legal Protection" Requirement of Article 8.* .............................. 24

C.    CT Cannot Meet the "Knowledge" Element of Its Article 8 Claim. ...................... 26

     *1.Use" Means "Trademark Use" as Understood at the Time the IAC Was Ratified.* .... 26

     *2.GC Did Not Have "Knowledge" of Trademark "Use" by CT as of March 13, 1978.* 28

V.    CONCLUSION ....................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*B & B Hardware, Inc. v. Hargis Indus., Inc.*,
  575 U.S. 138 (2015) ........................................................................................................... 14

*Baker v. Booz Allen Hamilton, Inc.*,
  358 F. App'x. 476 (4th Cir. 2009) ...................................................................................... 17

*Breard v. Greene*,
  523 U.S. 371 (1998) ........................................................................................................... 13

*Continental Corp. v. Nat'l Union Radio Corp.*,
  67 F.2d 938 (7th Cir. 1933) ............................................................................................... 27

*Emergency One, Inc. v. Am. Fire Eagle Engine Co.*,
  332 F.3d 264 (4th Cir. 2003) ............................................................................................. 28

*Empresa Cubana del Tabaco v. General Cigar Co., Inc.*,
  2013 WL 6910109 (Fed. Cir. Dec. 23, 2013) ............................................................. 12, 14

*Empresa Cubana del Tabaco v. General Cigar Co., Inc.*,

*Empresa I*: 213 F. Supp. 2d 247 (S.D.N.Y. 2002) ...................................................................... 2

*Empresa II*: No. 97 Civ. 8399, 2002 WL 31251005 (S.D.N.Y. Oct. 8, 2002) .............................. 2

*Empresa III*: No. 97 Civ. 8399, 70 U.S.P.Q.2d 1650, 2004 WL 602295 (S.D.N.Y.
  Mar. 26, 2004) ..................................................................................................................... 2

*Empresa IV*: No. 97 Civ. 8399, 2004 WL 925647 (S.D.N.Y. Apr. 30, 2004) ............................. 2

*Empresa IX*: Cancellation No. 9202585, 2022 WL 17844056 (T.T.A.B. Dec. 20,
  2022) ..................................................................................................................................... 2

*Empresa V*: 399 F.3d 462 (2d Cir. 2005) ............................................................................ *passim*

*Empresa VI*: 547 U.S. 1205 (2006) .............................................................................................. 2

*Empresa VII*: Cancellation No. 9202585, 2013 WL 3168090 (T.T.A.B. Mar. 14.
  2013) ..................................................................................................................................... 2

*Empresa VIII*: 753 F.3d 1270 (Fed. Cir. 2014) .................................................................. 2, 14, 15

*Glover v. Ampak, Inc.*,
   74 F.3d 57 (4th Cir. 1996) ...........................................................................16

*In re Gregg & Son, Inc.*,
   24 F.2d 898 (D.C. Ct. App. 1928) ...............................................................27

*Havana Club Holding, S.A. v. Galleon, S.A.*,
   203 F.3d 116 (2d Cir. 2000) ....................................................................9, 13

*Henry v. S/S Bermuda Star*,
   863 F.2d 1225 (5th Cir. 1989) .....................................................................21

*Kappos v. Hyatt*,
   566 U.S. 431 (2012) .......................................................................................8

*Matal v. Tam*,
   582 U.S. 218 (2017) .....................................................................................14

*Medtronic, Inc. v. Mirkowski Family Ventures, LLC*,
   571 U.S. 191 (2014) .....................................................................................16

*Moke Am. LLC v. Am. Custom Golf Cars, Inc.*,
   2023 WL 3232601 (E.D. Va. May 3, 2023) ...................................................8

*Mulugeta v. Ademachew*,
   407 F. Supp. 3d 569 (E.D. Va. 2019) ...........................................................17

*Palateria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. DE C.V.*,
   188 F. Supp. 3d 22 (D.D.C. 2016) ...............................................................16

*Perforaciones Maritimas Mexicanas S.A. de C.V. v. Seacor Holdings*,
   2008 WL 11394261 (S.D. Tex. Sept. 2, 2008), *aff'd and remanded*, 356 Fed.
   Appx. 675 (5th Cir. 2009) .............................................................................22

*Rolley, Inc. v. Younghusband*,
   204 F.2d 209 (9th Cir. 1953) ...................................................................28, 29

*Swatch AG v. Beehive Wholesale, LLC*,
   739 F.3d 150 (4th Cir. 2014) .....................................................................8, 15

*U.S. v. Monsanto*,
   491 U.S. 600 (1989) .....................................................................................25

**Statutes**

15 U.S.C. § 1071(b) ...................................................................................8, 15

22 U.S.C. § 6032(h) .........................................................................................9

22 U.S.C. §§ 6021 ........................................................................................................1

**Other Authorities**

31 C.F.R. §§ 515.101–515.901 (2022) ...................................................................1, 9

31 C.F.R. § 515.201 ....................................................................................................9

31 C.F.R. § 515.201(b)(1) .........................................................................................10

Fed. R. Civ. P. 12(c) .................................................................................................16

FED. R. CIV. P. 44.1 ..................................................................................................17

45 *Int'l Journal of Legal Information* (July 2017)....................................................20

John H. Merryman, Rogelio Perez-Perdomo, THE CIVIL LAW TRADITION (4th ed. 2019) .....................................................................................................................21

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed. 2023) § 19:118 ...................30

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed. 2023) § 32.50......................16

Nims, UNFAIR COMPETITION AND TRADE-MARKS (2d ed.), § 212 ............................................27

TRADEMARK PROTECTION AND TERRITORIALITY CHALLENGES IN A GLOBAL ECONOMY (Northampton, MA 2015) ("Farley"), at 60-61 ................................................26, 27

## I.   INTRODUCTION

Plaintiff General Cigar Co., Inc. ("GC") respectfully submits this Trial Brief establishing its right to relief on Counts I and X of its Amended Complaint.  (Dkt. No. 27).  Count I (*id.* ¶¶ 75-118) seeks a declaration that Defendant Empresa Cubana del Tabaco ("CT") cannot establish a claim for cancellation of GC's two U.S. trademark registrations ("Registrations") for the mark COHIBA for cigars under Article 8 of the 1929 General Inter-American Convention for Trade Mark and Commercial Protection, 46 Stat. 2907 ("Article 8" and "IAC").[1]  Count X (*id.* ¶¶ 161-171) seeks a declaration that the Court is barred under the Cuban Assets Control Regulations (the "CACR"), 31 C.F.R. §§ 515.101–515.901 (2022), and the codification of the CACR in the LIBERTAD Act, 22 U.S.C. §§ 6021 *et seq*, from cancelling GC's Registrations under Article 8 or any other theory of law, including the claims against which declaratory relief is sought in Counts II through IX of the Amended Complaint.

As detailed below, the trial evidence and law show that the Court should enter judgment in favor of GC on both Counts.  Because Count X does not require the Court to determine the content of foreign law, and a ruling favorable to GC on that Count would moot the Article 8 claim (and all other claims in this action), the CACR issue should be considered first.

---

[1] On March 13, 1978, GC applied to register a standard word mark COHIBA for "cigars," claiming a first use in commerce date of February 13, 1978.  Trial Declaration of J. Kevin Fee, ("Fee Decl.") ¶ 4, Ex. 1.  U.S. Reg. No. 1,147,309 was issued by the USPTO for this mark on February 17, 1981 ("First Registration").  *Id*.  On June 23, 1986, GC filed a Declaration under Sections 8 and 15 of the Lanham Act, *id*. ¶ 5, Ex. 2, making GC's First Registration incontestable.  *Id*. ¶ 6, Ex. 3 at A92130.  GC's First Registration is valid and subsisting.  *Id*. at A92131-39, A92143, A92145-46, A92157-58, A92171-74, A92178, A92185-91.  On December 30, 1992, GC applied for the stylized mark **COHIBA** under Section 1(b) of the Lanham Act.  *Id*. ¶ 7, Ex. 4 at A92193-96.  The registration issued as U.S. Reg. 1,898,273 on June 6, 1995 ("Second Registration").  *Id*. ¶ 8, Ex. 5.  GC's Second Registration is valid and subsisting.  *Id*. ¶ 7, Ex. 4 at A92261, A92279.  The First and Second Registrations are collectively referred to herein as the "Registrations."

The CACR and LIBERTAD Act bar this Court from cancelling GC's Registrations to the benefit of CT, because any such cancellation would constitute a transfer of property to a Cuban entity prohibited by the CACR. The Second Circuit, in *Empresa Cubana del Tabaco v. General Cigar Co., Inc.*, 399 F.3d 462 ("*Empresa V*"), held that a judicial cancellation of the Registrations at CT's request would be a transfer of property to a Cuban entity—CT—by a person subject to U.S. jurisdiction—a federal court—forbidden by the CACR, without any license authorizing such a transfer.[2] The Second Circuit also held that an international trademark treaty ratified before the LIBERTAD Act that required such a cancellation would irreconcilably conflict with U.S. law and would thus be "null." *Empresa V*, 399 F.3d at 481. The Second Circuit's analysis of the CACR and its holding that GC's Registration may not be cancelled apply to Count I here (the IAC was ratified in 1931, 65 years before enactment of the LIBERTAD Act) and requires a judgment determining that CT is not entitled to cancellation of the Registrations under Article 8 (or any other theory). Moreover, the Federal Circuit's ruling in *Empresa VIII* does not change this outcome.

