IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| GENERAL CIGAR COMPANY,<br>Plaintiff,<br>v.<br>EMPRESA CUBANA DEL TABACO, d/b/a CUBATABACO,<br>Defendant. | ) | 1:23-cv-227 (LMB/WEF) |

CORRECTED[1] MEMORANDUM OPINION

Before the Court for disposition on the written record is an action under 15 U.S.C. § 1071 brought by General Cigar Company ("plaintiff" or "General Cigar") seeking to reverse the decision of the Trademark Trial and Appeal Board ("TTAB") and vacate the TTAB's cancellation order of General Cigar's typeset and stylized Cohiba marks that had been registered with the U.S. Patent and Trademark Office ("USPTO"). Defendant Empresa Cubano del Tabaco d/b/a Cubatabaco ("defendant" or "Cubatabaco") seeks a dismissal of this civil action and an entry of judgment in its favor.[2] Because the Court finds that Cubatabaco has established that the TTAB's cancellation of General Cigar's registrations was proper under Article 8 of the Inter-American Convention ("IAC") and that the Cuban Assets Control Regulations do not prohibit such cancellation, General Cigar's requested relief will be denied and its Amended Complaint will be dismissed with prejudice.

[1] Page 19 has been replaced.

[2] The parties filed a Joint Motion Requesting Disposition of Action on a Written Record [Dkt. No. 59], which the Court granted. Although no motion to dismiss has been filed, dismissal with prejudice is the relief that Cubtabaco is seeking.

# I. BACKGROUND

This civil action is the culmination of nearly three decades of litigation in federal court and administrative tribunals between General Cigar, a Delaware corporation, and Cubatabaco, a Cuban state-owned company, both of which manufacture and distribute cigars using the Cohiba mark. The procedural history of this action is extensive, going back to January 1997, when Cubatabaco filed an application to register its "Cohiba" mark with the USPTO under Section 44(e) of the Lanham Act, 15 U.S.C. § 1126(e). Cubatabaco applied for trademark protection pursuant to a general license under § 515.527(a)(1) of the Cuban Assets Control Regulations, 31 C.F.R. Part 15 ("CACR"), which expressly authorizes Cuban entities to engage in transactions . . . "related to the registration and renewal" of trademarks before the USPTO. Cubatabaco also filed a petition to cancel General Cigar's trademark registrations, which the USPTO cited as grounds for refusing to register Cubatabaco's mark on the basis of its creating a likelihood of confusion with General Cigar's registered marks.

In October 1997, Cubatabaco sought and obtained a special license from the Department of Treasury's Office of Foreign Assets Control ("OFAC") to "initiate legal proceedings in the U.S. courts and to otherwise pursue their judicial remedies with respect to claims to the COHIBA trademark." [Dkt. No. 1-1] at 11. The following month, Cubatabaco sued General Cigar in the U.S. District Court for the Southern District of New York for trademark infringement and, among other things, to enjoin General Cigar from using its Cohiba marks. At the same time, Cubatabaco requested that the TTAB suspend the cancellation proceedings pending the outcome of the district court action, which the TTAB did.

A. The SDNY Action

In March 2004, following a bench trial, the district court permanently enjoined General Cigar's use of the Cohiba mark and cancelled its registrations after finding that Cubatabaco had acquired ownership of the mark under the famous marks doctrine. Empresa Cubana del Tabaco v. Culbro Corp., No. 97–8399, 2004 WL 925647, at *2–3 (S.D.N.Y. Apr. 30, 2004). General Cigar appealed.

On appeal, the Second Circuit reversed the district court's finding of infringement and vacated the cancellation of General Cigar's registrations and the injunctive relief granted by the district court. Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d 462, 472 (2d Cir. 2005). The Second Circuit held that the district court could not grant injunctive relief to Cubatabaco because such remedy would involve a prohibited transfer of property under CACR § 515.201 given that Cubatabaco would acquire ownership of the underlying Cohiba mark. Id. at 474–76.

After the Second Circuit issued its mandate, General Cigar moved the district court for orders dismissing Cubatabaco's cancellation petition and mandating denial of its registration application before the TTAB. Empresa Cubana Del Tabaco v. Culbro Corp., 478 F. Supp. 2d 513, 517 (S.D.N.Y. 2007). The district court denied the motion as untimely and stated in dicta that the TTAB should decide the preclusive effect of the Second Circuit's decision, if any, leaving open the question of whether cancellation by the TTAB—rather than injunctive relief granted by a federal court—would constitute a prohibited transfer under the CACR. Id. at 21–22 ("The Federal Circuit, which reviews decisions by the PTO/TTAB, has cautioned against applying a preclusive effect to federal court decisions in relation to trademark cancellation and opposition proceedings.").

General Cigar appealed the district court's denial of its motion. The Second Circuit affirmed, finding that it was not an abuse of discretion for the district court "to let [the TTAB] decide . . . what preclusive effect should be given to our decision." Empresa Cubana del Tabaco v. Culbro Corp., 541 F.3d 476, 479 (2d Cir. 2008). The Second Circuit did not address whether the TTAB's cancellation of General Cigar's registrations would constitute a prohibited transfer under the CACR. Id. at 477–79.

B. The TTAB Proceedings

When the TTAB proceedings resumed in June 2011, Cubatabaco filed its amended petition. General Cigar answered and moved for summary judgment on grounds that Cubatabaco lacked standing and that principles of issue and claim preclusion barred the amended petition. The TTAB agreed that Cubatabaco lacked standing and dismissed the amended petition with prejudice. Empresa Cubana del Tabaco v. General Cigar Co., Inc., 2013 WL 3168090, at *6–7 (T.T.A.B. Mar. 14, 2013). The TTAB explained that it did not need to reach the merits of the preclusion analysis because the standing issue was dispositive. Although it acknowledged that standing is generally conferred on a plaintiff whose pending application has been refused registration based on the defendant's blocking registration, it found that Cubatabaco lacked standing based on the Second Circuit's "binding, final federal court judgment determining that [Cubatabaco] was by law barred from acquiring any property interest in the mark COHIBA in the United States. . . ." Id. at 6.

Cubatabaco appealed the TTAB's decision to the Federal Circuit Court of Appeals, which vacated and remanded, finding that Cubatabaco had standing to raise a cause of action under the Lanham Act to seek cancellation of the registrations and that issue and claim preclusion did not bar its ability to seek such relief. Empresa Cubana Del Tabaco v. General

Cigar Co., Inc., 753 F.3d 1270, 1271 (Fed. Cir. 2014). Citing a Supreme Court decision that "clarified that issues sometimes discussed in terms of 'standing' are more appropriately viewed as interpretations of a statutory cause of action," the Federal Circuit examined whether Cubatabaco had a legitimate interest in cancelling the registrations of General Cigar's trademarks and a reasonable belief that the registrations were causing it damage. Id. at 1274 (citing Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 125–28 (2014)). The Federal Circuit held that because General Cigar's registrations were blocking Cubatabaco's application, which it had a right to file under Section 44(e) of the Lanham Act, Cubatabaco had a real interest in cancelling the registrations and therefore had a cause of action to seek their cancellation. Id. at 1274–75.