---

[2] To assist the Court in distinguishing among the various *Empresa Cubana* decisions, and as in prior filings in this case, this brief and GC's subsequent filings will use the following short references (not all of these decisions are cited in this brief):

*Empresa I*: 213 F. Supp. 2d 247 (S.D.N.Y. 2002) (dismissal of Article 8 claim).

*Empresa II*: No. 97 Civ. 8399, 2002 WL 31251005 (S.D.N.Y. Oct. 8, 2002) (denying CT motion for reconsideration of dismissal).

*Empresa III*: No. 97 Civ. 8399, 70 U.S.P.Q.2d 1650, 2004 WL 602295 (S.D.N.Y. Mar. 26, 2004). (post-trial findings of fact and conclusions of law).

*Empresa IV*: No. 97 Civ. 8399, 2004 WL 925647 (S.D.N.Y. Apr. 30, 2004) (final judgment).

*Empresa V*: 399 F.3d 462 (2d Cir. 2005) (affirming dismissal of Article 8 claim and reversing other relief granted to CT by district court).

*Empresa VI*: 547 U.S. 1205 (2006) (denying CT petition for cert.).

*Empresa VII*: Cancellation No. 9202585, 2013 WL 3168090 (non-precedential) (T.T.A.B. Mar. 14. 2013) (granting summary judgment dismissing CT Amended Petition on standing grounds)

*Empresa VIII*: 753 F.3d 1270 (Fed. Cir. 2014) ("Federal Circuit Decision") (reversing TTAB, reinstating Amended Petition, ruling on preclusion).

*Empresa IX*: Cancellation No. 9202585, 2022 WL 17844056 (precedential), at *1 (T.T.A.B. Dec. 20, 2022) ("TTAB Decision") (sustaining CT Article 8 claim and cancelling Registrations).

The Federal Circuit limited its holding to cancellation proceedings in the TTAB and recognized that the Second Circuit's CACR holding does apply to bar cancellation claims in federal court.

If the Court reaches the Article 8 claim, it should grant judgment to GC, because CT cannot establish the necessary elements, that: (1) CT "enjoyed legal protection" for the COHIBA mark in Cuba prior to March 13, 1978, the date when GC filed for its First Registration; and (2) on or before March 13, 1978, CT engaged in trademark "use" of the COHIBA mark in Cuba of which GC had "knowledge." While GC's opposition will respond to any argument on legal protection that CT presents, CT cannot prevail on the legal protection issue because it did not receive a Cuban registration for the COHIBA word mark until July 1, 1980, well after March 13, 1978.

Before July 1, 1980, CT owned only a registration for a design mark, Cuban Reg. No. 110,044, which consisted of a large, elaborate design of a fan of tobacco leaves and where the word "COHiBA" [sic] in small, stylized lettering appearing at the bottom of the design was only a minor element (the "Design Mark"). The word mark COHIBA used alone would have been a substantial change to the main distinctive elements of the Design Mark. Under then-applicable Cuban law, the word mark was effectively a new mark, which would not be legally protected unless separately registered. The word mark was not registered until July 1, 1980, however, two years after GC's U.S. filing date. The undisputed facts further indicate that CT ceased all use of the Design Mark by 1971 or 1972. Under Cuban law of the era, a trademark registration lapsed if the mark was not used for three consecutive years. CT would therefore have lacked protection for any mark incorporating "Cohiba" as of March 13, 1978. On the second element, CT cannot prove that GC had knowledge that CT was already engaged in trademark "use" of any COHIBA mark in Cuba as of March 13, 1978. The record shows that all GC knew was that the name of the private reserve cigar smoked by Fidel Castro was "Cohiba." Neither of these are trademark "uses," and

GC's knowledge of non-trademark uses of "Cohiba" does not satisfy Article 8's requirements.

## II.     STATEMENT OF FACTS[3]

### A.  The Claimed Development of a "Cohiba" Cigar Prior to March 13, 1978.

CT's witnesses have testified that around 1966, the head of the El Laguito cigar factory gave Fidel Castro an unbanded, unnamed cigar, which Castro enjoyed.  Fee Decl. ¶ 9, Ex. 6 at 63:15-65:9, 66:25-67:4; ¶ 10, Ex. 7 Tr. at 24:20-25:9; ¶ 12, Ex. 9 Tr. at 294:6-14; ¶ 13, Ex. 10 at Tr. 60:18-61:6.  El Laguito, which was not affiliated with CT, manufactured cigars "exclusively for Fidel Castro" under a "special plan of tobacco" for the Cuban Council of State.  *Id*. ¶ 10, Ex. 7 Tr. 21:2-7, 25:10-24; ¶ 13, Ex. 10 Tr. 59:10-24.  Castro began gifting these unnamed cigars to other members of the Cuban government and to visiting diplomats and dignitaries.  *Id*. ¶ 14, Ex. 11 Tr. 12:10-16, 19:12-20:21, 21:3-16; ¶ 15, Ex. 12 Tr. 30:12-19, 31:20-32:20.  Around 1967 or 1968, Celia Sanchez, the head of the "Council of State," named Castro's private cigar "Cohiba."  *Id*. ¶ 13, Ex. 10 Tr. 10:3-6, 10:16-23, 21:15-22:4, 22:11-23:23.  Sanchez asked Daniel Garcia, a graphic designer, to design containers and the cigar band for the "tobaccos that were smoked by [] Castro."  *Id*.  Garcia developed the design below.  *Id*. Tr. 27:16-28:8; ¶ 11, Ex. 8 Tr. 74:11-19.



*Id*. ¶¶ 16-17, Exs. 13-14[4] (translation and excerpted photocopy above).

---

[3] GC has filed its objections to evidence on CT's exhibit list and transcript designations, all of which GC reserves.  (Dkt. No. 98).  CT waived any and all objections by failing to comply with the Court's order to file objections to GC's Exhibit List.  (Dkt. No. 19).

[4] Exhibits 13-14 to the Fee Declaration were belatedly produced by CT, which CT claimed were a certified copy and color photocopy of the registration certificate for the mark registered as Cuban Reg. No. 110,044.  The Court denied GC's motion *in limine* (Dkt. Nos. 79, 100) seeking exclusion of CT's exhibits purporting to be copies of this certificate.   GC does not waive its right to appeal from the Court's denial of its motion *in limine* or concede the accuracy of any of the copies produced by CT.

El Laguito continued manufacturing those cigars with this design, for the sole use of Fidel Castro and the State Council of Cuba, to give as gifts to favored foreign visitors. *Id*. ¶ 10, Ex. 7 Tr. 21:17-24:4. Over 27 years of litigation, CT has not produced any images of cigar bands or cigar boxes bearing this design, and in discovery here, CT admitted that it has no such documents (or any records of sales, manufacturing, or marketing of Cohiba cigars before 1982). *Id*. ¶ 18, Ex. 15 at RFA Nos. 1-34; *see also* ¶ 12, Ex. 9 at Tr. 321:3-13; ¶ 19, Ex. 16 at Tr. 21:18-22:2, 93:3-11; ¶ 20, Ex. 17 at Tr. 55:3-16; ¶ 9, Ex. 6 at Tr. 28:19-29:7; ¶ 21, Ex. 18 at Tr. 62:15-22, 64:13-15.

On September 29, 1969, during negotiations to transfer the El Laguito factory from the State Council to CT, CT applied to the Cuban entity with responsibility for registering trademarks to register the Design Mark as a trademark under Cuban law.[5] *Id*. ¶ 16, Ex. 13; ¶ 14, Ex. 11 at Tr. 19:12-20:2; ¶ 13, Ex. 10 at Tr. 71:11-72:16. The registration issued on May 16, 1972 under Registration No. 110,044. *Id*. The registration certificate delivered to CT ("Certificate") described the registered Design Mark as "COHIBA (according to design)." *Id*. The Certificate stated that the registration covered use of the mark for "raw tobacco, tobacco processed for smoking, chewing or sniffing, and cigarettes" – no mention was made of cigars. *Id*. ¶¶ 16-17, Exs. 13-14. This registration lapsed under Cuban law for non-use by 1975, as GC shows below. Had that lapse not occurred, the registration would have lapsed on May 16, 1987, 15 years after issuance when CT failed to file for renewal. *Id*. ¶ 11, Ex. 8 at Tr. 71:4-74:10.

The second page of the Certificate contains a box labeled "DISEÑO" ("DESIGN") (this box appears to be standard for Cuban certificates of the era). *Compare id*. ¶ 16, Ex. 13 at 6 *with*

---

[5] Authority over trademark registrations has been held by different Cuban government entities from 1936 to now. Currently that authority is exercised by the Cuban Office of Industrial Property ("OCPI") [Oficina Cubana de la Propiedad Industrial]. This brief will refer to these authorities as the "Registration Authority" rather than their individual names except where necessary.