In reaching its decision, the Federal Circuit rejected General Cigar's argument that the Second Circuit's decision prohibited the TTAB from cancelling General Cigar's registrations because that would result in a prohibited property transfer under the CACR. The Federal Circuit explained that the Second Circuit never addressed that specific issue. "Rather, the Second Circuit decided only that the CACR limited the federal court's authority to grant Cubatabaco injunctive relief. . . ." Id. at 1274–75 (citing Empresa, 399 F.3d at 476)).

The Federal Circuit also rejected General Cigar's argument that issue or claim preclusion barred Cubatabaco's Amended Petition. Id. at 1276. Finding that the TTAB never addressed or issued a judgment on the merits of Cubatabaco's cancellation claims and that the transactional facts involved in the district court's decision differed from those in the cancellation proceedings before the TTAB, the Federal Circuit held that neither issue nor claim preclusion applied. Id. at 1276–78.

On remand, the TTAB found that Cubatabaco proved by a preponderance of the evidence all required elements of its claim for cancellation of General Cigar's registrations under Article 8 of the IAC. That is, the TTAB found that Cubatabaco met its burden to show that (1) it enjoyed legal protection of its mark in Cuba before the date of General Cigar's registration applications in the United States, and (2) General Cigar had knowledge of Cubatabaco's use or employment of its mark in Cuba before it applied to register its marks. [Dkt. No. 1-1] at 27–32. The TTAB further found that issue preclusion did not bar Cubatabaco's Article 8 claim because the Federal Circuit held that it did not. Id. at 37 (citing Engle Indus., Inc. v. Lockformer Co., 166 F.3d 1379 (Fed. Cir. 1999)). The TTAB also rejected General Cigar's claim that the law of the case did not apply because the Supreme Court's decision in B&B Hardware, Inc. v. Hargis Indus., Inc., 575 U.S. 138 (2015) had since changed the law governing issue preclusion and "established a new test of identity between issues, under which the court is to take a 'broad view of what an "issue" is.'" Id. at 40. Contrary to General Cigar's assertion, the TTAB found that B&B Hardware actually "embraced" rather than changed the ordinary elements of issue preclusion, id. (citing In re GFC US LLC, 126 U.S.P.Q.2d 1214, 1218 (T.T.A.B. 2018)), and that it provided "no warrant for the TTAB to disregard the Federal Circuit's decision in contravention of established practice regarding mandates emanating from that court." Id. at 41.

The TTAB concluded that Article 8 of the IAC supported Cubatabaco's cancellation claim and that General Cigar failed to prove its affirmative defense of issue preclusion. Based on these findings, the TTAB granted Cubatabaco's amended petition to cancel General Cigar's registrations and ordered that they be cancelled in due course. Id. at 43.

General Cigar has appealed the TTAB's decision to this Court under 15 U.S.C. § 1071(b)(1) by filing a five-count Complaint seeking a de novo review, reversal, and vacatur of

the TTAB's cancellation order (Count I), declaratory judgments regarding certain of General Cigar's actions with respect to its registrations (Counts II–IV), and a declaratory judgment that General Cigar's second registration should not be cancelled under the Lanham Act (Count V). General Cigar later amended its Complaint to bring five additional claims for declaratory judgment that its registrations may not be cancelled for various reasons, including that the Cuban embargo regulations bar all grounds for cancellation of both registrations (Count X). The parties filed a Joint Motion Requesting Disposition of Action on a Written Record, which the Court granted. The Court limited the parties' briefing to Counts I and X because they are dispositive. That is, this case turns on whether General Cigar can establish that the TTAB erred in cancelling General Cigar's trademark registrations for the Cohiba mark under Article 8 of the IAC and whether the Cuban embargo regulations prohibit the cancellation of those registrations as improper property transfers.

## II. DISCUSSION

### A. Standard of Review

A trademark applicant "dissatisfied with the decision" of the USPTO has two remedies under the Lanham Act: either appeal to the United States Court of Appeals for the Federal Circuit, see 15 U.S.C. § 1071(a), or file a civil action in federal district court, see 15 U.S.C. § 1071(b). Under § 1071(a), an appeal to the Federal Circuit is taken "on the record" before the USPTO, id. § 1071(a)(4), and the USPTO's factual findings will be upheld if they are supported by "substantial evidence," see, e.g., Recot, Inc. v. Becton, 214 F.3d 1322, 1327 (Fed. Cir. 2000). In contrast, in a civil action under § 1071(b), "the district court reviews the record de novo and acts as the finder of fact." Swatch AG v. Beehive Wholesale, LLC, 739 F.3d 150, 155 (4th Cir. 2014). Upon the motion of a party, the district court must admit the USPTO record and give it

the "same effect as if originally taken and produced in the suit." § 1071(b)(3). In this civil action, the parties filed a joint motion to admit the record and have engaged in discovery and submitted additional evidence.

B. Evidentiary Objections

General Cigar has objected to Cubatabaco's Exhibit List and Testimonial Designations [Dkt. Nos. 98-1–2], including objections based on authentication (FRE 901, 902), foundation (FRE 602), relevancy (FRE 402, 403), and hearsay (FRE 801). General Cigar objected to more than 200 exhibits, often making multiple objections to each exhibit. It also objected to testimony in more than 80 depositions. Nearly all of General Cigar's objections amount to nothing more than boilerplate objections, simply citing to the Federal Rule of Evidence under which the objection is made but not including any specific legal argument.

Courts have found that boilerplate objections to evidence, without any legal argument or analysis to support them, do not warrant consideration. See Sandoval v. Cty. of San Diego, 985 F.3d 657, 666 (9th Cir. 2021) (district court abused its discretion by summarily sustaining all of defendant's boilerplate one-word objections for "relevance," "hearsay," and "foundation" to several pieces of evidence important to plaintiff's case even where plaintiff did not respond); Courtland Co., Inc. v. Union Carbide Corp., 2021 WL 2110876, at *3 (S.D. W. Va. May 25, 2021) ("unexplained, boilerplate objections to large swathes of evidence are also insufficient and do not warrant consideration"); see Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013) (court would not scrutinize objections that were "boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence"). The rationale for rejecting unexplained, generalized objections is simple—such objections leave the court "guessing at the arguments underlying them." Sandoval, 985

F.3d at 666. To the extent that General Cigar did not provide legal argument or analysis to support its objections to Cubatabaco's evidence, the Court declines to speculate as to what those specific arguments and analysis may be and has neither considered those objections nor rejected the exhibits or testimony to which such objections were directed.