*id*. ¶ 22, Ex. 19 at CT2005586.  Reproduced within the DESIGN box was the Design Mark created by Garcia, consisting of a stylized white design of a large fan of tobacco leaves, arching over another, smaller fan that could be an allusion to a peacock's tail, all against a black background. *id*. ¶ 16, Ex. 13 at 6; *see also id*. ¶ 13, Ex. 10 Tr. at 27:16-28:8; *id*. ¶ 11, Ex. 8 at Tr. 74:11-19. Centered below the two-fan design was the small word "COHiBA" (the "i" is presented in lowercase type) in a stylized font and appearing in a dark tan color in the color reproduction of the mark (although "gold" is claimed in the Certificate).  *Id*. ¶ 16, Ex. 13.

On March 7, 1972, prior to the issuance of Reg. No. 110,044, CT applied to the Registration Authority to register a COHIBA word mark.  *Id*. ¶ 23, Ex. 20; *id*. ¶ 38, Ex. 35 at 3-4.  The registration issued as Cuban Reg. No. 111,059 on July 1, 1980 for "raw tobacco, tobacco processed for smoking, chewing or sniffing, and cigarettes" ("Word Mark Registration").  "Cigars" was not claimed.  *Id*.  CT claims this registration remains in force in Cuba.[6]  *Id*. ¶ 24, Ex. 21.

When CT took over the manufacturing of Cohiba cigars at El Laguito in 1970, CT's board of directors disliked the "colonial style" of Garcia's design and that same year asked Humberto Cabezas, the PR director of CT, to develop an entirely new design to support a new image for the Cohiba cigars.  *Id.* ¶ 14, Ex. 11 at Tr. 12:10-16, 19:12-20:21, 21:3-16; *id*. ¶ 15, Ex. 12, at Tr. 30:12-19, 31:20-32:20.  The new design, pictured below ("Indian Head Mark"), was approved in 1971 and (with minor updates) was the only design CT used on Cohiba cigars until the early 1980s:



---

[6] GC reserves the right, if the Court asks for briefing on other counts, to show that CT did not timely renew the Word Mark Registration. (*See* Dkt. No. 27 at ¶¶ 65, 115).

*id*. ¶ 25, Ex. 22; *id*. ¶ 11, Ex. 8 at Tr. 75:5-7; 24:12-14; *id*. ¶ 20, Ex. 17 at Tr. 88:12-23; *id*. ¶ 14,

Ex. 11 at Tr. 28:3-24.  At the same time, in 1971 or 1972, CT ceased all use on cigars of the Design

Mark which had been registered in Cuba under Reg. No. 110,044, and never resumed such use of

this mark on cigars.  *Id*. ¶ 11, Ex. 8 at Tr. 74:20-75:8; ¶ 13, Ex. 10 at Tr. 55:4-23, 61:7-62:2, 66:25-

67:6; ¶ 14, Ex. 11 at Tr. 12:10-16, 19:12-20:21, 21:3-16; ¶ 15, Ex. 12 at Tr. 30:12-19, 31:20-32:20.

Until the mid-1990s, "diplomarkets" in Cuba were stores in which only non-Cubans could

shop.  *Id*. ¶ 9, Ex. 6 at Tr. 9:8-15, 19:3-13, 27:14-28:5.  These diplomarkets accepted payments in

only hard currency or dollars, not Cuban pesos.  *Id*. at Tr. 27:14-25. Around 1972-1973, after CT

ceased using the Design Mark, CT started offering Cohiba cigars featuring the Indian Head Mark

in diplomarkets, *id*. ¶ 14, Ex. 11 at Tr. 68:2-10, but these were not available for purchase by Cuban

nationals until around 1993.  *Id*. ¶ 9, Ex. 6 at Tr. 27:14-28:9; *see also* ¶ 19, Ex. 16 at Tr. 24:3-13.

CT took no steps to put "Cohiba"-branded cigars on the public market until 1981.  The first

public references to a "new" cigar brand launched by CT called Cohiba were in 1981.  *id*. ¶ 26,

Ex. 23 at A22607-614 (*World Tobacco* July 1982); ¶ 27, Ex. 24 at A22616-20 (Sept. 22, 1982

Cigar Association of America Report); ¶ 28, Ex. 25 (*Cubatabaco International* July-December

1981); ¶ 15, Ex. 12 at Tr. 29:15-21; ¶¶ 11-12, Exs. 8-9 at Tr. 13:6-25, 207:23-209:6, 210:1-12.

**B.  GC's Lack of Knowledge Concerning Trademark Use of the COHIBA Mark in Cuba Prior to March 13, 1978.**

In the Southern District action, GC officers and employees testified that they had no

personal knowledge about any Cuban use in trade of the "Cohiba" mark prior to March 13, 1978.

What they were told by others outside the company was that "Cohiba" was the name of Fidel

Castro's personal cigar and that "Cohiba" cigars were given away as gifts to visiting diplomats

and personalities by Castro and members of his government.  *See id*. ¶ 29, Ex. 26 at Tr. at 60:11-

61:8; ¶ 30, Ex. 27 at Tr. 133:7-136:13, 138:12-23, 139:25-141:10, 167:22-168:8, 635:13-24; ¶ 31,

Ex. 28 at Tr. 22:20-22; ¶ 32, Ex. 29 at Tr. 26:2-8; ¶ 33, Ex. 30 at Tr. 16:11-17:24.  The GC personnel acquired their information directly or indirectly from Oscar Boruchin, a GC employee, who in turn got his information from Bernardo Benes, a U.S. State Department official who negotiated on behalf of the U.S. directly with Fidel Castro.  *Id*. ¶ 34, Ex. 31 at Tr. 16:25-18:15, 25:10-27:24.  Benes testified that as of 1978, Fidel Castro told him directly that Cohiba cigars were only for "diplomatic PR" and were "not for sale."  *Id.*  ¶ 35, Ex. 32 at Tr. 37:16-38:21.  Benes in turn told Boruchin that "Cohiba" was a cigar "given for diplomats and people that have business with the government."  *Id*. ¶ 34, Ex. 31 at Tr. 16:25-18:15, 25:10-27:24.  Boruchin then relayed this information to GC's executives, telling them that "Cohiba" was "not on the market, that [it] was just given to visitors, diplomats, and … at that time didn't mean anything to anybody, nobody knew it."  *Id*.

## III.  THE CUBAN EMBARGO REGULATIONS AND LIBERTAD ACT BAR THE COURT FROM CANCELLING GC'S REGISTRATIONS UNDER ARTICLE 8 OF THE IAC OR ANY OTHER LEGAL THEORY

### A.  Nature of this Action under 15 U.S.C. § 1071(b)(1)

This action to determine the rights to the U.S. COHIBA mark is brought before a federal district court under 15 U.S.C. § 1071(b)(1) and is therefore *de novo* in all respects. The Court has its own authority, independent of the TTAB, to grant or deny cancellation of trademark registrations, and makes its own conclusions of law, unaffected by any decision of the TTAB. *Moke Am. LLC v. Am. Custom Golf Cars, Inc.*, 2023 WL 3232601, at *9 (E.D. Va. May 3, 2023). Moreover, since there are new facts presented in this action which were not considered by the TTAB in the Decision, the TTAB's findings of fact receive no deference and the record, including the facts that were before the TTAB, is reviewed *de novo*.  *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 156 (4th Cir. 2014) (citing *Kappos v. Hyatt*, 566 U.S. 431, 445-46 (2012)).

**B. The CACR and LIBERTAD Act, as Explained in the Second Circuit's Decision in**
   ***Empresa V*, Bar This Federal Court from Cancelling GC's Registrations.**

The CACR, as codified by the LIBERTAD Act, prohibits any direct or indirect transfer of property, including trademarks, to a Cuban entity such as CT by a person subject to U.S. jurisdiction.  31 C.F.R. § 515.201.  The Second Circuit, in *Empresa V*, held that a district court order that enjoined GC from using its registered COHIBA mark in the U.S. and cancelled GC's Registrations was a transfer of property to CT, a Cuban entity, by a "person subject to the jurisdiction of the United States" (the district court).  399 F.3d at 476-77.  It held that the injunction and cancellation were not exempt from the prohibition by any general license in the CACR or specific license granted to CT by the Office of Foreign Assets Control ("OFAC").   399 F.3d at 472-76.  Here, the parties, facts, and law/regulations are the same as those considered in *Empresa V*, and, as in that case, there is no OFAC license here authorizing a cancellation of the Registrations by the Court.  The Court is therefore subject to the same "limitation on judicial authority," *id.* at 477, that was applied in *Empresa V*, and it should hold that GC's Registrations may not be cancelled under Article 8 of the IAC or any other theory.