C. Findings of Fact

In 1963, the U.S. government issued embargo regulations, which substantially prohibited commerce between the United States and Cuba. The prohibition is commonly known as the "Cuban Embargo." The regulations prohibit persons subject to U.S. jurisdiction from transporting, importing, or otherwise dealing in or engaging in any transaction with respect to merchandise that "(1) [i]s of Cuban origin; (2) [i]s or has been located in or transported from or through Cuba; or (3) [i]s made or derived in whole or in part of any article which is the growth, produce, or manufacture of Cuba." See 31 C.F.R. § 515.204. Cigars made with Cuban-grown tobacco fall within this ban, making it illegal for such cigars to be imported into or sold in the United States.

In September 1969, Cubatabaco, a Cuban-owned state enterprise,[2] applied in Cuba to register a mixed trademark with a graphic design of what appears to be a decorative folding fan and the word "Cohiba" beneath it. The registration for that mark, Reg. No. 110,044, issued on May 31, 1972, and was valid for 15 years ("mixed mark"). [Dkt. No. 110] at 4. Cubatabaco's mixed mark covered use of the mark for "raw tobacco, tobacco elaborated for smoking, chewing, or sniffing, and cigarettes." Id. at 5.

[2] Although Cubatabaco is a Cuban-owned state enterprise, Cuban Law No. 1191 of 1966 established it as a separate commercial entity from the Cuban government with its own legal personality, patrimony, and administration. [Dkt. No. 109-50] at 146.





Reg. No. 110,044

In March 1972, Cubatabaco applied to register the word mark "COHIBA" in block capital letters in Cuba. The registration for that mark, Reg. No. 111,059, issued on July 1, 1980, and is still valid and in effect today ("word mark"). Id. at 7–8. Cubatabaco's word mark covers use of the mark for "raw tobacco, tobacco elaborated for smoking, chewing, or sniffing, and cigarettes." Id. at 8.

Cubatabaco began selling Cohiba cigars in Cuba in 1970 and continued to do so exclusively until 1982, when it began exporting them to other countries. It sold at least 3.1 million Cohiba cigars in Cuba from 1970 until March 13, 1978. This estimate is based on annual sales, which increased over that period. In 1970, Cubatabaco sold between 350,000 to 370,000 Cohiba cigars; by 1975, the annual number of sales had increased by approximately 100,000; and by 1980, it had increased by an additional 100,000. [Dkt. No. 109-14] at 14. Cubatabaco sold Cohiba cigars either directly or indirectly: (1) to the Cuban Council of State, which gave them as protocol gifts to diplomats and foreign dignitaries; (2) at Havana's principal hotels; (3) at upscale restaurants; and (4) at two retail stores for foreign embassy staff, foreigners working in Cuba, Cubans with hard currency from traveling abroad, and others with permission. [Dkt. No. 109-14] at 15-16; [Dkt. No. 109-15] at 14-15; [Dkt. No. 109-21] at 13-14, 18, 116; [Dkt. No. 109-23] at 16-18; [Dkt. No. 109-24] at 11-12. Of the Cohiba cigars that Cubatabaco sold to the Counsel of State, approximately 240,000 were given as gifts annually. [Dkt. No. 109-14] at 18-20; [Dkt. No. 109-15] at 14. Both the Cuban Mission to the United Nations in New York and the Cuban

Interests Section in Washington, D.C. distributed Cohiba cigars at receptions and Cuba's president, Fidel Castro, regularly took numerous boxes of Cohiba cigars with him when he traveled abroad to give as gifts. [Dkt. No. 109-20] at 98-102; [Dkt. No. 109-14] at 66. In fact, Cohiba became known as "Castro's cigar." [Dkt. No. 109-24] at 13-15.

In the 1970s, General Cigar—one of the world's foremost manufacturers and marketers of handmade cigars—had an interest in acquiring Cuban cigar brands because U.S. consumers associated them with premium cigars. [Dkt. No. 109-30] ¶15. In 1976, General Cigar purchased the U.S. rights to three pre-Revolution brands from the Cifuentes family, a manufacturer of Cuban cigars until Cuba's expropriation of the cigar industry in 1960. [Dkt. No. 109-30] ¶15; [Dkt. No. 109-31] at 5-9. After acquiring the Cifuentes brands, General Cigar began exploring Cuban names for potential marks to use with its premium cigar business. [Dkt. No. 109-31] at 10. One of the names it identified was "Cohiba." General Cigar executives had heard that Cohiba was Castro's cigar and that Castro and other Cuban government officials gave Cohiba cigars as gifts to visitors, including diplomats and dignitaries. [Dkt. No. 109-34] at 8; [Dkt. No. 109-30] ¶23-24.

The November 15, 1977 issue of Forbes magazine contained an article about the United States cigar industry entitled, Help From Havana? The U.S. Cigar Industry is in Bad Odor. Can Cuban Tobacco Help it Relight? [Dkt. No. 109-32] at 6. The article theorized about the potential impact on the domestic cigar industry if Cuba were allowed to sell its tobacco and cigars in the United States. It explained that because American firms held all United States trademarks for the historic Havana cigar houses, "state-owned CubaTobacco [sic] [would have to] sell here under unknown colors, and brands it is now developing contrast sharply with the aristocratic old lines." Id. Citing an example of a developing Cuban brand that did not enjoy the

same status as those of the classic Havana cigar houses, the article stated that "Fidel's favorite brand, Cohiba, is named for the old Indian custom of smoking through one's nose. . . . Hardly the way to lure an American businessman to pay $2 for a cigar." Id. Edgar M. Cullman, Sr., General Cigar's chair and principal owner, had a subscription to Forbes magazine and, although he did not specifically recall reading the Forbes article, he testified he "must have" read it because it was about the cigar industry. [Dkt. No. 109-33] at 8-10.[3] Similarly, his son, Edgar M. Cullman, Jr., who was General Cigar's executive vice president in charge of marketing, did not have an independent recollection of whether any of General Cigar's executives had read the Forbes article, but stated that he believed "that articles of interest would have come to the attention of management at General Cigar relative to the cigar industry" because there were so few such articles at the time. [Dkt. No. 109-30] ¶5; [Dkt. No. 109-34] at 21–22.

Charles H. Sparkes, who was responsible for General Cigar's trademark registrations and maintenance, testified that, in December 1977, approximately one month after the Forbes article was published, Bob Lilienfeld, General Cigar's vice president for premium domestic cigar sales, provided him with a handwritten list of three possible trademark names.

COHIBA — brand in Cuba (Castro's brand cigars) — 12-18-77 from E. Lilienfeld for registration

CIENFUEGOS
VIÑALES — E.M.C. suggestions

[3] All references to "testimony" refer to deposition testimony made under the penalty of perjury that was taken during discovery in the SDNY Action, the TTAB Proceedings, and in this civil action.