President Kennedy issued an executive order, effective February 7, 1962, imposing an embargo prohibiting importation of all goods of Cuban origin into the U.S.   Presidential Proclamation 3447 (February 3, 1962).  The Cuban Embargo was formalized by the 1963 issuance of the CACR, which, as amended, are currently found at 31 C.F.R. §§ 515.101–515.901 (2022).  In 1996, Congress enacted the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act ("LIBERTAD Act"), Pub.L. No. 104–114, 110 Stat. 785 (1996), "which, among other things, codified the regulations implementing the Cuban embargo."  *Havana Club Holding, S.A. v. Galleon, S.A.*, 203 F.3d 116, 120 (2d Cir. 2000); *see* 22 U.S.C. § 6032(h).  There has been no relevant change to the CACR since the Second Circuit's *Empresa V* ruling in 2005.

31 C.F.R. § 515.201(b)(1) provides that "except when specifically authorized by the Secretary of the Treasury" or an agency designated by him, transactions are prohibited which involve "property in which [Cuba], or any national thereof, has at any time . . . had any interest of any nature whatsoever, direct or indirect." Prohibited transactions include "all dealings in . . . transfers, withdrawals, or exportations of, any property. . . or evidences of ownership of property by any person subject to the jurisdiction of the United States." Section 515.201(c) prohibits "[a]ny transaction for the purpose of which has the effect of evading or avoiding any of the prohibitions set forth in paragraphs (a) or (b) of this section." "Property" and "property interest" include trademarks, *id*. §515.311, and "transfer" of property is defined in the broadest possible terms:

> [a]ny actual or purported act or transaction … the purpose, intent, or effect of which
> is to create, surrender, release, transfer, or alter, directly or indirectly, any right,
> remedy, power, privilege, or interest with respect to any property.

*Id.* § 515.310. The regulations further provide that a transfer of property to a Cuban entity or national is a prohibited transaction. *Id.* § 515.309(a). *See Empresa V*, 399 F.3d at 472. Thus, "absent a general or specific license, § 515.201(b)(1) of the Regulations prohibit[s] a transfer of property rights, including trademark rights, to a Cuban entity by a person subject to the jurisdiction of the United States." *Id.* at 473. In addition, transfer of property to a Cuban entity or national through operation of law is a prohibited transaction. *Id.* at 474-75.

The CACR contains a "general license" permitting a Cuban entity to engage in one subset of transactions relating to trademarks: those "related to the registration and renewal in the [USPTO] or the [U.S.] Copyright Office of patents, trademarks, and copyrights in which the Government of Cuba or a Cuban national has an interest." §515.527(a)(1). However, the "related to" language in this regulatory provision "should be interpreted narrowly as it is an exception to the broad prohibitions of the embargo." *Empresa V*, 399 F.3d at 476.

10

In July 1996, counsel for CT asked OFAC for an interpretation of this general license, as it intended to "bring a petition to cancel the prior registration of a trademark related to its efforts to register a trademark"; i.e., it intended to petition in the TTAB to cancel GC's Registrations. CT0022.  At the time, and currently, § 515.527 authorizes:

> [t]ransactions related to the registration and renewal in the [USPTO] or the [U.S.] Copyright Office of patents, trademarks, and copyrights in which the Government of Cuba or a Cuban national has an interest.

OFAC responded, by letter dated August 19, 1996, that "the authorization contained in § 515.527 may be relied on to . . . petition to cancel a prior registration of a trademark where these actions relate to the protection of a trademark in which Cuba or a Cuban national general license [sic] has an interest."  CT0022.  The letter did not state whether under the general license, the TTAB could grant a Cuban national's petition to cancel a U.S. entity's U.S. trademark registrations, and it did not express an opinion as to whether the general license would apply to a federal court action.  *Id.*

After filing its petition, CT chose to pursue its cancellation claims as part of an infringement action against GC in federal court instead of the TTAB and sought a specific license from OFAC authorizing this action.  Fee Decl. ¶ 36, Ex. 33.  In October 1997, OFAC granted a specific license authorizing CT and a sister entity to "initiate legal proceedings in the U.S. courts and to otherwise pursue their remedies with respect to the COHIBA trademark (the "Trademark") and against those persons that are alleged to be infringing upon the Trademark . . . ."  *Empresa V*, 399 F.3d at 474.  The Second Circuit concluded that while the license "allows [CT] to seek relief in U.S. court, [it] does not authorize transfers of property prohibited by the Regulations."  The U.S. government agreed, stating that "the most obvious reading of this license is that it allows [CT] to seek remedies but does not alter the substantive law for a court to apply in determining what, if any remedies, are appropriate."  *Id.* at 476.

11

After trial in the Southern District of New York, the district court entered judgment for CT on its claim that it obtained prior U.S. rights in the COHIBA mark through the so-called famous marks doctrine, and that GC's use of the mark infringed CT's rights under section 43(a) of the Lanham Act.  It enjoined GC from further use of the COHIBA mark and ordered cancellation of the Registrations.  *Empresa IV*.  On appeal, in *Empresa V*, the Second Circuit reversed the judgment, and vacated the injunctive and cancellation orders.

The Second Circuit held that "GC has the full panel of property rights in the COHIBA mark, including the right to exclude or limit others seeking to use the mark in the [U.S.]."  *Empresa V*, 399 F.3d at 476.  An order excluding "[GC] from commercial use of the COHIBA mark in the [U.S.] . . . would entail a transfer from [GC] of a "right, remedy, power, privilege, or interest with respect to [the COHIBA mark]," which is "exactly this brand of property right transfer that the embargo prohibits."  The CACR are "a limitation on judicial authority" to issue such orders.  *Id*. at 476-77.  CT has conceded that "this 'limitation on judicial authority' necessarily applied to both [the Southern District's] injunction and cancellation orders."  CT Reply Br., *Empresa Cubana del Tabaco v. General Cigar Co., Inc.*, 2013 WL 6910109 (Fed. Cir. Dec. 23, 2013), ("CT Federal Circuit Reply") at *1 (*see* Fee Decl., ¶ 37, Ex. 34 ).  The Second Circuit concluded that CT could not obtain ownership of the U.S. COHIBA trademark under the "famous marks" doctrine, as that would be a transfer prohibited by the Regulations.  *Empresa V*, 399 F.3d at 481.

CT argued to the Second Circuit that even if CT could not acquire the COHIBA trademark in the U.S., GC's use of the COHIBA mark for cigars was likely to cause consumer confusion, and that CT was therefore entitled to cancellation of the Registrations and an injunction under § 43(a) of the Lanham Act.  The Second Circuit also rejected this argument because "[GC]'s legal right to the COHIBA mark has been established against [CT].  [GC] has a right to use the mark in the

[U.S.] *because it owns the mark in the [U.S.]*"  *Id.* at 479 (emphasis added).

The government argued that without GC's U.S. registrations, CT could have registered the COHIBA mark in the U.S.  *Id.*  The court rejected the hypothetical as irrelevant because "*[GC] does have a valid registration on the COHIBA mark in the [U.S.]*," *id.*  (emphasis added), and that even if CT's COHIBA mark was "famous" in the U.S. before GC's first use of the mark in the U.S., "*this fact cannot justify a transfer of property rights in the COHIBA mark* to [CT]," either via a "famous marks" or a confusion theory.  *Id.* (emphasis added).

The Second Circuit also rejected CT's argument for relief under an international treaty, Article 6*bis* of the Paris Convention for the Protection of Industrial Property, Mar. 20, 1883, as revised at Stockholm, July 14, 1967, 21 U.S.T. 1583, 828 U.N.T.S. 305 ("Paris Convention").  *Empresa V*, 399 F.3d at 481.  It held that "[w]e do not read Article 6*bis* and Sections 44(b) and (h) of the Lanham Act to require cancellation of [GC]'s properly registered trademark or an injunction against its use of the mark in the [U.S.] under these circumstances."  *Id.*  Moreover, said the court, even if the Paris Convention, last ratified in 1970, did require that relief, it would have been rendered null by the LIBERTAD Act, enacted by Congress in 1996.  "'[L]egislative acts trump treaty-made international law' when those acts are passed subsequent to ratification of the treaty and clearly contradict treaty obligations."  *Id.* (citations omitted).  Thus, "any claim grounded in the Paris Convention that presented an irreconcilable conflict with the Regulations would be rendered 'null' by the Regulations."  *Id.* (citing *Breard v. Greene*, 523 U.S. 371, 376 (1998)); *see also Havana Club*, 203 F.3d at 124-126 (holding that plaintiff has no rights to "Havana Club" trademark as Article 11 of the IAC is overridden by CACR and LIBERTAD Act).

The same reasoning applies with full force in this case.  The Registrations "confer[] important rights and benefits" on GC, including constructive notice to third parties, prima facie

evidence of the validity and registration of the mark, and incontestability after five years of use after registration. *B & B Hardware, Inc. v. Hargis Indus., Inc.,* 575 U.S. 138, 142 (2015); *see also Matal v. Tam*, 582 U.S. 218, 226 (2017). These rights flowing from trademark registration are all "property" under the CACR. *See Empresa V*, 399 F.2d at 473. Were this Court to order cancellation of GC's Registrations, that would be a transfer of property to a Cuban entity by a person subject to the jurisdiction of the U.S. (the Court), which the CACR forbids. As the Second Circuit held, 399 F.3d at 476-477, and as CT conceded at the Federal Circuit, CT Federal Circuit Reply, 2013 WL 6910109 at *1, 5, the CACR expressly denies all federal courts the "judicial authority" to enter a cancellation order to the benefit of CT.