[Dkt. No. 109-36] at 4; [Dkt. No. 109-37] at 56–57. Next to the three possible names, was the notation "E.M.C. suggestions," id., referring to Edgar Cullman, Jr., and at the top of the list was "Cohiba." Sparkes explained that when Lilienfeld gave him the list, he asked Sparkes to "check the mark Cohiba." [Dkt. No. 109-37] at 12. Next to "Cohiba," Sparkes wrote "Castro's brand cigars" and someone else wrote "sold in Cuba" and "brand in Cuba." [Dkt. No. 109-37] at 18. Although Sparkes testified that he did not recognize the other person's handwriting, he explained how he carefully maintained General Cigar's trademark files of which he was the custodian from 1963 to 1988. [Dkt. No. 109-37] at 45–52. He also testified that he was the only person who placed documents in the files; that he kept them in a locked filing cabinet in his office; and if someone needed access to the trademark files, they had to go through him. Id. at 48, 50.[4]

After Sparkes checked for trademarks, he drafted a typewritten memo to a file labeled as the "Cohiba trademark file" to document the results of his trademark search:

[4] General Cigar objects to Cubatabaco Trial Exhibits CT332 [Dkt. No. 109-35] and CT333 [Dkt. No. 109-36] on the basis that they lack foundation and contain hearsay; however, Sparkes testified that these documents came from General Cigar's trademark files, which were kept in the ordinary course of General Cigar's business. [Dkt. No. 109-37] at 45–52. "Reports and documents prepared in the ordinary course of business are generally presumed to be reliable and trustworthy for two reasons: 'First, businesses depend on such records to conduct their own affairs; accordingly, the employees who generate them have a strong motive to be accurate and none to be deceitful. Second, routine and habitual patterns of creation lend reliability to business records.'" Certain Underwriters at Lloyd's, London v. Sinkovich, 232 F.3d 200, 204–05 (4th Cir. 2000) (quoting United States v. Blackburn, 992 F.2d 666, 670 (7th Cir.1993)). General Cigar argues that documents in its own trademark files are unreliable because Sparkes had no independent recollection of who made certain notations on those documents more than 20 years after the fact. The Court finds such argument unavailing. Sparkes' careful maintenance of General Cigar's trademark files weighs heavily in favor of finding these documents reliable and trustworthy. The TTAB also relied on these documents in finding that General Cigar had knowledge of Cubatabaco's use under Article 8(b) of the IAC.

12-12-77
CHS




Bob received list set-forth below from EMC,Jr. for possible trademarks which would be used a year or so from now from Dominican Republic.

COHIBA
CIENFUEGOS
VINALES } presently used in Cuba Castro's cigar brand
EMC Jr. suggestions

LA FLOR DE J. CAÑO

Told him the first three seemed clear as of March of this year according to Trademark Renewal Register for 1977, but we would need an outside search to up-date same.

If clear, I told him that a first use would have to be made and regular shipments continued for registration purposes.

***

Edgar Cullman, Jr. does not particularly want a TMA search. He says that he is satisfied to have the use made on any cigar. If so, I could have a grain label made up for the first three marks and at least have a first use made of the marks in commerce.

[Dkt. No. 109-37] at 15–16; [Dkt. No. 109-35] at 4. Next to "presently used in Cuba," Sparkes added a handwritten note that Cohiba was "Castro's cigar brand." [Dkt. No. 109-37] at 16; [Dkt. No. 109-35] at 4. Sparkes testified that he could not recall who told him that Cohiba was being used in Cuba or that it was Castro's cigar brand,[5] but that he was certain it was someone at General Cigar. [Dkt. No. 109-37] at 16–17.

With regard to their availability as possible trademark names, Sparkes wrote that "Cohiba," "Cienfuegos," and "Vinales" appeared clear as of March 1977, but that General Cigar would need to do an "outside search" to update that information. [Dkt. No. 109-35] at 4. At the bottom of the memo, Sparkes described a conversation he had with Edgar Cullman, Jr. about the need to conduct a further search: "Edgar Cullen, Jr. does not particularly want a TMA search.

[5] It is not surprising that Sparkes could not recall who provided that information given that he testified in July 2000 about events that occurred in December 1977, more than 20 years earlier.

He says that he is satisfied to have the [first] use made on any cigar." Sparkes testified that Cullen, Jr. "was more interested in getting an immediate filing date than going through" with the trademark availability search.[6] [Dkt. No. 109-37] at 55.

On March 13, 1978, General Cigar applied to register its Cohiba word mark with the USPTO. The registration for that mark, U.S. Reg. No. 1,147,309, issued on February 17, 1981. On December 30, 1992, General Cigar applied to register a stylized version of the Cohiba mark with the USPTO, citing a first use in commerce date in another form dating back to February 1978. The registration for that mark, U.S. Reg. No. 1,898,273, issued on June 6, 1995.

On January 15, 1997, Cubatabaco applied to register its Cohiba word mark with the USPTO under Section 44(e) of the Lanham Act, 15 U.S.C. § 1126(e). It applied for trademark protection pursuant to a general license under § 515.527(a)(1) of the CACR, which expressly authorizes Cuban entities to engage in transactions "related to the registration and renewal" of trademarks before the USPTO. Cubatabaco also filed a petition to cancel General Cigar's Cohiba trademark registrations, which the USPTO cited as grounds for refusing registration to Cubatabaco because its mark created a likelihood of confusion.

D. Conclusions of Law

1. Article 8 of the IAC

In the early twentieth century, the United States participated in several International Conferences of American States with respect to trademarks that resulted in multi-lateral trademark conventions to which the United States became a party. The "General Inter-American Convention for Trade Mark and Commercial Protection," which is also known informally as the Pan American Convention, is one such convention. Its beneficiaries include (1) nationals of

---

[6] Given the context, the Court assumes that "TMA" is an acronym for "trademark availability."

contracting states, and (2) domiciled foreigners who own a manufacturing or commercial establishment or an agricultural development in any of the contracting states. General Inter-American Convention for Trade Mark and Commercial Protection art. 1, 46 Stat. 2907 (1929). Both the United States and Cuba are parties to the IAC.

The TTAB's seminal decision addressing the IAC is British-American Tobacco Co. v. Phillip Morris Inc., 55 U.S.P.Q.2d 1585 (T.T.A.B. 2000). In that case, the TTAB denied the respondent's motion to dismiss the cancellation petition, holding that it had the requisite jurisdiction to consider the petitioner's claim under the IAC's Article 8. Consistent with the U.S. Supreme Court's decision in Bacardi Corp. of Am. v. Domenech, 311 U.S. 150, 161 (1940), the TTAB found that the IAC is self-executing and, therefore, became U.S. law upon ratification, requiring no special implementing legislation. British-American Tobacco, 55 U.S.P.Q.2d at 1589. As such, the TTAB concluded that the IAC has the same force of law as a federal statute and provides remedies independent of the Lanham Act. Id.