Moreover, cancellation must be denied whether or not CT establishes the merits of an Article 8 claim. Since the IAC was ratified in 1931 while Congress enacted the LIBERTAD Act in 1996 and thereby "reaffirmed and codified" the CACR, Congress's legislation trumps the IAC as far as Cuban claimants are concerned. *See Empresa V,* at 481. Any meritorious claim by a Cuban national under Article 8 would be in "irreconcilable conflict with the Regulations [and] would be rendered 'null' by the Regulations." *Id.* (citation omitted).

Two other considerations reinforce this conclusion. First, no license authorizes this Court to cancel the Registrations. CT's request to OFAC for an interpretation of the general license of § 515.527 addressed only cancellations at the TTAB, and according to the Federal Circuit, the general license only authorizes cancellation orders by the TTAB. *Empresa VIII*, 753 F.3d at 1275. CT itself conceded that under that license, "a *Board* cancellation order is licensed, but a *judicial* cancellation order is not." CT Federal Circuit Reply, 2013 WL 6910109, at *6) (emphasis in orig.). CT apparently knew that the general license would not apply in judicial proceedings, as it sought a specific license from OFAC to pursue its Southern District action. However, as the Second

14

Circuit held and the government agreed, the specific license that OFAC granted only authorized the initiation of a court proceeding "but does not authorize transfers of property barred by the Regulations," e.g., an order cancelling GC's Registrations. *Empresa V*, 399 F.3d at 476.

Second, the Federal Circuit, in *Empresa VIII,* did not and could not reverse the *Empresa V* decision applying the CACR to cancellation orders in judicial proceedings. CT asserted to the Federal Circuit that the Second Circuit's holding was "that the District Court's order requiring 'cancellation ... and an injunction ... would [1] entail a transfer of property rights in the COHIBA mark to Cubatabaco [2] *in violation of the embargo*'" and that the ruling was "limited to *judicial* authority to cancel a registration that results in a property transfer." Fee Decl. ¶ 37, Ex. 34 at *4-5 (brackets and emphs. in orig.). The Federal Circuit adopted this conclusion. *Empresa VIII*, 753 F.3d at 1273, 1274-75 (the "Second Circuit decided only that the CACR limited the federal courts' authority to grant injunctive relief because to do so would entail a prohibited transfer under the CACR"). The Federal Circuit's ruling, limited to proceedings before the TTAB, has no application in this action, where the Court's judicial authority to cancel a registration is at issue. This is a new judicial proceeding brought in an Article III court under 15 U.S.C. § 1071(b), which is *de novo* in all respects and is not an appeal from the TTAB Decision. *See Swatch*, 739 F.3d at 155.

In sum, the Second Circuit's analysis and conclusions of law are fully applicable here. The CACR bars the Court from cancelling GC's Registrations in favor of CT under the IAC, and indeed under any other theory CT has raised, which are addressed in Counts II-IX of the Amended Complaint. The Court should therefore terminate this litigation by entering (1) a declaratory judgment in GC's favor, adjudging and declaring that CT is not entitled to cancellation of GC's Registrations under any theory, (2) an order vacating the TTAB Decision and any relief awarded therein, and (3) a certification of the Court's order and judgment to the Director of the USPTO, to

make appropriate entry thereof on the USPTO's records.

**IV.   EVEN IF NOT BARRED BY THE CACR, CT MAY NOT PREVAIL ON THE MERITS OF AN ARTICLE 8 CLAIM UNDER THE IAC**

As noted above, the merits of CT's Article 8 claim are irrelevant because the CACR bars granting cancellation relief to CT. However, if the Court considers the Article 8 claim, it should rule that CT has not established the claim on the merits.[7]

**A.  Legal Standard on an Article 8 Claim**

A party seeking to cancel a registration bears the burden of showing, by a preponderance of the trial proof, that each of the elements of its claim for cancellation is satisfied. *Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir. 1996). The party retains that burden of proof if the cancellation claim is instead raised by the registrant, who sues for a declaratory judgment that the mark owner cannot satisfy the elements of the claim. *Medtronic, Inc. v. Mirkowski Family Ventures, LLC*, 571 U.S. 191, 198-99 (2014); *see also* 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32.50 (5th ed. 2023) ("The *Medtronic* patent case is applicable to trademark declaratory judgment cases"); *Palateria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. DE C.V.*, 188 F. Supp. 3d 22, 103 (D.D.C. 2016). Thus, CT bears the burden of showing that the preponderance of admissible evidence establishes all relevant elements of an Article 8 claim.

**B.  CT Has the Burden of Showing that the COHIBA Word Mark "Enjoyed Legal Protection" in Cuba Prior to March 13, 1978.**

*1.   Article 8's Requirement of "Legal Protection"*

Article 8 of the IAC applies where "the owner of a mark" in an IAC "Contracting State"

---

[7] In partially granting CT's motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) (Dkt. No. 46), the Court rejected GC's argument that the Second Circuit decision in *Empresa V* precluded CT from asserting an Article 8 claim against GC. GC does not reassert its preclusion arguments here, but reserves the right to raise them in the event of an appeal.

seeks to register the mark in a different Contracting State.  If registration is refused in the second country because of prior registration of an "interfering mark," the owner "shall have the right to apply for and obtain the cancellation and annulment of the interfering mark, upon proving, in accordance with the legal procedure of the country in which cancellation is sought, the stipulations in Paragraph (a) and either those of Paragraph (b) or (c) below."

Paragraphs (a) and (b) of Article 8 require the "owner of a mark" to prove:[8]

(a)   That he enjoyed legal protection for his mark in another of the Contracting States prior to the date of the application for the registration or deposit he seeks to cancel; and

(b)   That the claimant of the interfering mark, the cancellation of which is sought, had knowledge of the use, employment, registration, or deposit in any of the Contracting States of the mark for the specific goods to which said interfering mark is applied, prior to adoption and use thereof or prior to the filing of the application or deposit of the mark which is sought to be cancelled . . . .

CT thus carries the burden of proving that it satisfies both the "legal protection" element of paragraph 8(a) and the "knowledge" element of paragraph 8(b).  GC's incontestable First Registration states that the application was filed with the USPTO on March 13, 1978, and CT does not contest that fact.  (Dkt. Nos. 27, 33 ¶ 44).  Under paragraph 8(a), CT must therefore show that it enjoyed legal protection in Cuba for the COHIBA word mark prior to March 13, 1978.  Because this is a question of foreign law, CT bears the burden of proving the content of that law.  FED. R. CIV. P. 44.1; *Baker v. Booz Allen Hamilton, Inc.*, 358 F. App'x. 476, 481 (4th Cir. 2009); *Mulugeta v. Ademachew,* 407 F. Supp. 3d 569, 588 (E.D. Va. 2019).[9]

---

[8] CT does not and could not claim that it satisfies Paragraph 8(c), which requires that the goods designated by the owner's mark circulated in the second country before the filing of the application to register the targeted mark.  CT never sold COHIBA cigars in the U.S. (Dkt. Nos. 27, 33 ¶ 74).

[9] Typically, a Rule 44.1 issue arises in a choice of law context, where the plaintiff contends that foreign law applies to its claim.  If the plaintiff fails to carry its burden of proving the foreign law, the court applies forum law instead.  *Mulugeta*, 407 F. Supp. 3d at 588-89.  Here, however, legal

17

Because CT has the burden of proof on both elements of the Article 8 Claim, and GC has not yet reviewed CT's opening trial brief or its evidence supporting the Article 8 claim, GC will provide its full arguments on the Article 8 issues in its opposition brief. However, there are already several clear obstacles to CT carrying its burden on an Article 8 claim.

2.  *The Provisions of Cuban Decree-Law 805 of 1936 Governing Trademarks*

The parties agree that at all times relevant to this case, trademark rights in Cuba were governed by Decree-Law 805, adopted in 1936 ("DL 805/36"). Declaration of Yanay B. Sanchez (Jan. 13, 2024) ("Sanchez Decl.") ¶ 8; Fee Decl. ¶¶ 39-40, Exs. 36-37 at ¶ 5. DL 805/36 remained in effect until 1983, when it was superseded by Decree-Law 68/83. Sanchez Decl. ¶ 4, Ex. 1 ¶ 18. The core principle of DL 805/36 was that use of a mark prior to registration did not create any enforceable rights in the mark:

> Our trademark law has always maintained the old aphorism that the law protects the diligent, translating that diligence in the registration of the trademark, not its use . . . [T]his Decree-Law provides protection to those who register a trademark but does not impose any penalty for abandoning it when not registering it, *due to not providing any protection when another party attempts to register it or use it in similar products*.

Sanchez Decl., ¶ 5, Ex. 2 at ¶ 30 (Preamble to DL805/36) (emphasis added).