The TTAB then considered whether Article 8 creates a cause of action within the TTAB's subject matter jurisdiction. Answering that question in the affirmative, the TTAB reasoned that because it is authorized under Section 17 of the Lanham Act, 15 U.S.C. § 1067, to determine the registrability of marks in the context of ex parte appeals and inter partes proceedings, it has jurisdiction to consider a claim under Article 8 of the IAC because that article expressly relates to the registrability of marks. Id. The TTAB also held that a finding of jurisdiction did not violate the doctrine of territoriality of trademark rights but rather constituted an exception to the doctrine explicitly created by the IAC. Id. ("Under the territoriality doctrine, a trademark is recognized as having a separate existence in each sovereign territory in which it is registered or legally recognized as a mark. However, there are recognized exceptions in U.S.

law to the doctrine of territoriality that are created by international treaties and conventions to which the United States is a party. . . . While not previously addressed by the [TTAB], Article 8 of the Pan American Convention requires such an exception to the doctrine of territoriality.") (internal citations omitted).

As relevant to this litigation, Article 8 provides that:

> When the owner of a mark seeks the registration or deposit of the mark in a Contracting State other than that of origin of the mark and such registration or deposit is refused because of the previous registration or deposit of an interfering mark, he shall have the right to apply for and obtain the cancellation or annulment of the interfering mark upon proving, in accordance with the legal procedure of the country in which cancellation is sought, the stipulations in Paragraph (a) and those of either Paragraph (b) or (c) below:
>
> (a) That he enjoyed legal protection for his mark in another of the Contracting States prior to the date of the application for the registration or deposit which he seeks to cancel; and
>
> (b) That the claimant of the interfering mark, the cancellation of which is sought, had knowledge of the use, employment, registration or deposit in any of the Contracting States of the mark for the specific goods to which said interfering mark is applied, prior to adoption and use thereof or prior to the filing of the application or deposit of the mark which is sought to be cancelled; . . .

AIC art. 8.

a. Legal Protection

The first question the Court must consider is whether Cubatabaco's Cohiba mark enjoyed legal protection in Cuba before General Cigar filed its registrations in the United States on March 13, 1978. Because Cuban law governs this issue, the Court must determine the applicable Cuban trademark law at that time.

Determination of a foreign country's law is an issue of law governed by Federal Rule of Civil Procedure 44.1. FED. R. CIV. P. 44.1; S.E.C. v. Dunlap, 253 F.3d 768, 777 (4th Cir. 2023). In determining foreign law, a court "may consider any relevant material or source." FED. R. CIV.

P. 44.1. "Most often, foreign law is established through 'written or oral expert testimony accompanied by extracts from foreign legal material.'" Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran, 772 F. Supp. 2d 218, 227 (D.D.C. 2011) (quoting Ganem v. Heckler, 746 F.2d 844, 854 (D.C. Cir. 1984)); Jonas v. Est. of Leven, 116 F. Supp. 3d 314, 330 (S.D.N.Y. 2015). "Such expert testimony is intended to aid the court in determining the content of the law, not in applying that law to the facts of the case." Id. at 227–28 (citing Minebea Co. v. Papst, 444 F. Supp. 2d 68, 182 (D.D.C. 2006)). A court may also rely upon its own research when considering foreign law. See Ackermann v. Levine, 788 F.2d 830, 838 n.7 (2d Cir.1986). In fact, "federal judges may reject even the uncontradicted conclusions of an expert witness and reach their own decisions on the basis of independent examination of foreign legal authorities." Curtis v. Beatrice Foods, Co., 481 F. Supp. 1275, 1285 (S.D.N.Y.), aff'd, 633 F.2d 203 (2d Cir. 1980).

Each party produced evidence from an expert. Although both experts agree that Decree-Law 805/1936 ("DL 805/36"), "Industrial Property Law," was the law governing trademark protection in Cuba on March 13, 1978,[7] they agree on little else. The Court finds that the opinions of Cubatabaco's expert, Professor Marta Milagro Moreno, have greater credibility and persuasive force than those of General Cigar's expert, Yanay B. Sanchez. Professor Moreno has significantly more experience in interpreting Cuban law and has spoken and published extensively on Cuban industrial property, including trademark law. Compare [Dkt. No. 109-49] (Moreno Curriculum Vitae) with [Dkt. No. 113-2] (Sanchez Curriculum Vitae). She is also the Intellectual Property Chair at the University of Havana and developed the industrial property course there. Although Sanchez was a Patent and Trademark Specialist for the Cuban Industrial

[7] DL 805/36 was effective from April 4, 1936, until May 14, 1983, when it was replaced by Decree Law 68.

Property Office for more than two-and-a-half years and served as a judge in the Cuban civil court system before that, her legal experience is not nearly as extensive as Professor Moreno's. More importantly, Professor Moreno's opinions make better legal and logical sense.

i. Mixed Marks Protect A Word Element Standing Alone

Under DL 805/36, Article 103, a trademark registration was valid for 15 years from its issuance. [Dkt. No. 113-20] at 25. Accordingly, Cubatabaco's trademark registration for its mixed mark, which was registered on May 31, 1972, was valid on March 13, 1978, when General Cigar applied to register its Cohiba word mark. General Cigar argues that Cubatabaco's mixed mark registration did not provide protection for the word element "Cohiba" standing alone and that, to protect the word, Cubatabaco had to obtain a separate word mark registration, which it did not do until July 1, 1980. To support its position, General Cigar cites Article 136 of DL 805/36, which provided in relevant part:

> Article 136.—Should the main distinctive elements of the trademark be changed substantially, the Secretaría de Comercio [Secretariat of Commerce], upon a prior complaint by a third party, shall require the trademark owner to apply for a new registration, without affecting the protection of the original trademark. In this case, and without prejudice to the civil and criminal liabilities that may derive therefrom, the Secretaría de Comercio shall . . . inform him that within the term of thirty days he must request the registration of the trademark in use. Should the owner continue using the varied trademark without applying for a new registration, his trademark certificate shall be cancelled.
>
> . . .
>
> For as long as the owner of the varied trademark has not requested the registration of his variation or submitted a declaration before the Secretaría de Comercio to the effect that he will refrain from using the varied trademark, he shall lack all of the rights in relation thereto that are recognized to trademark owners by this Decree-Law.

[Dkt. No. 109-7] at 11.

General Cigar's reliance on Article 136 is misplaced. Article 136 addresses the protection of a "varied trademark," where the mark owner uses its trademark "in a manner other than as registered"—that is, where the "main distinctive elements of the brand are substantially changed." Id. When an owner uses a varied trademark and a third party complains, then "the Secretariat of Commerce will require such owner to apply for a new registration [within 30 days], without affecting the protection of the original trademark." Id. If the owner continues to use the varied mark and does not timely apply for a new registration or submit a statement to the Secretariat of Commerce that it will refrain from using the varied mark, then the original trademark certificate will be cancelled. Id. Cancellation under Article 136 is not automatic and that statute explicitly requires a third-party complaint to trigger a chain of events that could result in the original mark's cancellation.