Several articles of DL 805/36 establish the importance of registration under the Cuban trademark law. Arts. 1, 3 ("The protection that this Decree-Law grants . . . will be regulated by what is established therein and may not be protected by said Decree-Law but by the corresponding registration"); 7 ("The . . . trademarks . . . included in this Decree-Law constitute a property that is acquired by its registration with the Secretariat of Commerce. To justify that property, the submission of the appropriate document evidencing the registration will be indispensable.").

---

protection under foreign law is an element of Article 8. If CT does not carry its burden of showing legal protection for the COHIBA word mark under Cuban law as of 1978, then its claim fails.

Sanchez Decl., ¶ 4, Ex. 1 at ¶ 18, Ex. 2 at ¶ 30.

Registration of a mark with the Registration Authority gave the mark owner (a) the right to object to the granting of a trademark on the basis of conflict with the rights granted by the registration  (DL 805/36, Art 98(1); (b) the right to bring criminal actions against infringers (*id.*, Art. 98(2)); the right to seek civil damages for infringement (*id.*, Art. 98(3)); and the right to exercise other actions and rights authorized by the Decree-Law (*id.*, Art. 98(5)), which include court orders forbidding the use of an infringing mark.  Sanchez Decl., ¶ 5, Ex. 2 at ¶ 31.[10]

Professor Moreno, CT's Cuban law expert, asserted that "Registration No 110 044 granted CT the exclusive right to use the name COHIBA in Cuba as a mark for cigars, with or without an accompanying design."  Fee Decl. ¶¶ 39-40, Exs. 36-37 at ¶ 8.  However, that assertion is not supported either by the Registration Certificate or the citations in Moreno's Reports.

The Certificate itself does not suggest that the word "COHIBA" standing alone was legally protected by Reg. No. 110,044.  *See* Fee Decl. ¶ 6, Ex. 5.  The first page of the Certificate issued by the Registration Authority describes the registered mark as "MARK denominated 'COHIBA', (according to design)."  *Id.*  In contrast, when the word mark COHIBA was registered in Cuba in 1980 under Reg. No. 111,059, the first page of the registration certificate for that mark described the registered mark as "MARK denominated "COHIBA," without any reference to a "design."  *Id.* ¶ 23, Ex. 20 at A05283-84; *id.* ¶ 38, Ex. 35 at 3-4.  The restrictive reference "according to design" in the Certificate indicates that Reg. No. 110,044 protected only the word "COHiBA" when used in the stylized typeface and as part of the design shown in the "DESIGN" box on the second page

---

[10] Per *infra p. 24-25*, these rights are qualified by other articles of DL 805/36: Article 132, which provides for mandatory lapse of a registration if not been used for three consecutive years; and Article 136, which provides that where a mark owner has made changes to the "main distinctive elements" of a registered mark, the "varied mark" must be separately registered.

of the Certificate, and that the registration did not provide protection for COHIBA as a free-standing word mark.  *Id*. ¶ 6, Ex. 5.

In addition, on March 7, 1972, even before Reg. No. 110,044 was issued, CT applied to the Registration Authority to register the word mark COHIBA standing alone.  *Id*. ¶ 23, Ex. 20 at A05283-84; *id*. ¶ 38, Ex. 35 at 3-4.  A separate registration would have been unnecessary had it been obvious, as Professor Moreno now argues, *id*.  ¶¶ 39-40, Exs. 36-37 at ¶¶ 3, 5, that the word mark COHIBA was already protected in Cuba by Reg. No. 110,044.[11]  No CT witness has testified to the company's reason for making a separate application to register the word mark.

CT may assert in its trial brief other bases for arguing that the COHIBA word mark is protected.  GC reserves the right to respond to those arguments in its opposition brief.  However, at this point it is already clear that Moreno's expert reports do not show that DL 805/36 extended legal protection to the COHIBA word mark standing alone.  She relies on two Cuban Supreme Court judgments and a handful of 1940-era summary registration refusals by the Registration Authority.  *Id*. ¶¶ 40-41, Exs. 38-39 at ¶¶ 9-10.  However, Cuban law would not have regarded these as sources of law to be followed in later cases, and they do not establish that there was legal protection for the COHIBA word mark in March 1978.

As stated at Stephen Alexandre da Costa and Julienne E. Grant, "Guide to Cuban Law and Legal Research," 45 *Int'l Journal of Legal Information* (July 2017), at 82, 82 n.25, Cuba's legal system "adheres to the tenets of the civil law tradition" which "rejects the notion of judge-made law, focusing instead on codified statutory law."  At all times relevant to this case, Article 6 of the

---

[11] Yanay Sanchez, GC's Cuban law expert, is of the opinion that the separate registration for the word mark shows that CT's trademark lawyers were aware that a COHIBA word mark was a major variation from the registered Design Mark, and that under Art. 136 of DL 805/36, a separate registration was required for the word mark to have legal protection.  Sanchez Decl. ¶ 19.

Spanish Civil Code was in force in Cuba, and provided that "When there is no [written] law precisely applicable to the point in dispute, the custom of the place shall be applied, and in its absence, the general principles of law."  Sanchez Rebuttal Report ¶ 8 n.1.[12]  Thus, under Cuban law, a decision of the Cuban Supreme Court interpreting DL 805/36 in a particular case would not have been a source of law in 1978: it would not have been considered, much less viewed as binding, by lower courts or the Supreme Court itself in later cases applying the same written law provision but involving different parties and issues.

Professor Moreno herself acknowledged that at the time DL 805/36 was in effect, court decisions were not recognized as a "formal source of law." Fee Decl. ¶ 43, Ex. 40 at Tr. 238:13-15.  She testified that only in 2022 did Cuba adopt a procedural code that recognizes "the value of judicial decisions when the law has to be interpreted and applied."  *Id*. at Tr. 238:23-239:1.  This code references Cuba's new Procedural Code (Law 141/2021, effective January 1, 2022), which applies only to proceedings commenced after the effective date ("Disposicion Transitoria"). Sanchez Decl. ¶ 6, Ex. 3 at 12.  Article 4.1 of this Code provides a list of sources of law which courts may apply in resolving cases.  This list does not identify either prior judicial or administrative decisions as sources of law.  Article 4.2 states that courts may take into account "judicial resolutions . . . for matters regulated by this Code, containing *repeated opinions* issued by the chambers of the People's Supreme Court, which are not binding in nature but may be

---

[12] The judicial decisions of civil law countries are ordinarily not sources of law and may not be relied on to determine the content of those countries' law.  *Henry v. S/S Bermuda Star*, 863 F.2d 1225, 1230-31 (5th Cir. 1989) ("Stare decisis. . .is rejected by the civil law tradition.");  See also John H. Merryman, Rogelio Perez-Perdomo, THE CIVIL LAW TRADITION (4th ed. 2019) at 22 ("[T]he power and obligation of courts to base decisions on prior decisions - is ...rejected by the civil law tradition.  Judicial decisions are not law.").

invoked by the parties to support their claims."[13]  *Id.* (emphasis added).

Of the two Cuban Supreme Court decisions cited by Professor Moreno, one (Judgment No. 169, Cuban Supreme Court (June 16, 1932) (Fee Decl., ¶¶ 39-40, Ex. 36-37, Annex E)) was issued in 1932, before DL 805/36 was adopted, and references application of an entirely different Spanish law, Art. 5(6) of the Royal Decree of August 21, 1884.  The second decision (Judgment No. 468, Cuban Supreme Court (April 9, 1954) (*id.* at Annex D)) dates from 1954, when DL 805/36 was in effect, but does not purport to lay down any general rule of law applicable in later cases.  Moreno was unable to identify any later court decision or legal treatise citing the 1932 and 1954 Cuban Supreme Court judgments.  Fee Decl., ¶ 43, Ex. 40 at Tr. 235:8-23.  Also, even under the new Cuban procedural code, an isolated court decision such as the two mentioned by Moreno would not have met the requirement of repeated holdings on the same point of law, and these judgment therefore could not be raised by Cuban litigants in support of their claims.  Similarly, the summary Registration Authority refusals to register marks, cited for the first time in the Moreno Rebuttal Rep. ¶¶ 10-12 (Fee Decl., ¶¶ 40-41, Ex. 37-38), are not sources of law recognized in Cuba, and cannot establish that Reg. No. 110,044, for the Design Mark, protected the very different COHIBA word mark.

### 3. Article 136 of DL 805/36 Required Separate Registration of the COHIBA Word Mark for Protection to Attach to that Mark.

Under Article 136 of DL 805/36, use of the COHIBA word mark standing alone would

---

[13] This provision is similar to ones which other civil law countries have adopted.  For example, Mexico gives case law precedential value if it is "*jurisprudencia obligatoria* or *jurisprudencia definida*, which means that the Mexican Supreme Court has considered and decided the same issue five consecutive times in the same way," Carlos R. Soltero & Amy Clark-Meachum, *The Common Law of Mexican Law in Texas Courts*, 26 HOUSTON J. INT'L L. 119, 137 (2003), cited in *Perforaciones Maritimas Mexicanas S.A. de C.V. v. Seacor Holdings*, 2008 WL 11394261 (S.D. Tex. Sept. 2, 2008), *aff'd and remanded*, 356 Fed. Appx. 675 (5th Cir. 2009).

have been a "marca variada" (varied mark), and it would not be legally protected until CT obtained a separate registration for the word mark.  Since the Registration Authority did not issue CT a separate registration for the word mark until July 1, 1980, as Reg. No. 111,059, CT cannot show that it enjoyed legal protection in Cuba for the COHIBA word mark as of March 13, 1978.