Article 136 does not apply here because Cubatabaco has not changed the main distinctive elements of its brand; rather, it has continued to use the word "Cohiba," which was a distinctive element of its mixed mark for cigars. Moreover, no third party ever complained to the Secretariat of Commerce that Cubatabaco was using its mixed mark in a manner other than as registered. Therefore, Cubatabaco was under no obligation to apply for a new registration and its original registration was not subject to cancellation for a failure to do so.

Having determined that Article 136 does not apply, the Court must consider whether Cubatabaco's mixed mark protected the word element "Cohiba" standing alone. Article 99(1) of DL 805/36 protected any distinctive element of a trademark—graphic or phonetic—and prohibited others from registering a trademark with a similar distinctive element that might lead to consumer error or confusion:

> Article 99.—The following may not be registered as trademarks: 1) Any distinctive element that, being identical or bearing a graphic or phonetic similarity or

> resemblance to another [distinctive element] that has already been registered as a trademark for the same product or bearing a graphic or phonetic similarity or resemblance or for another [product] that might lend itself to unfair competition, might lead consumers to error or confusion.

[Dkt. No. 109-7] at 6–7.

Under the clear and unambiguous language of Article 99(1), the word "Cohiba" was a distinctive element that was already protected in Cubatabaco's mixed mark for cigars. General Cigar's subsequent use of the identical word in its trademark for cigars would certainly lead to consumer error or confusion. This conclusion is supported by Cuban jurisprudence. As Professor Moreno explains, two Cuban Supreme Court judgments, Judgment No. 428, issued on April 9, 1954 ("Sándoz Judgment"), and Judgment No. 169, issued on June 16, 1933 ("Lechera Judgment"), as well as six Cuban trademark authority decisions that involved mixed marks, have found that the word element of the mark standing alone can be protected. These decisions found that the word portion of a mixed mark barred third parties from registering a similar word mark because such registration would lead to error or confusion with the word element of the mixed mark.

General Cigar counters this authority by arguing that, as a civil law country, Cuba recognizes the primacy of statutory law and does not adhere to stare decisis. In finding that Cubatabaco's mixed mark protected the word element "Cohiba" standing alone, the Court has not considered these decisions binding precedent but considers them as guides in applying and interpreting Cuban trademark law. See Branch of Citibank, N.A. v. De Navares, 74 F.4th 8, 17–19 (2d Cir. 2023) (on de novo review, the Second Circuit considered "sources of Argentinian decisional law" in determining Argentina's law even though it is a civil law country).

In the Sándoz Judgment, the Cuban Supreme Court affirmed a lower court's judgment, which denied a trademark registration for the word mark "Sanatos" because of its phonetic

resemblance to a registered mixed mark that contained the word "Sándoz." The Sándoz mixed mark consisted of "a triangle in which a letter S is inserted and in the lower part of the base . . . the lettering Sándoz appears." [Dkt. No. 109-55] at 3. Even though the "Sanatos" mark was only a word mark with "no graphic resemblance that could mislead or confuse consumers" with the Sándoz mixed mark, the Cuban Supreme Court affirmed the lower court's denial of the registration because the two marks "share[d] such a huge phonetic resemblance that they [would] undoubtedly lead to the confusion that [Article 99 of DL 805/36] intends to prevent." Id.

Similarly, in the Lechera Judgment, the Cuban Supreme Court affirmed the lower court's judgment granting a petition to revoke a word mark registration for "Compañía Lechera de Cuba" because it used the word "Lechera," which was contained in an earlier filed mixed mark registration. [Dkt. No. 109-56] at 3–4. In 1916, Nestle Anglo Swiss Condensed Milk Company ("Nestle") obtained a registration for a mixed mark that contained the words "La Lechera" and bore the image of a woman holding a pitcher on her head. In 1929, Compañía Lechera de Cuba, S.A. obtained a registration for the word mark "Compañía Lechera de Cuba." Nestle filed a petition to revoke the word mark registration, which was granted. The Cuban Supreme Court affirmed, finding that use of the word "Lechera" in the word mark would "undoubtedly lead[] to error and confusion" with Nestle's mixed mark, in violation of Article 5 (6) of the Royal Decree of August 21, 1884.[9] Id. at 4. The court explained that it reached its decision "notwithstanding that the first registered trademark also [bore] the image of a woman holding a pitcher on her

[9] Although this law preceded DL 805/36, it similarly prohibited "the adoption of a trademark of any distinctive element that, due to its similarity or resemblance to any other distinctive element for which the trademark had already been granted, might lead to confusion or error." [Dkt. No. 109-50] at 7 n.1. Accordingly, the Court finds it instructive.

head" because such fact did "not weaken the argument" that use of the word "Lecehra" would give rise to error and confusion. Id.

In addition to these two Cuban Supreme Court decisions, Cubatabaco's expert referred to six Cuban trademark decisions each finding that word marks interfered with the word elements in registered mixed marks in violation of Article 99(1). [Dkt. No. 109-50] at 8–10. All of these decisions are consistent with the general principle of intellectual property law that a trademark registration is intended to protect consumers from confusion as to the origins of products.

General Cigar's expert, Sanchez, attempts to distinguish the two Cuban Supreme Court opinions on the basis that "they dealt with mixed marks whose graphic or figurative elements did not dominate the entire composite." [Dkt. No. 109-52] at 6. With respect to the Sándoz Judgment, she opines that the word elements in both marks "were the most distinctive or relevant elements" because the court focused its analysis "solely on the supposed phonetic similarity between the words 'Sándoz' and 'Sanatos.'"[9] The Court finds this interpretation of the case flawed. Nowhere in its decision did the Cuban Supreme Court discuss the size or significance of the word element as compared to the graphic element in finding that the Sanatos word mark

[9] Despite her assertion that the graphic elements in these cases did not dominate the mixed marks, Sanchez then states that she cannot determine the proportion and prominence of the graphic element in relation to the word element in the Sándoz mixed mark because the judgment attached to Professor Moreno's report does not include a reproduction of the mixed mark. Although that is true, the reproduction is contained in multiple other exhibits to Cubatabaco's Opening Trial Brief, e.g., [Dkt. No. 109-50] at 38, [Dkt. No. 109-55] at 6, to which Sanchez had access:




The Court finds Sanchez's statement that she could not make such a determination disingenuous.

would cause consumer confusion. Rather, the confusion arose strictly from the word element, which the court found was protected.

With respect to the Lechera Judgment, Sanchez asserts that the court found that the word element "Lechera" was "the predominant element and focus of attention" in both the word and mixed marks. That assertion misreads the opinion. In explaining why the word mark "Compañía Lechera de Cuba" would cause confusion with Nestle's mixed mark that contained the word element "La Lechera," the Cuban Supreme Court stated:

> [T]he second trademark includes the word "Lechera," which, upon being enunciated, dissipates the sound of the other words, "Compañía" and "Cuba," given that it is the predominant element and the one on which the attention is focused. . . .