Article 136 (Sanchez Decl. ¶ 6, Ex. 3) deals with "[t]he use of a trademark by its owner in a manner other than registered."  If this use "substantially change[s]" the "main distinctive elements of the trademark," then the mark is a different mark than the original mark.  (*Id*. ¶ 4, Ex. 1 at ¶¶ 21-22).  In that case, upon complaint by a third party, the Registration Authority "will require the owner of the trademark. . . to apply for a new registration, without affecting the protection of the original trademark."  Article 136.  If the owner does not comply with the command to register, it is subject to fines and ultimately cancellation of its original registration. Sanchez Decl. ¶¶ 11-13.

While the Registration Authority does not police the use of varied marks in the marketplace, it is required to act when a complaint is made by a third party.  *Id.*  And it is inevitable that such a complaint will be made if the mark owner sues to enjoin unauthorized use of the varied mark.  *Id*. ¶ 12.  The Registration Authority would have a mandatory duty under Article 136 to require the owner to file an application for a new registration and any enforcement action based on the original certificate would therefore fail.  *Id*. ¶¶ 13, 17.  Thus, the varied mark would not have legal protection until and unless the owner obtained a separate registration for the varied mark.[14]  *Id*. ¶ 14.  Moreover, such an application is like any other trademark application: it would

---

[14] The underlying principles of DL 806/35 establish that there cannot be legal protection for any mark until a registration for that mark is actually issued by the Registration Authority.  Registration alone grants rights in a trademark; as a corollary, no rights arise in a trademark until the mark is actually registered and that ownership of the mark for purposes of legally protecting must be

have to be examined by the Registration Authority to determine that it met the criteria for registration before the mark could be registered and a certificate issued.  *Id*. ¶ 16, n. 2.

The application of these Cuban law principles to the facts of this case is straightforward. CT's use of the COHIBA word mark would have been a change to the "main distinctive elements" of the registered Mixed Mark because it deleted the most prominent of those elements, the tobacco fan design, and would have used the word mark "COHIBA" in standard characters, not the stylized "COHiBA" in a distinctive font that features in the Design Mark.  Sanchez Decl. ¶¶ 15-16; *id*. ¶ 4, Ex. 1 at ¶ 21; Sanchez Decl. ¶ 5, Ex. 2 at ¶ 23.  The word mark would therefore be a "varied mark" under Cuban law.  CT would not have legal protection for the COHIBA word mark standing alone because if it brought an infringement action against a user of the COHIBA word mark, that party would file a complaint with the Registration Authority which would, in turn, require CT to register the word mark as mandated by Article 136. Until that registration issued, the unregistered word mark would not be legally protected.  Since the registration for the word mark did not issue until July 1, 1980, well after GC applied to register COHIBA in the U.S., CT cannot satisfy the "legal protection" element of Art. 8 of the IAC.  Sanchez Decl. ¶ 5, Ex. 2 at ¶ 25.

4. <u>*The Design Mark Registration Lapsed Prior to March 13, 1978 and CT Therefore Cannot Satisfy the "Legal Protection" Requirement of Article 8.*</u>

It appears that Professor Moreno was not informed by CT that it had ceased all use of the Design Mark covered by Reg. No. 110,044 by 1971-1972, and thereafter used a different design for its Cohiba cigars.  This omission undermines her opinion on legal protection.  Under Art. 132 of DL 805/36, trademark registrations lapse after three continuous years of non-use.  Since it is beyond dispute that the Design Mark covered by the Certificate was not used after 1972, and that

---

proven presenting the registration certificate for the mark.  Arts. 1, 3, 7, 98. *See* Sanchez Decl. ¶ 5, Ex. 2 at ¶¶ 18-22.

more than three years elapsed between that date and March 13, 1978, it follows that the COHIBA

word mark was not legally protected within the meaning of Article 8 as of March 13, 1978.

> Art. 132 of DL 805/36 provided in relevant part:

> A trademark *shall lapse*: . . . 4) When the party that obtained ownership of a trademark certificate does not make use thereof in Cuban territory during three consecutive years, except in the case of legally documented *force majeure*. (emphasis added).

Sanchez Decl. ¶ 6, Ex. 3 (emphasis added).   The words "shall lapse" is an unambiguously

mandatory phrase.  *See U.S. v. Monsanto*, 491 U.S. 600, 607 (1989) (interpreting "shall forfeit"

language in a criminal statute, stating "Congress could not have chosen stronger words to express

its intention that forfeiture be mandatory where the statute applied.")[15]

The definition of "use" for purposes of lapse under Article 132 is provided in an

implementing regulation, Art. 136 of Decree 209/1956: "[T]he trademark is in use when its owner

. . . has any of the products covered by [the trademark] for sale at his/her own establishment or

those products may be prepared from time to time, when no more than three years have elapsed

without those trademark-branded products being sold, and in general when the product covered by

the trademark is the object of commercial traffic."  Sanchez Decl. ¶ 6, Ex. 3; Fee Decl. ¶¶ 41-42,

Exs. 38-39 at ¶ 21 n.15.

The undisputed facts show that once CT took over the El Laguito cigar factory in 1970, it

promptly developed the new Indian Head Mark for the Cohiba cigars it was making and stopped

using the Design Mark in connection with cigars entirely in 1971 or 1972. Fee Decl. ¶ 11, Ex. 8 at

Tr. 24:12-14; 74:20-75:8; ¶ 13, Ex. 10 at Tr. 55:4-23, 61:7-62:2, 66:25-67:6; ¶ 14, Ex. 11 at Tr.

---

[15] Professor Moreno stated in her report that "Cuban law provided that a registrant's trademark registration *will lapse* if the registrant did "not make use [of the trademark] in Cuban territory during three consecutive years . . . ." Fee Decl. ¶¶ 40-41, Exs. 37-38 at ¶ 16 (emphasis added).

12:10-16, 19:12-20:21, 21:3-16, 28:3-24; ¶ 15, Ex. 12 at Tr. 30:12-19, 31:20-32:20; ¶ 15, Ex. 12 Tr. 88:12-23.   CT has produced no records showing that the cigars sold to foreigners in "diplomarkets" used the Design Mark.  *Id*; *see also id.* ¶ 18, Ex. 15.  Accordingly, under Article 132 of DL 805/36, the Design Mark registration lapsed no later than 1975, after "three consecutive years" during which neither CT nor diplomarket owners had any products branded with the Design Mark for sale, and there was no "commercial traffic" for products bearing the Design Mark.  The consequence is that, prior to March 13, 1978, Reg. No. 110,044 had lapsed and provided no legal protection for the COHIBA word mark (or any other element of the Design Mark) in Cuba. Therefore, CT will not be able to satisfy the "legal protection" requirement of Article 8.

**C.   CT Cannot Meet the "Knowledge" Element of Its Article 8 Claim.**

CT also cannot show, by a preponderance of the admissible evidence, that at the time GC applied to register the COHIBA word mark in the U.S. (March 13, 1978), GC had "knowledge" that CT was making a trademark "use" of the COHIBA word mark in Cuba for cigars.

*1.   "Use" Means "Trademark Use" as Understood at the Time the IAC Was Ratified.*

Paragraph (b) of Article 8 requires CT to prove that GC "had knowledge of the *use*, employment, registration, or deposit in [Cuba] of the [COHIBA word] mark for the specific goods to which said interfering mark is applied [*i.e.*, cigars], prior to adoption and use thereof [February 13, 1978, per the First Registration Certificate] or prior to the filing of the application … of the mark which is sought to be cancelled [March 13, 1978, per same]." (emphasis added).

The word "use" as it appears in Article 8(2) must be interpreted as the IAC signatories, including the U.S., understood that term at the time the IAC was adopted.  As stated in Christine Haight Farley, *The Pan-American Trademark Convention of 1929: a bold vision of extraterritorial meets current realities*, published in TRADEMARK PROTECTION AND TERRITORIALITY CHALLENGES

26

IN A GLOBAL ECONOMY (Northampton, MA 2015) ("Farley"), at 60-61, Fee Decl. ¶ 44, Ex. 41, there was then a "major conflict between the U.S  and the other American countries. . . over the source of trademark rights": in the U.S., trademark rights arose under the common law through "use of the mark," with registration being merely "evidence of that right," while "throughout Latin America, the registration creates the trademark right"; consequently, in Latin America, "unless and until the mark is registered, it is available for use by anyone." *Id.* at 61.  The U.S. delegation was the main driver of the new treaty, seeking a treaty that would:

> provide U.S corporations with trademark rights in advance for when and if they should choose to do business in one of the [other] contracting states.  Specifically, it was desired that these corporations should have trademark rights in cases where they did not register, use or advertise their mark if the party they sought to enjoin *had knowledge of their trademark rights in the U.S.*

*Id.* at 63 (emphasis added).  Under the IAC, accordingly, "the senior user does not have to prove fame in the country in which it seeks protection, but may merely show that the junior user *was aware of senior user's rights in any member country*."  *Id.* at 64 (emphasis added).