[Dkt. No. 109-56] at 4. The Cuban court did not find that the word element was the predominate element in both the word mark and the mixed mark; rather, the court found that the word "Lecehra" was the predominant word in the phrase "Compañía Lechera de Cuba." The court made no determination as to whether the graphic image or the text was the predominant element in the mixed mark because it was not necessary to its finding that the later filed word mark would "undoubtedly lead[] to error and confusion." In fact, the court stated that the law "prohibits the adoption as a trademark of any distinctive element that, due to its similarity or resemblance to any other distinctive element for which a trademark has already been granted, might lead to confusion or error. . . ." Id. (emphasis added).

Sanchez cites no legal authority for her opinion that a mixed mark protects the word element only if the word was "substantially more prominent in position, size, and appearance" than the graphic element. Based on the two Cuban Supreme Court decisions and the six Cuban trademark decisions that found that word marks interfered with the word elements in registered

mixed marks in violation of Article 99(1) of DL 805/36, as well as the general principle of law that a trademark registration is intended to protect consumers from confusion and error, the Court finds that on March 13, 1978, Cuban law provided legal protection for the word element "Cohiba" in Cubatabaco's mixed mark.

ii. Mark Lapses

General Cigar argues that even if Cubatabaco's registration of a mixed mark protected the word element "Cohiba," such protection had lapsed because Cubatabaco had ceased using the mark for more than three years before March 13, 1978. Cubatabaco counters that claim by arguing that the evidence shows that it used the mark on Cohiba cigars after March 13, 1975. Each party points to deposition testimony to support their version of the facts. The Court need not make credibility determinations because General Cigar's argument fails on the law.

Under Article 132 of DL 805/36, "[a] trademark shall lapse . . . [w]hen the party that obtained ownership of the trademark certificate does not make use thereof in Cuban territory during three consecutive years. . . ." [Dkt. No. 109-7] at 11. Contrary to General Cigar's argument that the word "shall" in the above-quoted language makes lapse automatic, Articles 133 and 138 make clear that a lapse must be declared by the Cuban Secretary of Commerce upon the request of a party having the right to apply for a trademark under DL 805/36. Id. These articles provide as follows:

> Article 133.—Lapsing of a trademark shall be declared by the Secretaría de Comercio; in the case provided under 1) above [at the end of its 15-year term], lapsing will be declared ex officio by that Secretaría, and in all of the other cases it will be declared upon request by a party.
>
> Article 138.—Requests to have a trademark declared lapsed will only be taken into account and processed if they are made by persons or groups having the right to apply for a trademark under this Decree-Law, who will be under the obligation to prove their capacity in that regard in their application.

Id. Cubatabaco's expert reviewed the Cuban trademark authority's records and found no declaration of lapse with respect to Cubatabaco's mixed mark. [Dkt. No. 109-50] at 17. And noticeably absent from General Cigar's expert and rebuttal reports on Cuban law is the opinion that the mark automatically lapsed for non-use. Accordingly, the Court finds that, as of March 13, 1978, Cubatabaco's mixed mark had not lapsed and was still in full force and effect.

b. General Cigar's Knowledge of Use

The Court must next determine whether on March 13, 1978, when General Cigar applied to register its "Cohiba" word mark with the USPTO, General Cigar knew of Cubatabaco's use of the mixed mark for "raw tobacco, tobacco elaborated for smoking, chewing, or sniffing, and cigarettes" in Cuba. General Cigar claims that it had no such knowledge and that, even if it did have knowledge, Cubatabaco was not "using" the mark as required by Article 8 of the IAC because it was not making trademark use of the mark.

With respect to evidence of General Cigar's knowledge that Cubatabaco was using the Cohiba mark for cigars in Cuba, Cubatabaco relies on the cigar industry article in the November 15, 1977 issue of Forbes magazine that stated that Cubatabaco's Cohiba cigar was "Fidel's favorite brand." Although General Cigar argues that it is unclear whether General Cigar executives had read the Forbes article because no one had an independent recollection of doing so, as previously explained, the Court has found that Cullen, Sr., General Cigar's chair and principal owner, admitted that he "must have read it" and Cullen, Jr., the executive vice president for marketing, also acknowledged that persons in General Cigar's management would have read it. Moreover, the Court has found that approximately one month after the Forbes article was published, in December 1977, General Cigar began vetting several names for potential trademarks for its premium cigar line, one of which was Cohiba. Two documents in its Cohiba

trademark file, both dated December 1977, show that General Cigar knew that Cohiba was a Cuban cigar brand sold in Cuba. Both documents also contain handwritten notes that Cohiba was "Castro's cigar brand," as was mentioned in the Forbes article. Further, the typewritten memo that Sparkes created for the Cohiba trademark file explained that Edgar Cullen, Jr. was not particularly interested in doing a further trademark availability search. When he testified about that memo, Sparkes stated that Cullen, Jr. was more interested in a "getting an immediate filing date." Three months later, on March 13, 1978, General Cigar filed an application to register its two Cohiba marks. These facts establish that, on March 13, 1978, General Cigar was aware of Cubatabaco's use of "Cohiba" for cigars in Cuba.

General Cigar argues that knowledge of "use" under Article 8 means knowledge of "trademark use," which requires placing the marked goods into the commercial market. General Cigar contends that, even if it did have knowledge of Cubatabaco's Cohiba cigars, it only knew that Cubatabaco was giving them to Cuban government officials, who then gifted them to diplomats and dignitaries; consequently, it did not have knowledge that Cubatabaco was making the kind of commercial use that would amount to trademark use of the mark. To support its view of "use," General Cigar argues that because the U.S. delegation was the primary driver of the IAC, "use" should be defined as that term is understood in U.S. trademark law. Additionally, General Cigar's expert, Sanchez, opines without referring to any Cuban statute or case law that the use of a mark on items that are given as gifts does not qualify as "actual and effective use" under Cuban law.[10] [Dkt. No. 109-51] at 18.

[10] The Court need not consider Sanchez's opinion about "use" under Cuban law because the pertinent inquiry here is what constitutes "use" under Article 8(b) of the IAC.

Although the U.S. delegation was involved in drafting the IAC,[11] it does not necessarily follow that the IAC's terms should be interpreted according to U.S. law. General Cigar has not cited any authority for its proposition that "use" in Article 8(b) is limited to the U.S. understanding of trademark use. In fact, General Cigar concedes that there is no "legislative history for the IAC" to support various interpretations of the terms "use, employment, registration or deposit." [Dkt. No. 122] at 24 ("CT's attempt to conjure a non-existent legislative history [for its interpretation of "employment"] is . . . unavailing."). Interestingly, Professor Christine Haight Farley, whom General Cigar cites in support of its interpretation of "use," [Dkt. No. 111] at 31, has written that the IAC "provides some of the strongest trademark protections seen in any international agreement to date"[12] and that "articles [7 and 8] advance rights that are anathema to the fundamental principle of U.S. trademark law."[13] Accordingly, the Court does not find General Cigar's argument or interpretation of "use" persuasive.