Inclusion of the word "use" in Article 8(b) was accordingly intended to protect the common law rights of U.S. mark owners acquired through "use" as that term was then understood in U.S. trademark law.  The word "use" in Article 8 must therefore be construed according to the meaning of "use" contemporaneously applied in U.S. trademark law – the one country where "use" of a mark, rather than registration, gave rise to trademark rights.

Then, as now, to "use" a mark and acquire rights in it, the owner must "adopt a trademark open to appropriation" (i.e., one not used by another or whose use is legally forbidden), "apply it or attach it physically to a vendible commodity; and . . . actually put the commodity so marked on the market." *In re Gregg & Son, Inc.*, 24 F.2d 898, 899 (D.C. Ct. App. 1928) (citing Nims, UNFAIR COMPETITION AND TRADE-MARKS (2d ed.), § 212); *see also Continental Corp. v. Nat'l Union*

*Radio Corp.*, 67 F.2d 938 (7th Cir. 1933).  The same principle applies today.  *Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 267 (4th Cir. 2003).  Acts falling short of placing marked goods on a market do not constitute "use" for trademark purposes, such as discussing future use of a mark.  *Rolley, Inc. v. Younghusband*, 204 F.2d 209, 212 (9th Cir. 1953).

To sweep more broadly would go beyond the IAC's intention of giving existing national trademarks international protection against conflicting registrations.  If "use" in Article 8(2) meant any employment of a mark whatsoever, that would allow a company that had simply "adopted" a mark or discussed the mark for potential future use, but made no attempt to use it commercially, to stop parties in other IAC countries from registering such marks.  This would diminish the availability of marks and disadvantage trade, without any corresponding benefits to the consumer.

### 2.  GC Did Not Have "Knowledge" of Trademark "Use" by CT as of March 13, 1978.

CT may cite other evidence that it purports shows GC had "knowledge" that CT was making a trademark "use" of COHIBA in Cuba as of March 13, 1978.[16]  However, what GC actually knew on the subject does not satisfy the knowledge required by Article 8.

*Forbes* Magazine published a November 15, 1977 article which speculated on how CT might market Cuban cigars in the U.S. if the embargo were somehow lifted.  Fee Decl. ¶ 45, Ex. 42.  *Forbes* opined that CT would face obstacles to such marketing because the pre-revolutionary Cuban cigar trademarks had been acquired by U.S. cigar companies:

> That means state-owned [CT] must sell here under unknown colors, and *brands it is now developing* contrast sharply with the old aristocratic lines.  Fidel's favorite brand, Cohiba, is named for the old Indian custom of smoking through one's nose.

*Id.* (emphasis added).   The President and Chairman of GC, Edgar Cullman, Sr., testified that he

---

[16] GC does not know what additional evidence of "use" CT may rely on for its case-in-chief, and GC therefore reserves its arguments and objections regarding that evidence for its opposition brief.

"must have read" the article because he subscribed to *Forbes*, *Id.*  ¶ 29, Ex. 26; however, neither he nor anyone else at GC could specifically recall reading this article. *Id*. ¶ 46, Ex. 43 ¶ 26; ¶ 32, Ex. 29 Tr. at 26:2-5; ¶ 34, Ex. 31 at Tr. 39:14-18; ¶ 29, Ex. 26 at Tr. 88:4-14; ¶ 33, Ex. 30 at Tr. 21:17-22:4, 42:21-43:6.  Regardless, this article would not have met Article 8's "knowledge" requirement even if Cullman had read it.  The plain meaning of the *Forbes'* reference to "brands [CT] is now developing" for export was that a Cohiba brand had *not* previously been placed on the market and was at most a mark that CT was considering using for export in the future.  That is not a trademark "use."  *Rolley, Inc.*, *supra*.  The reasonable reading of *Forbes's* reference to Cohiba as "Fidel's favorite brand" in the immediately following sentence likewise is that Cohiba was one of the brands that CT "is now developing" to sell in the future, and that Fidel Castro, head of Cuba and noted cigar smoker, favored that name among those that CT was considering for use in export cigars.  This understanding of the article would have been reinforced as Cullman and other GC executives had been informed by Oscar Boruchin, a sales manager, that he had learned that the "Cohiba" was only a cigar "given [to] diplomats and people that have business with the government." Fee Decl. ¶ 34, Ex. 31 at Tr. 16:25-18:15, 25:10-27:24; *see also* ¶ 29, Ex. 26 at Tr. 60:11-61:8; ¶ 30, Ex. 27 at Tr. 133:7-136:13, 138:12-23, 139:25-141:10, 167:22-168:8, 635:13-24; ¶ 31, Ex. 28 at Tr. 22:20-22; ¶ 32, Ex. 29 at Tr. 26:2-8; ¶ 33, Ex. 30 at Tr. 16:11-17:24.

The second article is a four-page article in the February 6, 1978 edition of the *New York* Magazine titled "Are Cuban Cigars Worth Smuggling."  CT0124.  The only reference to "Cohiba" is a personal anecdote by the author.  *Id*. at A13427.  He wrote that in 1974 he received two boxes of Cohiba cigars as a personal gift directly from Fidel Castro after interviewing him for thirteen hours.  *Id*.  According to the author, the "Cohiba specials" were a "*brand . . . used only for the 'maximo lider' himself and for his guests*."  *Id*. (emphasis added).  On its face, this would not give

GC knowledge of any *trademark* use of "Cohiba" in Cuba; to the contrary, the reader would have understood that "Cohiba" is a private reserve cigar which was given only as a gift and was not "on the market" in Cuba.

Lastly, CT also claimed that GC knew that Castro and other Cuban officials gave cigars called "Cohiba" as gifts to diplomats. However, such private gift-giving would not constitute a trademark "use," and therefore could not have put GC on notice that CT had protected legal rights in a Cohiba mark in Cuba.[17]

In short, the evidence does not prove that GC had knowledge, as of March 13, 1978, that CT was making a trademark "use" of a COHIBA mark, much less that it was aware that CT had rights in that mark in Cuba. CT therefore cannot prove a claim under Article 8 of the IAC and GC is entitled to judgment on Count I of the Amended Complaint.

## V.   CONCLUSION

For the reasons stated herein, the Court should declare that CT is not entitled to cancellation of GC's Registrations under an Article 8 IAC theory or any theory of law or, alternatively, grant judgment to GC on Count I of the Amended Complaint; and under either alternative, vacate the order of the TTAB cancelling those Registrations and certify its order and judgment to the USPTO.


Dated: January 16, 2024                              By:  */s/J. Kevin Fee*
                                                     J. Kevin Fee (VA Bar No. 88376)
                                                     Jane W. Wise (admitted *pro hac vice*)
                                                     DLA PIPER LLP (US)
                                                     500 Eighth Street

---

[17] Where a merchant already trading under an established trademark gives away articles that bear the mark to promote the commercial sale of the article (such as free samples) or to spread awareness of the mark and the goods or services it is normally associated with (such as golf balls imprinted with the trademark), that may constitute a trademark use. MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed.) § 19:118. However, there appears to be no caselaw extending this concept to pure private gifts, and *a fortiori*, it cannot apply to "gifts of state" given by a government to foreign diplomats and dignitaries.

Washington, DC 20004
Tel. 202.799.4441
kevin.fee@us.dlapiper.com
jane.wise@us.dlapiper.com

Andrew L. Deutsch (admitted *pro hac vice*)
Law Offices of Andrew L. Deutsch
6540 Olympic Place
Los Angeles, CA 90035
Tel: 917.861.3315
adeutsch221@gmail.com

Stanley J. Panikowski III (admitted *pro hac vice*)
DLA Piper LLP (US)
401 B Street
San Diego, CA 92101
Tel. 619.699.2700
stanley.panikowski@us.dlapiper.com

Joshua Schwartzman (admitted *pro hac vice*)
DLA Piper LLP (US)
1251 Avenue of the Americas, Fl. 27
New York, NY 10020
Tel. 212.336.4671
joshua.schwartzman@us.dlapiper.com

Oscar M. Orozco-Botello (admitted *pro hac vice*)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067
Tel. 310.595.3077
Oscar.orozco-botello@us.dlapiper.com

***Attorneys for Plaintiff General Cigar Company, Inc.***

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 16th day of January, 2024, a true and accurate copy of the

foregoing was electronically filed with the Clerk of the Court for the Eastern District of Virginia,

using the CM/ECF system, which will send a notification of such filing to all counsel of record.

Dated: January 16, 2024

By: */s/ J. Kevin Fee*
J. Kevin Fee (VA Bar No. 88376)
DLA PIPER LLP (US)
500 Eighth Street
Washington, DC 20004
Tel. 202.799.4441
kevin.fee@us.dlapiper.com

***Attorney for Plaintiff General Cigar Company, Inc.***

32