It is well-established that courts "should construe [a] treaty liberally to give effect to the purpose which animates it. Even where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging rights which may be claimed under it, the more liberal interpretation is to be preferred." Bacardi Corp. of Am. v. Domenech, 311 U.S. 150, 226 (1940) (citations omitted). In interpreting the IAC, the U.S. Supreme Court has stated:

> [T]the clear purpose of the treaty is to protect the foreign trade marks which fall within the treaty's purview. The basic condition of that protection, as set forth in

---

[11] See Christine Haight Farley, The Pan-American Trademark Convention of 1929: A Bold Vision of Extraterritorial Meets Current Realities, in TRADEMARK PROTECTING AND TERRITORIALITY: CHALLENGES IN THE GLOBAL ECONOMY 58, 62 (Irene Calboli & Edward Lee, eds., 2014) ("Farley").

[12] Christine Haight Farley, The Lost Unfair Competition Law, 110 TRADEMARK REP. 739, 768 (July–Aug. 2020).

[13] See Farley at 66–67.

> Article 3, is that the mark shall have been 'duly registered or legally protected' in one of the Contracting States.

Bacardi, 311 U.S. at 163.

Although the IAC provides broad protection for trademarks, it also recognizes the need to protect innocent parties who file registration applications and does so by including a knowledge requirement in Article 8(b). See Farley at 66. But to require knowledge of a specific type of use, as General Cigar urges, appears contrary to the IAC's intent. General Cigar does not cite any authority for its argument that the junior user must have knowledge that the senior user used the mark on products sold in the Contracting State where the mark was registered. The very fact that the junior user has any knowledge of the mark's use—be it on goods given as diplomatic gifts or sold in commercial markets—indicates that the senior user made public and open use of the mark and serves to put the junior user on notice. If the senior user's use of the mark were merely private, internal, or for business development purposes only, then a person or business in a foreign country would have no way of knowing of that use. By having general knowledge of the mark's use, the junior user cannot claim that he was an innocent filer.

Here, it does not matter whether General Cigar knew that Cubatabaco was selling Cohiba cigars in Cuban hotels and restaurants or to the Cuban government, which in turn gave them to diplomats and dignitaries. The evidence in the record, including the Forbes article, the two notes from General Cigar's trademark files, and Sparkes' testimony, is more than sufficient evidence to conclude that General Cigar was aware that the Cohiba mark was "presently used in Cuba," for "a brand in Cuba," which was known as "Castro's cigar brand" and was "sold in Cuba." [Dkt. No. 109-35] at 4; [Dkt. No. 109-36] at 4. That these statements appear in General Cigar's records a month after the Forbes article was published clearly show that General Cigar had

knowledge that Cubatabaco was using the Cohiba mark on cigars in Cuba within the meaning of the IAC's Article 8(b).

Because Cubatabaco has proven by a preponderance of the evidence that, as of March 13, 1978, the date that General Cigar registered its Cohiba word mark, Cubatabaco's mixed mark provided legal protection to the word element "Cohiba" and General Cigar had knowledge of Cubatabaco's use of "Cohiba" for cigars in Cuba, the Court finds that the TTAB validly cancelled General Cigar's registrations under Article 8 of the IAC.

2. Cuban Assets Control Regulations

Although the Court has found that the TTAB validly cancelled General Cigar's marks under IAC Article 8, it must nonetheless determine whether the CACR prohibit such cancellation. The CACR, which are currently found at 31 C.F.R. §§ 515.101–515.901 (2022), were codified in 1996, when Congress enacted the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act ("LIBERTAD Act"), Pub. L. No. 104–114, 110 Stat. 785 (1996). See 22 U.S.C. § 6032(h). These regulations prohibit transactions that involve "property in which [Cuba], or any national thereof, has at any time . . . had any interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 515.201(b)(1). Prohibited transactions include "all dealings in . . . transfers, withdrawals, or exportations of, any property. . . or evidences of ownership of property by any person subject to the jurisdiction of the United States." "Property" and "property interest" include trademarks, id. §515.311, and "transfer" of property is defined in the broadest possible terms: "[a]ny actual or purported act or transaction . . . the purpose, intent, or effect of which is to create, surrender, release, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property. . . ." Id. § 515.310.

The CACR has exceptions. Relevant to this litigation is the provision that provides a general or specific license that allows Cuban entities to engage in certain otherwise prohibited transactions. See 31 C.F.R. §§ 515.27(a)(1), 515.318. Section 515.527(a)(1) contains a "general license" permitting a Cuban entity to engage in transactions "related to the registration and renewal" of trademarks before the USPTO. § 515.527(a)(1). A specific license, which authorizes a Cuban entity to engage in a specific transaction that would otherwise be prohibited by the CACR, must be requested from OFAC. 31 C.F.R § 515.318.

When the Federal Circuit reviewed this dispute, it found that the CACR's general license permitted Cubatabaco to apply to register its Cohiba mark and seek cancellation of General Cigar's marks because those marks blocked its application. Empresa, 753 F.3d at 1275. In reaching that conclusion, the Federal Circuit rejected General Cigar's argument that the Second Circuit's decision prohibited Cubatabaco's claims before the TTAB, explaining:

> The Second Circuit's decision held only that the district court could not enjoin General Cigar from use of the COHIBA mark under its interpretation of the CACR's prohibition against transfers of property. It specifically does not address Cubatabaco's ability to seek cancellation of the Registrations before the Board, which the CACR authorizes by general license.

Id.

General Cigar argues that the Federal Circuit's decision is irrelevant because it was limited to proceedings before the TTAB. But those proceedings are what is at issue in this civil action, in which General Cigar is asking the Court to reverse the TTAB's decision and vacate its order cancelling General Cigar's Cohiba registrations. [Dkt. No. 27] at 50. Contrary to General Cigar's assertion, this Court is not deciding whether it can cancel the registrations; rather, the issue is whether the TTAB properly cancelled General Cigar's registrations. Based on the Federal Circuit's decision, which this Court has already determined is law of the case, [Dkt. No.

47] at 18, the Court finds that the CACR do not prohibit the TTAB from cancelling General Cigar's registrations because the TTAB's cancellation of General Cigar's registrations does not constitute a prohibited transfer of property under the CACR; rather, it constitutes a lawful decision under the CACR's general license provision, § 515.527(a)(1).[14]

III. CONCLUSION

For these reasons, General Cigar's Amended Complaint [Dkt. No. 27] will be dismissed with prejudice by an Order to be issued with this Memorandum Opinion.

Entered this 7th day of May, 2025.

Alexandria, Virginia

/s/ LMB

Leonie M. Brinkema
United States District Judge

[14] Left unanswered, and not at issue in this litigation, is whether granting Cubatabaco's application to register the Cohiba mark would violate the CACR.